JUDGE COTE

10 CV 5063

## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF NEW YORK

SALON FAD,
CINDY'S HAIR SALON,
CHU'S HAIR SALON,
CARASTRO & COMPANY HAIR
DESIGN, EnV STUDIO SALON LLC,
NEW MILLENNIUM SALONS L.L.C.
D/B/A SALON 2000, SALON 1325, SASSY
& CLASSY SALON AND SPA,
THE WORKS HAIR AND NAIL SALON,
THE VERANDA SALON AND SPA, INC.,
VICTORIA'S SALON AND SPA,
WILLIAM DAVID SALON

                       **Plaintiffs,**

     — v. —

L'ORÉAL USA, INC.,
CONAIR CORPORATION,
FAROUK SYSTEMS, INC.,
JOHN PAUL MITCHELL SYSTEMS,
SEXY HAIR CONCEPTS, LLC,
THE PROCTER AND GAMBLE
COMPANY,
TIGI LINEA, LP

                       **Defendants.**

Case No. _____

CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED



RECEIVED
JUL – 1 2010
U.S.D.C. S.D. N.Y.
CASHIERS

### Nature of the Case

1.      Plaintiffs bring this action on their own behalf, and on behalf of a class of beauty salons, against the Defendants, who are manufacturers of professional hair care products, for false advertising pursuant to the Lanham Act. Plaintiffs request a trial by jury of their claims.

**The Parties**

2.      Plaintiff, Salon FAD is a nonprofit organization formed in 2008 to advance the interests of salons in the face of the large-scale diversion of professional products into non-professional retail channels. FAD stands for "Fight Against Diversion" and Salon FAD is the assignee of Bobbi Sordelet's and Daily Trends Salon's interest in this case.

3.      Plaintiff Cindy's Hair Salon is located at 3301 Peach Orchard Road, Augusta, Georgia 30906.

4.      Plaintiff Chu's Hair Salon is located at 5734 Windsor Drive, Columbus, Georgia 31909.

5.      Plaintiff Carastro's & Company Hair Design is located 3101 Roswell Road, Suite U, Marietta, Georgia 30062.

6.      Plaintiff EnV Studio Salon LLC is located at 880 Marietta Highway, Suite 620, Roswell, Georgia 30075.

7.      Plaintiff New Millennium Salons L.L.C. d/b/a Salon 2000, is located at 571 Hammock Road, Milledgeville, Georgia 31061.

8.      Plaintiff Salon 1325 is located at 1325 Rock Quary Road, Stockbridge, Georgia 30281.

9.      Plaintiff Sassy & Classy Salon & Spa is located at 102 East Clinton Street, Gray, Georgia 31032.

10.      Plaintiff The Works Hair and Nail Salon is located at 1482 Chestnut Bypass, Center, Alabama 35960.

11.     Plaintiff The Veranda Salon and Spa Inc. is located 1366 South Houston Lake Road, Kathleen, Georgia 31047.

12.     Plaintiff Victoria's Salon and Spa is located at 300 Hughes Road, #B, Madison, Alabama 35758.

13.     Plaintiff William David Salon is located at 3820 Peachtree Road NW, Suite 120, Buckhead, Georgia 30625.

14.     Plaintiffs (or their assignor) are professional salons or hair care professionals that offer their customers hair care products: (1) manufactured by the Defendants, and (2) labeled, marketed, or advertised by the Defendants as available only through professional salons.

15.     Defendant L'Oreal USA, Inc. ("L'Oreal") is a Delaware corporation. Its headquarters is located at 575 Fifth Avenue, New York, New York 10017. L'Oreal produces and advertises professional products under several brands, including Matrix, Redken, Pureology, Kerastase, and L'Oreal Professionnel.

16.     Defendant Conair Corporation ("Conair") is a Delaware corporation with its principal place of business at 1 Cummings Point Road, Stamford, Connecticut 06902. Conair produces and advertises professional products under the Rusk brand.

17.     Defendant Farouk Systems, Inc. ("Farouk"), is a Texas corporation with its principal place of business at 250 Pennbright, Houston, Texas 77090. Farouk produces and advertises professional products under the Chi and Biosilk brands.

18.     Defendant John Paul Mitchell Systems ("Paul Mitchell") is a California corporation with its principal place of business at 9701 Wilshire Boulevard, Suite 1205,

Beverly Hills, California 90212. Paul Mitchell produces and advertises professional products under the Paul Mitchell brand.

19.     Defendant Sexy Hair Concepts, L.L.C. ("Sexy Hair"), is a California corporation with its principal place of business at 9232 Eton Avenue, Chatsworth, California 91311. Sexy Hair produces and advertises professional products under the Sexy Hair brand.

20.     Defendant The Procter & Gamble Company ("P&G"), is an Ohio corporation with its principal place of business in Cincinnati, Ohio. P&G produces and advertises professional products under several brands, including Sebastian Professional.

21.     Defendant TIGI Linea, L.P., ("Tigi") is a Texas limited partnership with its principal place of business at 2311 Midway Road, Carrollton, Texas 75006. Tigi produces and advertises professional products using the Tigi name, including Bed Head, Catwalk, Rockaholic, S-factor, and B for Men.

### Jurisdiction and Venue

22.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1125(a).

23.     This Court has personal jurisdiction over Defendants because Defendants either reside in or engage in a continuous and systematic course of doing business in New York, or have substantial contacts with, transact and solicit business in, or derive substantial monetary benefit from their contacts with the State of New York.

24.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c) because Defendants conduct business in or have substantial contacts with or may be found in the Southern District of New York, and a substantial portion of the events at

issue have arisen in this district, and because Defendants are subject to personal jurisdiction within this district.

## Professional Hair Care Products

25.     The professional hair care industry in the United States generates more than $15 billion in annual sales. (U.S. Census Bureau, 2002 Economic Census; First Research Industry Profile, Hair Care Services, 10/27/08).  The industry is highly fragmented, with more than 70,000 professional salons nationwide, and many more licensed cosmetologists. (Id.) Salons typically sell their customers not only hair cutting, shampooing, coloring, and styling services, but also sell hair care products, such as shampoos and conditioners. (First Research, supra.)

26.     Sales of hair care products are an important revenue source for salons and typically provide 5 to 40 percent of salon revenues.  Salon profit margins are usually higher for product sales than for cutting and styling services. (Id.)

27.     Hair care products fall into two broad categories: (1) mass market products that are marketed and sold through chain drug stores, grocery stores, department stores, and mass retailers such as Target, CVS, Walgreen's, and Kroger and (2) professional or salon-only products that are intended for sale only through professional hair salons.

28.     The Defendants publicly identify themselves as manufacturers of hair products that serve the professional salon industry and whose products are only available and sold in professional salons.

29.     Defendants' false advertising of their professional, salon-only products is the focus of this complaint.

**The Economic Relationship Between Defendants and Salons**

30.    The economic interests of salons and the Defendants are closely intertwined.  The president of L'Oreal's Professional Products Division described the difference between L'Oreal's professional division and the company's consumer division in an interview in the July 2007 edition of *American Salon* magazine:

> We've been at the service of hairdressers since 1907; we have a consumer business that sells to the mass market.  We don't sell to them . . . because it's not our *raison d'être*.  As a company, we have a huge amount of respect for all of our major retail partners, but it's not the role of the professional business to sell to the mass-market.  *The role of the professional business is to be at the service of professional stylists and salons.*

(emphasis added throughout Complaint, unless otherwise noted).

31.    Regarding its Professional Products Division, L'Oreal's 2009 Annual Report states: "Professional Products.  The privileged partner of hairdressers, the Professional Products Division distributes its products in hair salons all over the world.  It supports them in every facet of their development, and offers them high level education. Its portfolio of differentiated brands meets the needs of all kinds of salons."

32.    The Defendants use salons to create demand for their professional products.  Regarding its Matrix brand of professional products, L'Oreal explained the critical role that salons play in creating demand for Matrix products:

> L'Oreal labels its Matrix hair products for "professional" use by trained and licensed hair stylists in salons.  L'Oreal produces Matrix hair care products exclusively for use and sale in beauty salons and beauty schools. Licensed hair stylists use Matrix products while providing hair styling services, and recommend products to patrons.  *Matrix adopted a system of salon-only distribution, which relies on professional hair stylists' use and recommendation, as an alternative to the elaborate and expensive advertising and marketing campaigns that mass-market manufacturers use to promote hair-care products sold in grocery and drug stores.*  L'Oreal's years of providing quality Matrix products, education, and service to its

customers has created strong professional demand. *This demand is further fostered by L'Oreal's pledge to allow Matrix products to be sold only to professional salons and contracts promising to sell only via L'Oreal's professional salon distribution system.*

L'Oreal Complaint, p. 3, August 4, 2009, *L'Oreal USA S/D, Inc. v. Hair Casino Venture L.L.C.*, 2:09-cv-01484-ECR-LRL, U.S. District Court, Dist. of Nevada ("Las Vegas Complaint").

33.     Defendant Sexy Hair's president states on the company's website that he is moving the company's advertising to focus on stylists "whose recommendations drive professional hair care." (www.sexyhair.com/html/executive_bios.aspx, 6/21/10).

34.     As these statements demonstrate, the economic interests of salons and the Defendants are related.   The salons recommend and demonstrate the products, which drives demand.   Professional product demand is also created by the Defendants' labeling and advertising that their products are available for sale only through salons.   The Defendants' representations, made continuously over the years, that Defendants' professional products are only available in salons are an important aspect of their professional products' nature, characteristics, and qualities.   Only through their economic relationship with salons can Defendants advertise their brands as professional grade and available only through salons, and thus capture the caché, goodwill, higher price, and significant revenues that salon-only products command.

35.     Defendants also benefit from the salon relationship because it permits them to save money on expensive television and print advertising that would be spent if the salons and stylists were not creating demand by demonstrating and recommending the Defendants' professional products to salon customers.

36.     The economic relationship with Defendants is crucial to salons.   The salons and stylists invest their time learning about the Defendants' products either at

schools run by the defendants or other training venues. The salons invest their money and shelf space stocking the products in their salons. The salons invest more of their time, along with their reputations, explaining, demonstrating, and recommending the products to their customers.

### Defendants' Labels and Advertising

37. On their product labels, on the internet, and in print, the Defendants advertise their products as available only through salons. Defendants clearly label each bottle of their professional products as available for sale only in professional salons. Examples of Defendants' product labels are:

| Table 1 Product Labels | | |
|---|---|---|
| **Defendant** | **Brand** | **Label** |
| L'Oreal | Matrix | "For Sale Only in Professional Beauty Salons" |
| | Redken | "Exclusive Salon Distribution" |
| | Pureology | "Available Only at Fine Salons & Spas" |
| Farouk | Biosilk | "Authorized for Sale Only Through Professional Salons" |
| Tigi | Bed Head | "Sold Only in Professional Salons" |
| Sexy Hair Concepts | Sexy Hair | "Sold Only in Professional Salons" |
| Conair | Rusk | "Sold Exclusively in professional salons" |
| P&G | Professional Sebastian | "Guaranteed only when sold by an authorized salon" |
| Paul Mitchell | Paul Mitchell | "Guaranteed only when sold by a professional hairdresser, otherwise it may be counterfeit, old, or tampered with" |

38.    Each of the Defendants maintain websites that advertise the professional nature of their salon-only products, including:

- www.loreal.com

- www.matrix.com

- www.matrixbeautiful.com

- www.redken.com

- www.redkensalon.com

- www.pureology.com

- www.kerastase-usa.com

- www.tigihaircare.com

- www.tigiprofessional.com

- www.paulmitchell.com

- www.farouk.com

- www.sexyhair.com

- www.conair.com

- www.rusk1.com

- www.sebastianprofessional.com

- www.sebastianinspires.com

- www.sebastianfightsdiversion.com

39.    As with their labeling, Defendants' advertising on the website claims that their professional products are available only through salons.  For example:

| Table 2 Internet Advertising | |
|---|---|
| L'Oreal | "Redken products are available exclusively in fine salons." (www.redkenformen.com/anti_diversion.aspx, 6/2/08) |

"Redken products are available exclusively in fine salons."
(www.redkencolor.com/anti_diversion.aspx, 6/2/08)

"Where can I buy Redken Products?  Redken products are sold in hair
salons across the country.  To locate a Redken product please enter your
zip code into our salon finder. . . .

Can I buy Redken Products online?  Redken products are not
guaranteed when sold online.  Redken products should be sold
exclusively in salons. . . .
Can I buy Redken products at mass stores or groceries?   Redken
products are not guaranteed when sold in mass stores or groceries.
Redken products should be sold exclusively in salons "
(www.redken.com/faq, 6/21/10)

"PureOlogy is sold only in fine salons and spas."
(www.pureology.com, 12/15/08).

"For example, all genuine Pureology products are sold exclusively in
fine salons or spas."
(www.pureology.com/systems/anti-diversion, 6/21/10)

"IN-SALON SPECIALTIES.  Matrix is a full-service professional salon
brand, committed to developing services."
(www.matrix.com/products/add_on_services/biolage_smooth_seal.aspx,
6/16/10)

"Matrix, the leading professional hair care and hair color company in
the United States, is part of L'Oreal USA's Professional Products
Division. . . . Matrix is committed to the development of the salon
professional and offers a wide range of hair care, hair color, and hair
texturizing products . . . Matrix inspires all salon professionals to
transform    a    passion    for    beauty    into    personal    success."
(www.matrix.com/about_matrix, 6/16/10)

Please purchase Matrix products from salons and spas that can offer you
the best service and product recommendations for your hair.   Only
products purchased in a salon or spa are guaranteed to perform to our
standards.  Thank you for supporting your salon and spa community."
(www.matrix.com/antidiversion/qa.aspx, 6/16/10)

"Matrix states on all its advertising, 'Genuine Products Guaranteed
Only in Salons."
(www.matrix.com/antidiversion, 6/16/10)

| Tigi | Main webpage circa 2008-9:  "At TIGI, we work with designers and hairdressers worldwide to ensure that the latest styles and products are in salons — and salons only." <br><br> "At TIGI, we work with hairdressers across the Globe ensuring the latest styles and products are in salons - for the use of the professional hairdresser and their clients." (http://www.tigihaircare.com/consumer/en-US/about/default.asp, 1/07/09, 6/23/10) |
|---|---|
| Paul Mitchell | "John Paul Mitchell Systems is the most recognized professional manufacturer of salon products worldwide." (www.paulmitchell.com/products/pages/products.aspx, 6/21/10) <br><br> "Our products are only guaranteed when sold by a professional hair salon." (www.paulmitchell.com/salons/pages/salons.aspx, 6/21/10) <br><br> "Over 28 years ago, two friends had a vision - to found a company for hairdressers - one that would provide tools of success for hair care professionals and educators, their salons, and the entire beauty industry. . . . John Paul refuses to sell the company because of the initial vow he took to stand by the professional beauty industry.  Since no public corporation can guarantee it will *market John Paul Mitchell Products exclusively through salons,* for John Paul - selling is simply not an option." (http://www.paulmitchell.com/About_Us/Pages/TheStory.aspx, 12/22/08) <br><br> "Where should I purchase Paul Mitchell products? Only in a professional hair salon, barber shop or beauty supply where they perform professional salon services." (http://www.paulmitchell.com/About_Us/Pages/ProductControl.aspx, 12/22/08) |
| P&G | "The top five reasons to purchase Wella•Sebastian products only in salons or authorized beauty supply stores  .   .   . <br><br> 5. Ethics.  Wella•Sebastian products should only be sold in authorized salons and beauty supply stores.  Purchasing them elsewhere is as unethical as someone selling them elsewhere." (http://www.sebastianfightsdiversion.com/top_5reasons.html, 12/22/08) |
| Sexy Hair | "Sexy Hair is available for sale only in professional salons." (www.sexyhair.com/index/where_to_buy.html, 12/15/08). |

|  | "Retail sale of Sexy Hair products is authorized only in professional beauty salons including chain salons such as JCPenny and Trade Secret." (www.sexyhair.com/index.About_Sexy_Hair.html, 12/15/08)

"Sexy Hair manufactures high-quality products for distribution within the professional beauty industry, and our hair and body collections can be found in over 60,000 licensed salons throughout the US and in more than 25 countries across the globe." (www.sexyhair.com/index.About_Sexy_Hair.html, 12/15/08) |
|---|---|
| Farouk | "Farouk Systems, Inc. is a Houston based company that manufactures high quality professional hair care and spa products. Farouk Systems' uniqueness comes from being a company owned and operated by a team of hairdressers that include over 2,000 educators in over 92 countries." (http://www.farouk.com/about.asp, 1/07/09, 6/21/09) |
| Conair | "The Professional Products Division.   The Division features both toiletries and appliances . . . which are exclusively for salon use and resale. . . The premium Rusk brand of hair care products. . . . A valuable part of the Professional Products Division, Rusk products continue to define the profession." (www.conair.com/corporate-cn-10.html, 6/10/10). |

40.   Defendants' print advertisements also advertise their products as available only at professional salons.  For example:

| Table 3 Print Advertising | |
|---|---|
| **Defendant** | **Advertisement Wording** |
| L'Oreal's Matrix | "ONLY PROFESSIONAL" April 2007 *Elle* |
| L'Oreal's Matrix | "HAIR THERAPIE ONLY FROM THE SALON" and "ONLY PROFESSIONAL" June 2008 *Elle* |
| L'Oreal's' Redken | "GET INSPIRED.  SEE YOUR STYLIST." August 2006 *Elle* |
| L'Oreal's Redken | "HAIRCOLOR THIS AMAZING: ONLY FROM A REDKEN STYLIST" and "GET INSPIRED. SEE YOUR STYLIST." October 2006 *Elle* |

| L'Oreal's PureOlogy | "Available only in Fine Salons & Spas." April 2008 *American Salon* |
| TIGI's Bed Head | "Sold only in professional salons." July 2008 *Elle* |
| Sexy Hair Concepts' | "Sold only in professional salons." April 2008 *American Salon* |
| Paul Mitchell | "The real Paul Mitchell . . . guaranteed only in salons and Paul Mitchell schools. www.paulmitchell.com" June 2010 *InStyle* |

## Diversion

41.    All of this product label, internet and print advertising is false.  Despite their labeling, advertising, and promotion each of the Defendants' professional brands is sold throughout the country in drug stores, grocery stores, and other mass merchandise retail stores.

42.    The sale of professional or salon-only products through stores that do not have a salon on the premises is known as "diversion."

43.    In the 1980s and 1990s, diversion occurred, but at a low level compared to today.  In the more recent past, the quantity of diverted salon-only products sold in drug stores, grocery stores, big box stores, and over the internet, increased enormously.

44.    Today, diversion accounts for more than $1 billion of the beauty industry's $5 billion in annual sales of salon-only products. (www.beautyindustryfund.com)

45.    In 2001, a group of manufacturers, distributors, and salons created the Beauty Industry Fund (BIF) "to support and strengthen the professional beauty industry by eliminating product diversion."  (http://beautyindustryfund.com/AboutUs/default.asp,

6/30/10)   At least four defendants, P&G, Sexy Hair, Farouk and Paul Mitchell, are members of the BIF.    (http://www.beautyindustryfund.com/membership/default.asp, 6/24/10)

46.    The BIF publishes AC Nielsen/Market Decisions data concerning diversion of salon-only products and describes their data collection procedures:

> Utilizing ACNielsen's SCANTRACK data service, ACNielsen/ Market Decisions identifies the professional products (at item level) being sold in this nationally projectable sample of food, drug and mass merchandisers. In order to establish a historical view of diversion activity, data from the last two years for all four hair-care categories is examined. This data is displayed on a quarterly basis in order to show the direction that diverted product sales are heading.
> (http://www.beautyindustryfund.com/DiversionData/default.asp, 6/30/10)

47.    The Nielsen data shows an explosion of diversion since 2000.

| Table 4 Professional Products Sold Outside Salons 2000-2009 (thousands of dollars) | | | | | | | | | | |
| Defendant | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | Totals '00–'09 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Matrix (L'Oreal) | 3,051 | 6,550 | 15,019 | 33,036 | 57,302 | 78,243 | 93,941 | 122,086 | 127,415 | 99,649 | $636,292 |
| Redken (L'Oreal) | 7,166 | 8,328 | 13,854 | 16,126 | 12,162 | 17,876 | 33,969 | 45,497 | 48,109 | 27,302 | $230,389 |
| Pureology (L'Oreal) | 0 | 0 | 0 | 0 | 0 | 555 | 3,921 | 9,988 | 17,400 | 8,498 | $40,362 |
| Wella-Sebastian | 34,059 | 41,362 | 49,460 | 58,911 | 52,546 | 50,362 | 53,133 | 51,409 | 43,168 | 21,183 | $455,593 |
| Paul Mitchell | 27,898 | 32,774 | 34,987 | 38,716 | 44,943 | 56,562 | 54,685 | 34,536 | 38,748 | 43,579 | $407,428 |
| Tigi | 2,018 | 5,145 | 18,051 | 27,581 | 25,263 | 32,939 | 45,185 | 51,878 | 57,721 | 60,313 | $326,094 |
| Rusk | 7,063 | 9,314 | 11,127 | 13,575 | 12,879 | 13,764 | 14,987 | 15,334 | 15,635 | 14,853 | $128,531 |
| Sexy Hair (fka Ecoly Int'l) | 0 | 1,307 | 2,926 | 6,760 | 10,583 | 12,640 | 16,842 | 23,653 | 30,995 | 35,027 | $140,733 |
| Farouk | 0 | 0 | 3,204 | 9,243 | 16,068 | 21,801 | 25,941 | 26,679 | 32,215 | 35,279 | $170,430 |
| Totals | $81,255 | $104,780 | $148,628 | $203,948 | $231,746 | $284,742 | $342,604 | $381,060 | $411,406 | $345,683 | $2,535,852 |

48.    Defendant L'Oreal owns three heavily diverted brands: Matrix, Redken, and PureOlogy.   When L'Oreal acquired Matrix in 2000, Matrix had sold $3 million dollars of products outside salons.  Under L'Oreal's ownership, by 2008 Matrix had over $122 million in sales outside salons.

49.    In 2006, before L'Oreal acquired PureOlogy, the brand had diverted sales of just under $4 million.  L'Oreal acquired PureOlogy in May, 2007.  In the next year and a half, L'Oreal increased sales of PureOlogy outside salons to $14 million.

50.    Sales of diverted TIGI product have grown nearly every year since 2000 and grew from $2 million in 2000 to over $60 million in 2009.

51.    According to the ACNielsen data, sales of Sexy Hair's products outside of salons increased from $3 million in 2002 to $35 million in 2009.

**The Economic Interests of Salons and Defendants Diverge Over Diversion**

52.    For Defendants, every bottle of professional product sold, regardless of whether sold in a salon or a grocery, a drug store, or any other retail store, increases their sales revenue and profits.

53.    But for salons, professional products sold in drug stores, groceries, and other retail stores are lost sales and lost profits.

54.    In addition to lost sales and profits, the reputation and goodwill of salons are damaged by the large scale diversion of "professional" products.

**Defendants Acknowledge The Injury to Salons**

55.    Defendants have acknowledged the harm to salons caused by diversion and emphasized the importance of the integrity of their advertising to their brands, to the consuming public, and to the salons.

| Table 5 Injury to Salons | |
|---|---|
| L'Oreal | "Why Diversion is Bad?  *Diversion hurts your business.*  If clients purchase professional products outside the salon, for what they believe to be a cheaper price (it usually isn't), then they're not going to buy it from you.  Also, *it hurts the professional industry* by weakening the stylist-client relationship and the credible need for professional recommendation of the best products for the clients' hair." (www.redkensalon.com/difference/anti-diversion, 6/2/08, also 6/22/10).<br><br>"Most importantly, these products are sold without the service and recommendation of your stylist who knows the best product for your hair, and *deprives them of the sale of this product and their service.*"  (www.matrix.com/about_matrix/diversion, 12/15/08)<br><br>"Diversion is a serious problem facing our industry today.  It *effects the entire salon industry by degrading the professionalism and credibility of professional products from both an ethical and financial standpoint.*  PureOlogy firmly prohibits diversion and supports a manufacturer's right to dictate where its products are sold." (www.pureology.com, 12/15/08) |
| Sexy Hair | "Diversion has multiple affects on those in the salon industry.  It corrupts our synergy, weakens our strength as opinion leaders, and *diminishes our capacity to earn.*" (www.sexyhair.com/book/Anti_Diversion_Policy.html, 12/15/08) |
| P&G | "*Diversion directly interferes with the manufacturer's distribution channels and legitimate salon revenue.*  When diverted product shows up in your local grocery store or department store, *it hurts your salon business, it hurts the overall profession and ultimately it can hurt the consumer.*" (www.sebastianfightsdiversion.com, 12/22/08)<br><br>"Diversion directly interferes with the manufacturer's distribution channels and legitimate salon revenue. When diverted products are sold at an unauthorized retail outlet it hurts the salon business and ultimately the overall beauty profession." (http://www.sebastianprofessional.com/en_US/anti_diversion/index.jsp, 6/22/10) |

56.    The BIF, of which at least four defendants are members,  aims "to inform

the industry and the public about just how serious this problem has become" and purports

to support anti-diversion efforts — calling them "A Fight Worth Fighting" — because

"[t]he diversion of professional hair-care products into mass retail severely hurts the

*salon   industry*."      (www.beautyindustryfund.com/HowtoHelp/default.asp,   10/17/08,

6/24/10)

### Defendants' False Statements Opposing Diversion

57.    Defendants publicly purport to oppose diversion in their advertising:

| Table 6 Defendants' Opposition to Diversion | |
|---|---|
| L'Oreal | "In order to protect Matrix salons and ensure that consumers receive the highest quality products appropriate for their specific hair needs, Matrix continues in its commitment to aggressively combat diversion." (www.matrix.com/about_matrix/diversion/whatis.aspx, 12/15/08)<br><br>"Matrix continues its commitment to aggressively combat diversion:<br>  ■  A former FBI agent developed the strategies and oversees implementation of Matrix's anti-diversion program.<br>  ■  Exclusive product coding is used to track the movement of Matrix products. This is the method for tracing products to industry diverters<br>  ■  . . .<br>  ■  Matrix representatives undertake regular shelf sweeps at unauthorized retail outlets in the U.S. These products are subsequently decoded in an effort to identify diverters . . ."<br>(www.matrix.com/antidiversion, 6/16/10)<br><br>"PureOlogy firmly prohibits diversion and supports a manufacturer's right to dictate where products are sold." (www.pureology.com/, 12/15/08) |
| Sexy Hair | "Authorized distribution of our products is through professional salons via a select group of distributors. Unauthorized distribution - diversion - results in our professional products sharing a shelf with OTC products in retail stores and chain outlets.<br><br>Diversion has multiple affects on those in the salon industry. It corrupts our synergy, weakens our strength as opinion leaders, and diminishes our capacity to earn. I, as stylist, salon owner, and manufacturer, am incensed from all perspectives.<br><br>I don't believe that any manufacturer in our industry is exempt from this attack. Finally, many manufacturers are joining together, pooling resources, in an attempt to eradicate or, at the very least, lessen the pace by which it is spreading.<br><br>I urge all of you to help. |

| | |
|---|---|
| | Consumers:<br>Remember that professional products found in unauthorized locations cannot and will not be guaranteed by the manufacturers and that formulas could have been tampered with and the product performance will likely pale in comparison. Do not purchase professional salon products from any source other than a professional salon.<br><br>Salon Owners:<br>Do not participate when approached by "collectors". Complain to store managers when you see professional products in unauthorized locations. Never forget the role you play and how powerful you are as an opinion leader. Your clients come to you for your expertise, talent and advice. Share it openly and against unauthorized retailers. Explain to your customers the risks associated with diverted products. . . .<br><br>Sincerely yours,<br>Michael O'Rourke Founder and Chairman Sexy Hair Concepts"<br>(http://www.sexyhair.com/anti-diversion_policy.htm, 12/15/08) |
| Tigi | "To All TIGI In-Crowd Salons:<br><br>The fight against diversion and counterfeiting has been a long battle. Now, we are beginning to see the results of the hard work and dedication. On behalf of TIGI, I want you to know that our commitment to fighting diversion does not stagger. In fact, TIGI is aggressively fighting those who counterfeit and divert our products to large, well-known, unauthorized, mass-market retailers. . . .<br><br>We are hopeful that the evidence obtained in these raids will reveal those individuals and companies who are engaged in these practices. Through legal action, we will bring them to justice. Currently, our attorneys have contacted unauthorized retailers, grocery, drug, and discount stores and urged them to cease selling and to remove both BED HEAD and Catwalk products from their shelves immediately. Many of these retailers have already removed the product or are in the process of doing so. Additionally, retailers are being asked to provide all records that relate to their sources and provide records of all TIGI products sold through all retail outlets.<br><br>TIGI is a "salon-only" product and therefore guaranteed only in professional salons. TIGI product purchased from unauthorized retailers may not be the same genuine product and may not produce the same results as those purchased from professional salons.<br><br>I urge you to please contact us with any information you may have about diverted or counterfeit TIGI products by calling our Anti-Diversion Team at (800) 259-8596 ext. 2935. Your call could be the key to our efforts to stop diverters and counterfeiters. Also email us at diversion@modernbeauty.ca. |

|  | With your help we can put a stop to the unauthorized manufacturing and distribution of TIGI hair care products.  Together, we can and will remove them from the shelves of unauthorized retailers throughout the country.<br><br>Thank you in advance for your cooperation and help.<br>Bruno Mascolo<br>CEO and Chairman of the Board<br>TIGI Linea, LP"<br>(http://www.modernbeauty.ca/industry/whats_happening/index.php?mod=cnt&act=cnt&id=197, 1/9/09) |
|---|---|
| Paul Mitchell | "Where should I purchase Paul Mitchell products?<br>Only in a professional hair salon, barber shop or beauty supply where they perform professional salon services.<br><br>What can I do to fight diversion?<br>Purchase professional salon products only from a professional hair salon. Tell your friends about what you learned on this web site."<br>(http://www.paulmitchell.com/About_Us/Pages/ProductControl.aspx, 12/22/08)<br><br>"Diversion is the ugly side of the beauty industry.  The professional salon products you buy in the grocery stores, drug stores, or on the internet are black market, counterfeit, or tampered with.  Please call 1-888 398-8884 to report diverted product."<br><br>"Get the real deal, not a bogus steal.  The only way to guarantee authenticity is to buy Paul Mitchell at a professional hair salon."<br><br>"Spread the word.  Tell your friends about the risks of buying professional products anywhere but at a salon."<br><br>(http://www.paulmitchell.com/About_Us/Documents/get_real_pop_06.pdf, 12/22/08) |
| P&G | "We are taking a stand against diversion.  For the growth of our industry.  For the success of our salon partners.  For the respect and creativity of the stylist . . . Here's how we're putting an end to diversion.  We have implemented an aggressive program to stop diversion."<br>(www.sebstianfightsdiversion.com/stand.html, 12/22/08)<br><br>"Sebastian Professional is firmly committed to devoting the resources necessary to fight diversion and support the professional salon business."<br>(www.sebastianprofessional.com/en_US/anti_diversion/index.jsp, 12/22/08)<br><br>"OUR PROMISE TO YOU.  As part of the Procter & Gamble Professional group of brands, Wella • Sebastian is clearly committed to administering the |

| | resources necessary to fight diversion and support the professional salon business." (www.sebastianfightsdiversion.com/trackingdiversion.html, 12/28/08) |
|---|---|

58.   But despite their public statements opposing diversion, the Defendants profit greatly from diversion and do not try to stop it.  In a case brought by L'Oreal concerning diversion of its Matrix products, Judge Wexler in the United States District Court for the Eastern District of New York made the following findings of fact following a bench trial:

27.  The large scale of the diversion market and the reports available to and reviewed by L'Oreal make clear that L'Oreal is currently, and has in the past several years, been well aware of the diversion of Matrix products and of the growth of that market.

28.  L'Oreal has the technology and ability to trace diverted products to particular distributors.

31.  Nonetheless, the court finds that if L'Oreal wished to stop diversion of Matrix products it could do so by identifying the source of the diverted products and exercising its contractual right to terminate distributors that sell large quantities of Matrix products to collectors or jobbers.

34.  L'Oreal employees testified at trial that the company was committed to maintaining the professional nature of the Matrix brand. For example, L'Oreal's Vice President and General Manager of the brand testified as to the marketing of Matrix products to professionals and the importance of maintaining the product's placement in that market.

35.  Charles Domroe, L'Oreal's Director of Security, testified as to his commitment, over several years, to ending the diversion market and his monitoring of distributors so as to stop diversion.

36.  *The court finds such testimony to be completely at odds with the reality of L'Oreal's business.*

37.  In light of the fact that L'Oreal has known of the magnitude of the diversion market for several years, the court finds any claim that L'Oreal is serious about ending diversion of its product to be without credibility. *Instead, the court finds that L'Oreal is content to enjoy the profits associated with diverted product, while paying "lip service" to the notion that they are interested in protecting the professional nature of the brand.*

*Matrix Essentials v. Quality King Dist. Inc. et al.,* ("Matrix I"), 522 F. Supp. 2d 470, 474-5 (E.D.N.Y. 2007).

59.   Following an appeal and remand, Judge Wexler further held:

When the 1990 injunction was agreed to, Matrix took the issue of diversion seriously.   The company took aggressive steps to protect the professional nature of its product.   It vigorously pursued, and sought punishment of those who sold Matrix branded products outside of the professional chain of distribution.   Diversion was viewed as having the potential to harm the value of the Matrix name to the professional community, and the company took aggressive steps to stop the practice.

In direct contrast, during the time period 2002-2007, there was widespread, growing, and completely unchecked diversion of Matrix products outside the so-called "professional" chain of distribution.   During this period, 'L'Oreal took no steps to end diversion – and it is not surprising why.   The profits reaped by L'Oreal during this period were enormous and unprecedented. . . While L'Oreal took the position at trial that it was serious about ending diversion of its "professional" Matrix product line, the facts presented painted a completely different picture.   In fact, L'Oreal did nothing to end diversion during the time period at issue, and was instead pleased to simply reap the increasing profits . . . The reality of the marketplace makes L'Oreal's "professional distribution only" argument ring hollow.   Far from suffering any damage from diversion, L'Oreal's profits soared as a result of the practice.

*Matrix Essentials v. Quality King Dist. Inc. et al.,* 670 F. Supp. 2d 159, 163 (E.D.N.Y 2009)("Matrix II").

### Defendants Can Stop Diversion

60.   Defendants advertise that they have the means to stop diversion of their salon-only products.

| Table 7 |
| Defendants Statements Re Ability to Stop Diversion |

| L'Oreal | "We have launched a new state-of-the-art product coding system that is 100% accurate in tracking products to diverters." (www.matrixbeautiful.com/about_matrix/diversion.aspx, 6/2/08)

"In order to protect Redken salons and to ensure that consumers only receive the highest quality Redken products appropriate for their specific hair needs, Redken continues in its commitment to aggressively implement an anti-diversion policy.   This is what you should know about what's happening to |

stop diversion of Redken salon professional products:  A former FBI agent developed the strategies and oversees the implementation procedures of Redken's anti-diversion program . . . Procedures/Policies.  1.  Exclusive product coding is used to track the movement of Redken hair care and styling products.  This is the method for tracing products to industry diverters. Primary coding of salon products and selective, follow-up audits of distributorships have effectively revealed violators.  Our secondary coding helps identify those salons suspected of diversion.  2.  Redken representatives undertake regular shelf sweeps, at unauthorized retail outlets in the U.S. and certain foreign countries.  These products are subsequently decoded in a concerted effort to identify diverters.  3.  Ongoing intelligence procedures are in place to further uncover diversion schemes, including those involving stores and misuse on the internet.  4.  Redken's Diversion Inspection Staff (D.I.S.) audit suspected distributor operations. . . . "
(www.redkencolor.com/anti_diversion.aspx, 6/2/08).

"Pureology continues its commitment to aggressively combat diversion: Exclusive product coding is used to track the movement of Pureology products. This is the method for tracing products to industry diverters.  Pureology representatives undertake regular shelf sweeps at unauthorized retail outlets in the U.S. These products are subsequently decoded in an effort to identify diverters.  Ongoing intelligence procedures uncover diversion schemes, including those involving stores and misuse of the internet."
(www.pureology.com/systems/anti-diversion/what-pureology-is-doing, 6/21/10

"We ensure that our teams closely monitor what our distributors do and require them to report and take executive action against diverters.  All of this is possible now because we've got the most sophisticated and robust primary- and secondary-coding system in the business.  It allows us to be able to, in a very short amount of time, *identify exactly which distributor our products have been sold to, and from their, it enables us to identify which salon the distributor has sold the products to* because our distributors are all obliged to code at the secondary level.  This system gives us very accurate traceability."
(L'Oreal's President of Professional Products Division, David Craggs, interview in *American Salon* magazine, July 1, 2007)

"The L'Oreal Professional Products Division, which includes Matrix, Redken, L'Oreal Professionnel, Kérastase, PureOlogy and Mizani, has a zero-tolerance anti-diversion policy.  We strictly enforce our no-diversion policy at every level possible, from production to the salon.  We code.  We shop.  We terminate.  Our 360 degree approach to this issue includes encouraging customers to buy only from salons and urging distributors and stylists to respect their commercial contracts and not to support collectors.  (If they breach, we cut them off.)"
(L'Oreal Professional Products Division, Anti-Diversion Policy in *American Salon* magazine, July 1, 2007)

| Sexy Hair | "We at Sexy Hair Concepts are committed to:<br>Terminating any distributors we find diverting products directly or indirectly.<br><br>Ensuring distributors stop shipping to any salons known to be or suspected of diverting products.<br><br>Working with other manufacturers to implement procedures which will minimize the ability to divert our product and to trace those responsible.<br><br>Doing everything in our power to legally stop retailers from selling diverted products."<br>(http://www.sexyhair.com/book/anti-diversion_policy.htm, 12/15/08) |
|---|---|
| Farouk | "To further ensure that its products remain strictly professional, Farouk marks its products with an anti-diversion code that enables and facilitates tracking."<br>(Farouk Anti-Diversion Policy in *American Salon* magazine, July 1, 2007) |
| P&G | "We have instituted a 'zero tolerance approach' and are committed to providing the best anti-diversion plan of any manufacturer of professional hair products.  We have a state of the art coding system that allows us to identify products found in an unauthorized retail outlet."<br>(www.sebastianprofessional.com/en_US/anti_diversion/index.jsp, 12/22/08)<br><br>"Wella Sebastian has implemented a state-of-the-art tracking and coding system that enables us to know where our products are at all times. At the time our products leave our warehouse for shipping, they are scanned by a handheld device that records:<br>  ▸ where the product is being shipped<br>  ▸ the date of shipment<br>  ▸ the quantity being shipped<br><br>Products being shipped by our distributors are handled in the same manner.<br><br>Professional Salon Agreements<br>We require each of our salons to sign a Professional Salon Contract, a binding agreement that requires them to only use Wella Sebastian products for in-salon services and for sale to individuals for personal and home use.<br><br>Watchdog Network<br>We utilize a team of national shoppers throughout North America who regularly visit mass market stores, locate our products and record tracking codes.  Furthermore, our direct sales model enables us to see what's being bought and sold more closely. |

Four Stage Process
We have a firm yet fair four-stage policy in place allowing us to identify any salon found in violation of their professional salon contract

STAGE 1: Salon is warned and placed on "watch list"
STAGE 2: Written warning and order limit cut by 40%
STAGE 3: Personal visit to salon and order limit cut by 60%
STAGE 4: Account terminated"
(http://www.sebastianfightsdiversion.com/antidiversion.html, 12/22/08)

### Defendants Participate in Diversion

61.    Defendants' claims that they oppose diversion are false.  Defendants' statements that they can stop diversion – viewed in light of the hundreds of millions of dollars the Defendants earn every year from sales of diverted product – reveal Defendants' intent to continue diverting their salon only product.  The Defendants have increased revenues from diverted products even though Defendants claim that their anti-diversion programs and sophisticated coding systems can trace diverted products and determine exactly the source of diverted product..

62.    If the Defendants wished to stop diversion, they could do so by using their product coding to identify the source of the diverted products and exercising their contractual right to terminate distributors that divert professional-only products.

63.    On information and belief, Farouk knowingly sells its professional products, both liquids and hair irons, directly to diverters.  In particular:

a.    In late 2006, Mr. Farouk Shami, the founder of Farouk Systems, negotiated deals with Cadeau Express, a Las Vegas company run by Mr. Ramon DeSage.  Cadeau Express is neither a salon not a distributor to professional salons, but Farouk listed Cadeau Express internally as a

"chain salon" and sold Cadeau Express $20 million of Farouk professional products in 2007.

b. Mr. Shauki Gulamani, while acting as president of Farouk Systems, was directly involved in the diversion of Farouk professional products. On at least two occasions, he negotiated multi-million dollar purchases of professional-only items with known diverters. Gulamani charged the diverters prices below wholesale, which further undercut salons' ability to sell professional product at a profit.

c. Mr. Basim Shami is one of Farouk's most persistent diverters, but is shielded from Farouk's anti-diversion efforts because he is Farouk Shami's son. On at least one occasion, and with Farouk's knowledge, Basim Shami set up an off-shore corporation to divert product back into the United States.

d. Farouk Systems publicly claims to be working to "ensure its products remain strictly professional," but internally, Farouk ignores leads and stonewalls anti-diversion efforts from its own officers and employees — who on several occasions have purchased and brought diverted product into the office in the hopes that Farouk would keep its promises to stylists, to salon owners, and to the public and use the coding system to track the product back to the diverting entity.

64. L'Oreal also deals directly with Mr. DeSage's Cadeau Express and arranges for the sale of L'Oreal's professional products outside of salons. In the Las Vegas suit, L'Oreal describes its "Casino Deal," in which:

L'Oreal informed Reimer [an executive with a distributor named Armstrong-McCall] that it would make approximately $3.2 million of Matrix products, including 110,000 full-size bottles of each Color.smart shampoo and conditioner and a variety of travel size bottles of Matrix products, available to Cadeau for purchase for the Cadeau Casino Amenity Program. On November 28, 2006, and December 14, 2006, L'Oreal shipped a variety of Matrix products, including 110,000 full-size bottles of each Color.smart shampoo and conditioner and over 42,000 travel-size bottles of various Matrix products, to Cadeau's warehouse, located at 3494 East Sunset Road in Las Vegas, Nevada.

(L'Oreal's Las Vegas Complaint, p. 15.)

65.    On information and belief, since at least late 2007, Sexy Hair has been selling its professional products directly to Cadeau Express.

### Defendants' False Advertising and Unfair Competition

66.    Defendants' labeling, print, and internet advertising and promotion of their professional products is literally false and misrepresents the nature, characteristics, qualities, and origin of the Defendants' products. Despite their advertising that the products are available only through professional salons, the Defendants' salon-only products are widely available in grocery stores, drug stores, mass merchandise stores, and over the internet.

67.    If not literally false, Defendants' labeling, print, and internet advertising of their professional products as available only in salons is intentionally deceptive and misleading and likely to cause confusion among consumers as to the nature, characteristics, qualities, and origin of Defendants' products. Confusion is heightened by Defendants' claims that they oppose diversion and are able to prevent diversion.

68.    Defendants' labeling and advertising falsely describes the products as available only in professional salons. These statements of fact are likely to cause confusion or mistake or to deceive the purchaser as to the affiliation, connection, or

association of Defendants' products with salons, or to cause confusion or mistake as to the salons' sponsorship or approval of Defendants' salon-only products that are available at stores that are not professional salons. Confusion is heightened by Defendants' claims that they oppose diversion and are able to prevent diversion.

69.   By falsely advertising that their products are available only in professional salons while reaping the benefits of sales outside of professional salons, Defendants use the Plaintiffs' salon services, goodwill, and reputation, and create a false impression as to the affiliation, connection, or association among the Defendants' products and the Plaintiffs' businesses and services. These misrepresentations result in lost revenue, lost profits, lower business value, and lost goodwill and reputation to the Plaintiffs.

70.   When Defendants advertise their products as available only in professional salons, but render those claims false by permitting their salon-only products to be sold outside of salons, the salons are placed in competition with the Defendants for sales of professional products.

71.   Defendants' misrepresentations result in lost revenue, lost profit, lower business value, and lost goodwill and reputation to the Plaintiffs.

### Class Action Allegations

72.   This complaint asks that the court establish seven separate classes, one class for each Defendant.

73.   The L'Oreal Class. Plaintiffs bring this action on their own behalf, and under Rule 23 of the Federal Rules of Civil Procedure, as representatives of a class of all professional hair salons and licensed cosmetologists that purchased L'Oreal professional products for resale to their customers within the United States from 2000 to the present.

Excluded from the class are any salons L'Oreal previously identified as having diverted L'Oreal's professional products during the class period.

74. The Tigi Class. Plaintiffs bring this action on their own behalf, and under Rule 23 of the Federal Rules of Civil Procedure, as representatives of a class defined as all professional salons and licensed cosmetologists that purchased professional hair products manufactured by Tigi for resale to their customers within the United States from 2000 to the present. Excluded from the class are any salons Tigi previously identified as having diverted Tigi's professional products during the class period.

75. The Sexy Hair Class. Plaintiffs bring this action on their own behalf, and under Rule 23 of the Federal Rules of Civil Procedure, as representatives of a class defined as all professional salons and licensed cosmetologists that purchased professional hair products manufactured by Sexy Hair Concepts or its predecessor for resale within the United States from 2000 to the present. Excluded from the class are any salons Sexy Hair previously identified as having diverted Sexy Hair's professional products during the class period.

76. The Farouk Class. Plaintiffs bring this action on their own behalf, and under Rule 23 of the Federal Rules of Civil Procedure, as representatives of a class defined as all professional salons and licensed cosmetologists that purchased professional hair products manufactured by Farouk for resale to their customers within the United States from 2000 to the present. Excluded from the class are any salons Farouk previously identified as having diverted Farouk's professional products during the class period.

77.   <u>The Paul Mitchell Class</u>.  Plaintiffs bring this action on their own behalf, and under Rule 23 of the Federal Rules of Civil Procedure, as representatives of a class defined as all professional salons and licensed cosmetologists that purchased professional hair products manufactured by John Paul Mitchell Systems for resale within the United States from 2000 to the present.  Excluded from the class are any salons Paul Mitchell previously identified as having diverted Paul Mitchell's professional products during the class period.

78.   <u>The P&G Class</u>.  Plaintiffs bring this action on their own behalf, and under Rule 23 of the Federal Rules of Civil Procedure, as representatives of a class defined as all professional salons and licensed cosmetologists that purchased Sebastian brand hair products manufactured by The Wella Corporation for resale within the United States from 2000 to the present.   Excluded from the class are any salons P&G previously identified as having diverted P&G's professional products during the class period.

79.   <u>The Conair Class</u>.  Plaintiffs bring this action on their own behalf, and under Rule 23 of the Federal Rules of Civil Procedure, as representatives of a class defined as all professional salons and licensed cosmetologists that purchased Rusk brand hair products manufactured by Conair Corporation for resale within the United States from 2000 to the present.  Excluded from the class are any salons Conair previously identified as having diverted Conair's professional products during the class period.

80.   The members of each class are numerous and joinder is impracticable.

81.   With respect to each class, the claims of the representative plaintiffs are typical of the members of the class.

82.     With respect to each class, the plaintiffs will fairly and adequately protect and represent the interests of the class members.  The interests of the representative plaintiffs are coincident with, and not antagonistic to, those of the class members.

83.     Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex class actions and commercial litigation.

84.     With respect to each class, questions of law and fact common to the members of the classes predominate over questions that may affect only individual members because the Defendant in each class acted in a manner generally applicable to all the members of the class.

85.     With respect to each class, questions of law and fact common to the class exist and include:

(a)     whether the Defendant's advertising that their salon-only products are available only in salons is a literally false statement.

(b)     whether the Defendant's advertising that their salon-only products are available only in salons is false, misleading, and likely to deceive or confuse consumers.

(c)     whether plaintiffs have standing to sue under the Lanham Act;

(d)     whether Defendants acted intentionally in their advertising;

(e)     whether Plaintiffs are entitled to recover up to 3 times lost profits or Defendant's profits;

(f)     Whether to permit recovery of attorney's fees.

86.     Class action treatment is the superior method for the fair and efficient adjudication of this controversy because class treatment will permit a large number of

similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would require. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that it might not be practicable to pursue individually, substantially outweigh the difficulties, if any, that may arise in management of this class action.

## COUNT 1

## VIOLATION OF THE LANHAM ACT –FALSE ADVERSTISING

## (15 U.S.C. § 1125(a))

87.    Plaintiffs repeat and reallege all the preceding paragraphs of this Complaint as if fully set forth herein.

88.    Plaintiffs have a reasonable interest that should be protected against Defendants' false and misleading advertisements and a reasonable basis for believing their interests have been and are being damaged by Defendants' false and misleading advertising.

89.    Defendants made false and misleading statements in commercial advertising concerning Defendants' salon-only products.

90.    The false and misleading statements concern the nature, characteristics, qualities, or origin of the Defendants' products.

91.    Defendants' statements are literally false, or the statements are misleading and likely to confuse or deceive purchasers of the Defendants' products.

92.   The falsity and deception was material and was likely to influence purchasing decisions.

93.   Defendants' goods traveled in interstate commerce.

94.   Plaintiffs were injured by declining sales, lost profits, loss of goodwill, and other injuries.

95.   Plaintiffs' injuries were caused, in whole or in substantial part, by Defendants' acts of false advertising and unfair competition described herein.

96.   Defendants' acts constitute a violation of the Lanham Act and entitle Plaintiffs to recover Defendants' profits, Plaintiffs' damages, and the costs of this action. The circumstances of this case and the Defendants' actions entitle Plaintiffs to recover Defendants' profits, three times the damages to each class, and reasonable attorney fees.

## COUNT 2

### VIOLATION OF THE LANHAM ACT –UNFAIR COMPETITION

### (15 U.S.C. § 1125(a))

97.   Plaintiffs repeat and reallege all the preceding paragraphs of this Complaint as if fully set forth herein.

98.   In connection with their salon-only products, Defendants made false and misleading descriptions of fact.

99.   The Defendants' false and misleading descriptions of fact are likely to cause confusion, or to cause mistake, or to deceive as consumers as to the affiliation, connection, and association of Defendants' products.

100.   The Defendants' false and misleading descriptions of fact are likely to cause confusion, or to cause mistake, as to the Plaintiffs' sponsorship and approval of Defendants' salon-only products.

101.   The falsity and deception was material.

102.   Defendants' goods traveled in interstate commerce.

103.   Plaintiffs were injured by declining sales, lost profits, loss of goodwill, and other injuries.

104.   Plaintiffs' injuries were caused, in whole or in substantial part, by Defendants' acts of false advertising and unfair competition described herein.

105.   Defendants' acts constitute a violation of the Lanham Act and entitle Plaintiffs to recover Defendants' profits, Plaintiffs' damages, and the costs of this action. The circumstances of this case and the Defendants' actions entitle Plaintiffs to recover Defendants' profits, three times the damages to each class, and reasonable attorney fees.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs request:

106.   That the Court determine that this action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23 of the Federal Rules of Civil Procedure, be given to all members of the Plaintiff classes;

107.   That the false and misleading statements and pattern of deceptive practices alleged herein be adjudged in violation of the Lanham Act.

108.   That Plaintiffs and each class member of the classes recover their damages, the disgorgement of Defendants' profits, and up to three times their damages,

as provided by law, and that judgments in favor of Plaintiffs and the Plaintiff classes be entered against Defendants;

109. That Plaintiffs and the Plaintiff classes recover their costs of this suit, including reasonable attorneys' fees, as provided by law; and

110. That Plaintiffs and the Plaintiff classes be granted such other, further and different relief as the nature of the case may require or as may be deemed just and proper by this Court.

111. Plaintiffs demand a trial by jury.

Dated:   June 30, 2010

                                   Respectfully submitted,

                                   SUSMAN GODFREY L.L.P.

                                   James T. Southwick
                                   S.D. Admission No. JS 4264
                                   1000 Louisiana Street, Suite 5100
                                   Houston, Texas 77002-5096
                                   Telephone: (713) 651-9366
                                   Fax: (713) 654-6666

                                   Attorney-in-Charge for Plaintiffs

OF COUNSEL:

Richard W. Hess
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone: (713) 651-9366
Fax: (713) 654-6666