IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

SALON FAD,
CINDY'S HAIR SALON,
CHU'S HAIR SALON,
CARASTRO & COMPANY HAIR
DESIGN, EnV STUDIO SALON LLC,
NEW MILLENNIUM SALONS L.L.C.
D/B/A SALON 2000, SALON 1325,
SASSY & CLASSY SALON AND SPA,
THE WORKS HAIR AND NAIL SALON,
THE VERANDA SALON AND SPA, INC.,
VICTORIA'S SALON AND SPA,
WILLIAM DAVID SALON, VIDA SPA
SALON,

           Plaintiffs,
         − v. −

L'ORÉAL USA, INC.,
CONAIR CORPORATION
FAROUK SYSTEMS, INC.,
JOHN PAUL MITCHELL SYSTEMS,
SEXY HAIR CONCEPTS, LLC,
THE PROCTER AND GAMBLE
COMPANY, TIGI LINEA, LP

           Defendants.

Case No. 10-cv-5063  (DLC)

PLAINTIFFS' MEMORANDUM OF LAW
OPPOSING DEFENDANTS' MOTIONS TO DISMISS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ iv-vii

INTRODUCTION ...................................................................................... 1

ARGUMENT ............................................................................................. 3

1.    Plaintiffs Have Standing Under the Lanham Act ............................... 3

    A.    Plaintiffs' Cannot Be Denied Standing on These Motions to Dismiss .............. 4

    B.    Defendants Fail to Distinguish The Circuit Split on Standing ................ 6

    C.    Plaintiffs Have a Reasonable Interest to be Protected ............................. 7

        (1)    Plaintiffs Have an Interest in Maintaining the Value of Salon Products ................ 8

        (2)    Plaintiffs Have an Interest in Controlling Their Association ................ 9

        (3)    Plaintiffs Have an Interest in Maintaining Their Reputation and Customer Goodwill ................ 10

        (4)    Plaintiffs Have an Interest in Ensuring Their Customers are not Confused ................ 11

        (5)    Plaintiffs Have an Interest in Being the Outlet for Professional Products ................ 12

    D.    Plaintiffs Have a Reasonable Basis for Believing Defendants' False Advertising Will Damage Plaintiffs' Interests ................ 12

        (1)    Plaintiffs do not Need to Present Proof of Lost Sales for a Reasonable Basis ................ 13

        (2)    Plaintiffs Sell Fewer Products Because of Defendants' False Advertising ................ 13

        (3)    False Advertising Damages the Value of Salon Products ................ 14

        (4)    Defendants' False Association Creates a Reasonable Basis ................ 15

        (5)    Plaintiffs Have an Interest in Maintaining Their Reputation and Customer Goodwill ................ 16

(6)   Defendants' False Advertising Causes Consumer Confusion that Harms Plaintiffs ................................................................17

E.   Defendants' Three Primary Arguments are Incorrect.............................................17

   (1)   Plaintiffs and Defendants are Indirect Competitors....................................17

   (2)   Plaintiffs Are Not "Unhappy Customers"....................................................19

   (3)   Diversion, Combined with False Advertising, Causes Plaintiffs' Harm ................................................................................................20

2.   Plaintiffs Have Article III Standing ................................................................................20

3.   Plaintiffs State a Claim for False Advertising ................................................................21

A.   Defendants' Advertising is Material................................................................24

   (1)   Defendants' Statements Concern the Inherent Quality of the Products................................................................................................25

   (2)   The Statements Affect Consumers' Purchasing Decisions.........................26

B.   The Advertising Is False and Misleading ................................................................28

C.   The Advertising is Likely to Confuse Consumers ......................................................31

D.   The First-Sale Doctrine Is Inapplicable to Plaintiffs' Claims................................31

E.   Plaintiffs Are Entitled to an Injunction Against Defendants' False Advertising ................................................................................................32

4.   Plaintiffs Have Stated a Claim for Unfair Competition..............................................32

5.   Farouk's Motion to Sever Should Be Denied ..............................................................35

A.   Motions to Sever are Strongly Discouraged ................................................................36

B.   Four of the Five Factors at Issue Favor Denying Severance ..............................36

CONCLUSION................................................................................................38

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abernathy & Closther, Ltd v. E & M Advertising, Inc.*,
    553 F. Supp. 834 (E.D.N.Y. 1982) ........................................................................ 26

*Air Turbine Technology, Inc. v. Atlas Copco AB*,
    410 F.3d 701 (Fed. Cir. 2005) ............................................................................... 6

*Ashcroft v. Iqbal*,
    --- U.S. ---, ---, 129 S. Ct. 1937 (2009) ................................................................ 4

*Avis Rent A Car Sys., Inc. v. Hertz Corp.*,
    782 F.2d 381 (2d Cir. 1986) ........................................................................... 22, 28

*Bangkok Crafts Corp. v. Capitolo di San Pietro in Vaticano*,
    No. 03 Civ.0015(RWS), 2005 WL 1595285 (S.D.N.Y. July 6, 2005) ........... 9, 10, 18

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ........................................................................................... 4

*Bennett v. Spear*,
    520 U.S. 154 (1999) ........................................................................................... 21

*Berni v. International Gourmet Restaurants of America, Inc.*,
    838 F.2d 642 (2d Cir. 1988) ................................................................................. 5

*Brooks ex rel. Estate of Bell v. Topps Co., Inc.*,
    No. 06 Civ. 2359(DLC), 2007 WL 4547585 (S.D.N.Y. Dec. 21, 2007) ................. 30

*Coca-Cola Co. v. Tropicana Products, Inc.*,
    690 F.2d 312 (2d Cir. 1982) ........................................................................... 5, 16

*Compania Embotelladora del Pacifico v. Pepsi Cola Co.*,
    256 F.R.D. 131 (S.D.N.Y. 2009) ......................................................................... 36

*Conte Brothers Automotive v. Quaker State-Slick 50*,
    165 F.3d 221 (3d Cir. 1998) ................................................................................. 6

*Crab House of Douglaston, Inc. v. Newsday, Inc.*,
    418 F. Supp. 2d 193 (E.D.N.Y. 2006) ............................................................ 19, 20

*Cramer v. Fedco Auto. Components Co.*,
    No. 01-CV-0757(SR), 2002 WL 1677694 (W.D.N.Y. July 18, 2002) .................... 35

*DiFolco v. MSNBC Cable L.L.C.*,
    --- F.3d ---, No. 09-2821-cv, 2010 WL 3911330, *5 (2d Cir. Oct. 7, 2010) ............. 4

*Ferrer v. Maychick,*
    69 F. Supp. 2d 495 (S.D.N.Y. 1999) ................................................................. 13, 15

*Ford v. NYLCare Health Plans of Gulf Coast, Inc.,*
    301 F.3d 329 (5th Cir. 2002) .................................................................................. 21

*Groden v. Random House, Inc.,*
    61 F.3d 1045 (2d Cir. 1995) ................................................................................... 30

*Havana Club Holding, S.A. v. Galleon, S.A.,*
    203 F.3d 116 (2d Cir. 2000) ............................................................................... 6, 12

*Hearst Bus. Publishing, Inc. v. W.G. Nichols, Inc.,*
    76 F. Supp. 2d 459 (S.D.N.Y. 1999) ...................................................................... 27

*Iconix Brand Group, Inc. v. Bongo Apparel, Inc.,*
    No. 06 Civ. 8195 (DLC), 2008 WL 2695090 (S.D.N.Y. July 8, 2008) .................... 10

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.,*
    247 F.R.D. 420 (S.D.N.Y. 2007) ............................................................................ 36

*ITC Ltd. v. Punchgini Inc.,*
    482 F.3d 135 (2d Cir. 2007) ............................................................................ 6, 7, 12

*John Paul Mitchell Systems v. Randalls Food Markets, Inc.,*
    17 S.W.3d 721 (Tex. App. 2000, pet. denied) ........................................................ 32

*Johnson & Johnson v. Carter-Wallace, Inc.,*
    631 F.2d 186 (2d Cir. 1980) ......................................................................... 5, 13, 14

*Katzman v. Victoria's Secret Catalogue,*
    167 F.R.D. 649 (S.D.N.Y. 1996) ............................................................................ 19

*Kournikova v. Gen. Media Commc'ns, Inc.,*
    278 F. Supp. 2d 1111 (C.D. Cal. 2003) .................................................................... 6

*L. & J.G. Stickley v. Cosser,*
    255 Fed. App. 541, 2007 WL 4171651 (2d Cir., Nov. 27, 2007) ............................. 27

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ............................................................................................ 4, 21

*Matrix Essential Inv. v. Drug Emporium Drug Mart, Inc.,*
    988 F.2d 576 (5th Cir. 1993) .................................................................................. 32

*McNeilab, Inc. v. Am. Home Prods., Corp.,*
    848 F.2d 34 (2d Cir. 1988) ...................................................................................... 5

*Microsoft Corp. v. AGA Solutions, Inc.,*
    2007 WL 777756 (E.D.N.Y. Mar. 12, 2007) .......................................................... 34

*Nat'l Assoc. of Pharm. Mfgs., Inc. v. Ayerst Labs., Div. of/and Am. Home Prods. Corp.,*
  850 F.2d 904 (2d Cir. 1988) ........................................................................................ 4, 5

*Nat'l Basketball Ass'n. v. Motorola, Inc.,*
  105 F.3d 841 (2d Cir. 1997) ...................................................................................... 25, 27

*Omega Engineering, Inc. v. Eastman Kodak Co.,*
  30 F. Supp. 2d 226 (D. Conn. 1998)............................................................................... 17

*Ortho Pharms. Corp. v. Cosprophar, Inc.,*
  32 F.3d 690 (2d Cir. 1994) ................................................................................... passim

*PDK Labs, Inc. v. Friedlander,*
  103 F.3d 1105 (2d. Cir. 1997) ........................................................................................ 5

*PPX Enterprises, Inc. v. Audio Fidelity Enterprises, Inc.,*
  818 F.2d 266 (2d Cir. 1987) ............................................................................................ 3

*PPX Enters., Inc. v. Audiofidelity, Inc.,*
  746 F.2d 120 (2d Cir. 1984) ................................................................................... passim

*S.C. Johnson & Son, Inc. v. Clorox Co.,*
  241 F.3d 232 (2d Cir. 2001) .................................................................................. 22, 24, 28

*Schering Corp. v. Pfizer Inc.,*
  189 F.3d 218 (2d Cir. 1999) ................................................................................. 1, 28, 31

*Sebastian Int'l Inc. v. Longs Drug Stores,*
  53 F.3d 1073 (9th Cir. 1995) ......................................................................................... 31

*Societe Des Hotels Meridien v. LaSalle Hotel Operating P'ship., L.P.,*
  380 F.3d 126 (2d Cir. 2004) ............................................................................. 4, 6, 9, 16

*Spring Mills, Inc. v. Ultracashmere House, Ltd.,*
  724 F.2d 352 (2d Cir. 1983) ......................................................................................... 12

*Telecomm. Int'l Am., Ltd. v. AT&T Corp.,*
  280 F.3d 175 (2d Cir. 2001) ..................................................................................... 6, 35

*Time Warner Cable, Inc. v. DIRECTV, Inc.,*
  497 F.3d 144 (2d Cir. 2007) ..................................................................................... 28, 31

*United Mine Workers of Am. v. Biggs,*
  383 U.S. 715 (1966)........................................................................................................ 36

*Vidal Sassoon, Inc. v. Bristol-Myers Co.,*
  661 F.2d 272 (2d Cir. 1981) .................................................................................. 22, 25, 26

*Warner Bros Entm't Inc. v. Ideal World Direct,*
  516 F. Supp. 2d 261 (S.D.N.Y. 2007) .......................................................................... 36

*Warner Bros. Inc. v. Gay Toys, Inc.,*
    658 F.2d 76 (2d Cir. 1981) ..................................................................................... 33

**Statutes**

15 U.S.C. § 1125(a) (commonly referred to as Section 43(a) of the Lanham Act).............. passim

**Other Authorities**

*5 McCarthy on Trademarks* § 27:35 ....................................................................... 25

*5 McCarthy on Trademarks,* § 27.8 ....................................................................... 33

*5 McCarthy on Trademarks,* § 27:32 (West Group 2009). ........................................... 6

**Rules**

FED. R. CIV. P. 12 ............................................................................................. 5

FED. R. CIV. P. 12(b)(6) ..................................................................................... 4

FED. R. CIV. P. 20(A)(2) ..................................................................................... 37

FED. R. CIV. P. 21 ............................................................................................ 35

FED. R. CIV. P. 8(a)(2) ....................................................................................... 4

## Introduction

This Lanham Act case is brought by hair salons against seven manufacturers which advertise and promote their hair products as sold only in salons, yet sell large quantities of these same products in mass market stores.  By their own admission, Defendants could keep their products out of mass market stores and limit distribution to salons, but they fail to do so.

Defendants want two things that cannot be had together.  They want their advertising to convey a message of professional quality by stating that their products are available only through professional salons, yet they also want the additional profits that come from selling their products in grocery and drug stores.

Defendants choose to falsely advertise their products as available only through salons, while selling their products on the mass market.  But while Defendants receive increased revenues through these misrepresentations, this same false advertising injures the salons, who lose both their reputation as providers of professional products, as well as an important part of their revenues.  Hence, this lawsuit.

While on the Second Circuit, Justice Sotomayor wrote that "plaintiffs alleging a literal falsehood are claiming that a statement, on its face, conflicts with reality, a claim that is best supported by comparing the statement itself with the reality it purports to describe." *Schering Corp. v. Pfizer Inc.,* 189 F.3d 218, 229 (2d Cir. 1999).  Plaintiffs' First Amended Complaint (the "Complaint") lays out the contrast between the Defendants' advertising of their products as "For Sale Only in Professional Beauty Salons" and the reality that Defendants sold $345 million of these same products outside salons in 2009.  Complaint ¶¶ 39, 52.

Defendants present several myopic arguments for dismissal that do not fit the facts and circumstances alleged in the Complaint.  In particular, Defendants argue that:

1. Plaintiffs lack standing to sue, even though professional salons are expressly referenced on each of the millions of Defendants' hair product bottles;

2. Defendants' own advertising is immaterial and will not influence consumer purchasing decisions; and

3. Consumers could not possibly be confused by a shampoo bottle in a drug store whose label says it is available only in a professional salon.

The forty-page Complaint easily exceeds the pleading standard and describes how:

- The salons have standing because their business – which includes the purchase, use, recommendation, and sale of Defendants' products – is injured by Defendants' continued false representations that their products are exclusively available through salons.

- Defendants' false advertising that their products are available only in professional salons intentionally and effectively sends a message to consumers that these salon products are superior to mass-market brands.

- Consumer confusion is not necessary when advertising is literally false, but the contrast between the advertising and the reality of product availability is likely to confuse consumers as to the professional nature of the products and the superiority of the products to mass market brands.

For the reasons set forth below, Defendants' motions to dismiss should be denied.

# ARGUMENT

## 1.

## Plaintiffs Have Standing Under the Lanham Act

Plaintiffs assert claims under the Lanham Act for false advertising and unfair competition. The face of the statute gives a broad grant of standing to "any person who believes that he or she is likely to be damaged" by such acts.

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
> **(A)** is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> **(B)** in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1) (emphasis added). Although originally interpreted narrowly, "Section 43(a) subsequently has been employed successfully to combat a wide variety of deceptive commercial practices." *PPX Enterprises, Inc. v. Audio Fidelity Enterprises, Inc.,* 818 F.2d 266, 270 (2d Cir. 1987).

Federal courts applying the statute have developed prudential standing requirements, with significant differences among the circuits. In the Second Circuit "[i]n order to establish standing to sue under [Section 43(a)], a plaintiff must demonstrate a reasonable interest to be protected against the advertiser's false or misleading claims, and a reasonable basis for believing that this interest is likely to be damaged by the false or misleading advertising." *Ortho Pharms. Corp. v. Cosprophar, Inc.,* 32 F.3d 690, 694 (2d Cir. 1994) (citations and internal quotation marks omitted). Plaintiffs meet both these core requirements.

### A.      Plaintiffs Cannot Be Denied Standing on These Motions to Dismiss

Determining whether a plaintiff has a reasonable interest to protect and a reasonable basis for believing he is likely to be damaged requires a factual analysis. A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When ruling on a dismissal motion under Rule 12(b)(6), the court must accept all factual allegations as true, and draw all reasonable inferences in the plaintiff's favor. *See DiFolco v. MSNBC Cable L.L.C.*, --- F.3d ---, No. 09-2821-cv, 2010 WL 3911330, at *5 (2d Cir. Oct. 7, 2010). A complaint must only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, --- U.S. ---, ---, 129 S. Ct. 1937, 1949, (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "In other words, a complaint is not required to have 'detailed factual allegations, but it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation.'" *DiFolco*, at *5 (quoting *Iqbal*). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal* at 1950.

The same pleading rules apply to determining standing. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (discussing Article III standing). Applying this standard, the Second Circuit has a history of reversing decisions that dismiss Lanham Act claims for lack of standing before a fact record is developed. *See, e.g., Societe Des Hotels Meridien v. LaSalle Hotel Operating P'ship., L.P.*, 380 F.3d 126, 130 (2d Cir. 2004) (reversing district court dismissal of Section 43(a) false advertising claim); *Nat'l Assoc. of Pharm. Mfgs., Inc. v. Ayerst Labs., Div. of/and Am. Home Prods. Corp.*, 850 F.2d 904, 917 (2d Cir. 1988) (reversing dismissal of Section 43(a) case on standing because "appellants should be

given the opportunity to develop their evidence" on the claim); *PPX Enters., Inc. v. Audiofidelity, Inc.*, 746 F.2d 120, 124-25 (2d Cir. 1984) (reversing district court dismissal of Lanham Act unfair competition claim on standing grounds); *Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186 (2d Cir. 1980) (reversing district court's dismissal based on lack of Lanham Act standing).

The rarity of successful Rule 12 motions to dismiss based on Lanham Act standing can be seen through an examination of Second Circuit precedent.  Of all the seminal Lanham Act cases that have reached the appellate court, nearly every decision has either overturned a district court's dismissal of a Lanham Act standing claim, or affirmed only those decisions rendered on a motion for summary judgment or following a bench trial:[1]

- *Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186 (2d Cir. 1980) (reversing district court due to incorrect Lanham Act standing ruling).

- *Coca-Cola Co. v. Tropicana Prods., Inc.*, 690 F.2d 312 (2d Cir. 1982) (reversing district court's denial of preliminary injunction in part on Lanham Act standing).

- *PPX Enters., Inc. v. Audiofidelity, Inc.*, 746 F.2d 120 (2d Cir. 1984) (reversing district court dismissal of Lanham Act unfair competition claim on standing grounds).

- *McNeilab, Inc. v. Am. Home Prods., Corp.*, 848 F.2d 34 (2d Cir. 1988) (affirming grant of preliminary injunction for Lanham Act false advertising violation).

- *Nat'l Assoc. of Pharm. Mfgs., Inc. v. Ayerst Labs., Div. of/and Am. Home Prods. Corp.*, 850 F.2d 904, 917 (2d Cir. 1988) (reversing dismissal of Section 43(a) case based on standing).

- *Ortho Pharm. Corp. v. Cosprophar, Inc.*, 32 F.3d 690, 692 (2d Cir. 1994) (affirming lack of Lanham Act standing "entered after a bench trial" in the district court).

- *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1107 (2d. Cir. 1997) (reviewing district court "award of summary judgment" based on Lanham Act standing).

---

[1] In *Berni v. International Gourmet Restaurants of America, Inc.*, 838 F.2d 642 (2d Cir. 1988), the Second Circuit affirmed the dismissal of a Lanham Act claim on standing grounds.  This case, however, featured an extreme set of facts.  Plaintiffs did not allege "facts suggesting a present commercial interest" and did not "offer goods or services," and had no plans to do so in the future.  *Id.* at 647-48.  Plaintiff salons are commercial enterprises, selling both goods and services, and thus *Berni* is inapplicable to this case.

- *Havana Club Holding, S.A. v. Galleon, S.A.*, 203 F.3d 116 (2d Cir. 2000) (affirming district court's ruling on Lanham Act standing after a bench trial).

- *Telecomm. Int'l Am., Ltd. v. AT&T Corp.*, 280 F.3d 175, 181 (2d Cir. 2001) (reviewing standing claim after "grant of summary judgment").

- *Societe Des Hotels Meridien v. LaSalle Hotel Operating P'ship., L.P.*, 380 F.3d 126 (2d Cir. 2004) (reversing district court dismissal of Section 43(a) false advertising claim).

- *ITC Ltd. v. Punchgini Inc.*, 482 F.3d 135, 142 (2d Cir. 2007) (reviewing "award of summary judgment" on Lanham Act standing claim).

## B.    Defendants Fail to Distinguish the Circuit Split on Standing

In arguing the Lanham Act standing point, Defendants rely on opinions from outside the Second Circuit, including from circuits that have adopted differing tests for standing. For example, Paul Mitchell quotes the test for Lanham Act standing under the Ninth Circuit's precedent.[2] This test is not applicable because, as 5 *McCarthy on Trademarks* recognizes, "[t]he Ninth Circuit, generally followed by the Seventh and Tenth Circuits, has usually taken a more restrictive view of standing than the other circuits."[3]

Five of the six motions cite the Third Circuit's five-factor test in *Conte Brothers Automotive v. Quaker State-Slick 50*, 165 F.3d 221 (3d Cir. 1998). This test is applicable only in the Third and Eleventh Circuits.[4] Two motions rely on *Air Turbine Technology, Inc. v. Atlas Copco AB*, 410 F.3d 701 (Fed. Cir. 2005), which also employs a different standing test than developed by the Second Circuit.[5] The Court should reject Defendants' effort to import other circuits' standing jurisprudence that differs from the Second Circuit's case law.

---

[2] *See* Memorandum of Law in Support of Defendant John Paul Mitchell Systems' Motion to Dismiss First Amended Complaint at 5 (citing *Kournikova v. Gen. Media Commc'ns, Inc.*, 278 F. Supp. 2d 1111, 1117 (C.D. Cal. 2003) for Lanham Act standing requirements).
[3] 5 *McCarthy on Trademarks*, § 27:32 (West Group 2009).
[4] *Id.* (discussing *Conte Bros.* five-factor test).
[5] *See Air Turbine Tech.*, 410 F.3d at 709-10 (citing Eleventh Circuit law for standing test under Section 43(a)).

### C.    Plaintiffs Have a Reasonable Interest to be Protected

Plaintiffs meet the first requirement for standing under Section 43(a):  "a reasonable interest to be protected against the advertiser's false or misleading claims." *Ortho Pharms.*, 32 F.3d at 694.  "[R]easonable interest . . . includes commercial interests, direct pecuniary interests, and even future potential for a commercial and competitive injury." *ITC Ltd*, 482 F.3d at 169 (citation and quotation marks omitted).   In this case, Plaintiffs have current and future commercial and direct pecuniary interests affected by Defendants' false advertising affects.

The Complaint details the close commercial and pecuniary interests Plaintiffs have in the supply, demand, advertising, and sales of professional hair care products, including the Defendants' products.  Complaint ¶¶ 26-38.  As L'Oreal's annual report states:  "The privileged partner of hairdressers, [L'Oreal's] Professional Products Division distributes its products in hair salons all over the world.  It supports them in every facet of their development, and offers them high level education.  Its portfolio of differentiated brands meets the needs of all kinds of salons." Complaint ¶ 32.

The commercial and economic relationship between salons and Defendants works both ways.  Again, in L'Oreal's words:

> [L'Oreal's brand] Matrix adopted a system of salon-only distribution, which relies on professional hair stylists' use and recommendation, as an alternative to the elaborate and expensive advertising and marketing campaigns that mass-market manufacturers use to promote hair-care products sold in grocery and drug stores. L'Oreal's years of providing quality Matrix products, education, and service to its customers has created strong professional demand.   This demand is further fostered by L'Oreal's pledge to allow Matrix products to be sold only to professional salons and contracts promising to sell only via L'Oreal's professional salon distribution system.

Complaint ¶ 33.

Defendants use the salons to drive consumer demand for their products and to elevate Defendants' products to the status of "professional products."   The "professional" quality of

these products allows Defendants' to advertise a message of competitive superiority.   Complaint ¶¶ 35-36.

### (1)   Plaintiffs Have an Interest in Maintaining the Value of Salon Products

Plaintiffs' have direct commercial and pecuniary interests affected by Defendants' false advertising.   First, Plaintiffs have an interest in maintaining the value of salon-associated products that the salons stock and sell.   Products associated with salons are distinguished "from mass market hair care products" and the salon label "communicates the superiority of Defendants' professional products from mass market products."   Complaint ¶ 44.   Because consumers view salon products as distinct and superior, the salon label "adds cachet and value" and thus provides Plaintiffs and Defendants with a more valuable good to sell.   *Id.*   The salons' commercial and pecuniary interest in the value of salon-associated products is jeopardized when Defendants misrepresent their products by either directly misstating they are for sale only in salons or wrongly associating the product with salons.   Defendants' false advertising lowers the value and sales of hair care products in salons.   Complaint ¶¶ 82-83.

This is sufficient to confer standing under Second Circuit law.   In *PPX Enterprises, Inc.*, defendants sold albums that were "misleadingly packaged" as Jimi Hendrix albums despite the fact that he was not featured on the albums.   746 F.2d at 125.   Plaintiffs, the royalty owners for some Hendrix albums, sued defendants for falsely advertising that they were selling Hendrix albums.   The Second Circuit held that plaintiffs had a reasonable interest because they had "straight-forward commercial interests that could reasonably be affected by misleadingly packaged Jimi Hendrix recordings."   *Id.*

The Second Circuit's holding in *PPX Enterprises* is directly applicable in this case. Defendants intentionally create misleading packaging that reduces the value of the products

available for sale in Plaintiffs' salons, injuring the salons. Complaint ¶¶ 82-83. This misleading advertising is a sufficient reasonable interest to be protected by the Lanham Act

### (2)    Plaintiffs Have an Interest in Controlling Their Association

Plaintiffs also have a direct commercial and pecuniary interest relating to their close association with Defendants' products. Defendants advertise and label their products with express references to salons. Because of this association, Defendants tout the products stocked, recommended, and sold by Plaintiffs' salons as superior to and more valuable than non-salon products. *Id.* ¶¶ 44-45. When Defendants falsely state that their products are sold only in salons only, Defendants improperly associate their products with salons. *Id.* ¶ 45. This is a forced affiliation with Plaintiffs, and reduces the value and the cachet of products bought and sold at Plaintiffs' salons. *Id.*

The Second Circuit has held that this creation of a false affiliation is the kind of interest that creates Lanham Act standing. In *Societe des Hotels Meridien*, plaintiff sued under the Lanham Act because defendant falsely claimed that plaintiff's hotels were part of defendant's hotel chain. 380 F.3d at 128-29. The district court dismissed the claim on Lanham Act standing, but the Second Circuit reversed. The court held that "creating a false affiliation . . . and benefiting from the goodwill associated" with Plaintiffs is a reasonable interest that the Lanham Act protects. *Id.* at 130. Defendants have created this same false affiliation with Plaintiffs, by claiming that their products are either exclusively sold in salons or tying their products to the salons' reputations. Plaintiffs are able to defend their reasonable interest in their names, affiliation, and reputation through Section 43(a) of the Lanham Act.

In *Bangkok Crafts Corp. v. Capitolo di San Pietro in Vaticano*,[6] the defendants continued to advertise as though they were plaintiffs' licensee despite the termination of an earlier licensor-

---

[6] No. 03 Civ.0015(RWS), 2005 WL 1595285 (S.D.N.Y. July 6, 2005).

licensee relationship. The plaintiffs sued defendants for false advertising, and defendants argued that plaintiffs did not have standing. The court disagreed, finding that the defendants' continued assertion that they were plaintiffs' licensee was a form of "commercial exploitation of [plaintiffs'] name and association with it." *Id.* at *6. Like the defendants in *Bangkok Crafts*, Defendants have closely associated themselves with Plaintiffs through their advertising and sale of their products as professional through their affiliation with the salon industry. Defendants' false advertising exploits that association to the salons' detriment.

This Court too has recognized the importance of protecting affiliation and reputation. *Iconix Brand Group, Inc. v. Bongo Apparel, Inc.*,[7] examined a case in which plaintiff sued defendant for selling products bearing its logo. *Id.* at *2. The plaintiff did not have the trademark to its logo, but nonetheless this Court held that plaintiff had standing under Section 43(a) because it had "both a general commercial interest and a direct pecuniary interest in the strength of [plaintiff's] mark." *Id.* at *6. Plaintiffs are in the same situation. Although they may not have a trademark on the Defendants' false advertising terms, Plaintiffs do have an interest in the strength of their affiliation with professional products. This is a reasonable interest that is protected under Section 43(a) of the Lanham Act.

(3)     **Plaintiffs Have an Interest in Maintaining Their Reputation and Customer Goodwill**

Plaintiffs also have a direct commercial and pecuniary interest in ensuring that Defendants' false advertising does not harm their reputation and goodwill with customers. By falsely advertising that hair care products are either available for purchase only in salons or affiliated with salons, Defendants threaten the goodwill that Plaintiffs have built with their customers as providers of professional products. Complaint ¶ 74. This loss of goodwill and sullied reputation threaten Plaintiffs because their customers may choose not to purchase

---

[7] No. 06 Civ. 8195(DLC), 2008 WL 2695090 (S.D.N.Y. July 8, 2008) (Cote, J.).

products at Plaintiffs' salons or purchase fewer products and services at those salons.  *Id.* ¶ 75.
Plaintiffs' reputation and goodwill are also harmed because they are no longer the exclusive
distribution point for these hair care products, and because they are selling goods with false
advertising affixed to them.  *Id.* ¶¶ 71-72.

The loss of goodwill and the degradation of Plaintiffs' reputation are both protected
interests.  In *PPX Enterprises*, defendants were falsely labeling their albums as Jimi Hendrix
albums.  746 F.2d 122-23.  Plaintiffs owned a royalty interest in properly-labeled Jimi Hendrix
albums, and sued defendants for their false advertising on the grounds that it would hurt sales of
Plaintiffs' albums.  *Id.*  The Second Circuit agreed that plaintiffs had standing, noting that "if
consumers buy defendants' Jimi Hendrix albums and find that they have, in fact, been misled,
then it is not unlikely that they will be reluctant to buy other Hendrix recordings, including those
in which plaintiffs have their interests."  *Id.* at 125.

Similarly, consumers who purchase Defendants' mislabeled products will be reluctant to
buy other products and services from Plaintiffs.  As in *PPX Enterprises*, Plaintiffs have a
protectable interest under Section 43(a).

### (4)   Plaintiffs Have an Interest in Ensuring Their Customers are not Confused

Defendants' false advertising causes customer confusion, and Plaintiffs have a
recognizable interest in preventing this from happening.  Defendants' advertising states that
professional hair care products are only available in salons, yet consumers see these products
bearing this false advertising in other locations.  Complaint ¶ 75.  This false advertising confuses
consumers as to the professional nature of these hair care products, and will result in lost sales
and a lower business value for Plaintiffs.  *Id.* ¶¶ 70, 76.  It may also ultimately lead to fewer sales
of professional hair care products, as customers are not sure if any product labeled "sold only in
salons" or otherwise affiliated with salons will accurately reflect the product's professional

nature. *Id.* ¶¶ 82-83.  "[C]onsumer confusion is at the heart of the purpose of the Lanham Act and is 'the central inquiry in all cases of alleged trademark infringement and unfair competition.'"  *Havana Club Holding, S.A. v. Galleon, S.A.*, 62 F. Supp. 2d 1085, 1096 (S.D.N.Y. 1999) (quoting *Spring Mills, Inc. v. Ultracashmere House, Ltd.*, 724 F.2d 352, 357 (2d Cir. 1983)).  This is a direct commercial and pecuniary interest that can be vindicated through Section 43(a).

(5)      **Plaintiffs Have an Interest in Being the Outlet for Professional Products**

Finally, Plaintiffs have an interest in being the only provider of professional hair care products.  Products that are labeled for sale only in salons, or products that are affiliated with salons, can only be professional products if they are used and sold by salons; this is what makes the products professional. Complaint ¶ 80.  Were Plaintiffs' salons the point of sale for these products, Plaintiffs would be able to control the products' distribution and pricing.  *Id.*  With Defendants actions, however, Plaintiffs lose this control and the associated revenue and reputation.  *Id.*  For all of the above reasons, Plaintiffs have a commercial and pecuniary interest in stopping Defendants' false advertising.

**D.      Plaintiffs Have a Reasonable Basis for Believing Defendants' False Advertising Will Damage Plaintiffs' Interests**

Plaintiffs also satisfy the second prong of the standing test for a false advertising claim under the Lanham Act:  a reasonable basis for believing that Plaintiffs' interests described above will be damaged by Defendants' false advertising.  *See Ortho Pharms. Corp.*, 32 F.3d at 694. "The reasonable basis prong requires the plaintiff to show both likely injury and a causal nexus to the false advertising."  *ITC Ltd.*, 482 F.3d at 170 (citation and internal quotation marks omitted).  The Complaint properly alleges this likely injury and causal nexus.

### (1) Plaintiffs do not Need to Present Proof of Lost Sales for a Reasonable Basis

Several Defendants argue that Plaintiffs need to present concrete evidence of losses tied to Defendants' false advertising, but this is not the rule. The Second Circuit in *Johnson & Johnson* clarified that plaintiff is not required to present "proof of actual loss and specific evidence of causation," but only "whether it is likely that [defendant's] advertising has caused or will cause a loss of [plaintiff's] sales." 631 F.3d at 190. Plaintiff must only make "a logical causal connection between the alleged false advertising and its own sales position." *Id.* As another court put it, "[t]he exact damages figure . . . is not relevant"; plaintiff must only show that the "plaintiff's interest . . . has been injured by [the defendant's] advertising." *Ferrer v. Maychick*, 69 F. Supp. 2d 495, 501 (S.D.N.Y. 1999). Thus, Defendants' demand for more concrete injury evidence at the motion to dismiss stage is not required for Lanham Act standing.

### (2) Plaintiffs Sell Fewer Products Because of Defendants' False Advertising

Perhaps the most significant harm to Plaintiffs will come through lost sales because of Defendants' advertising. Defendants' false advertising puts additional "professional" products on the market at other locations, and thus makes Defendants at least indirect competitors of Plaintiffs. Complaint ¶ 78. This competition causes financial harm to Plaintiffs. Defendants profit from sales in grocery and drug stores, but these sales take away sales from Plaintiffs, which otherwise would have been the only location in which consumers could have bought the product. *Id.* "Every time Plaintiffs sell hair care products, they earn money; every time they lose a sale because the potential customer purchased diverted, falsely advertised hair care products, Plaintiffs lose a potential profit." *Id.* This is a direct injury that results from Defendants' false advertising and diversion.

The Second Circuit has recognized such injury and a causal nexus on numerous occasions. In *Johnson & Johnson*, plaintiff and defendant were also indirect competitors, but plaintiff was able to show that there was a causal connection between the defendant's advertising and injury to plaintiff. 631 F.2d at 190. Defendant sold a substitute for shaving cream (a depilatory) that plaintiff alleged was taking sales away from its shaving cream. *Id.* The Second Circuit agreed that there was an injury to plaintiff from reduced sales, and a causal nexus to defendant's false advertising: "For each new depilatory user, a corresponding decline in the use of shaving products such as oils and lotions appears probable." *Id.* This is precisely the same situation that is at issue here. As defendants sell more diverted, falsely advertised products, plaintiffs are denied sales and have a "corresponding decline" in sales. *Johnson & Johnson* shows that this is a sufficient reasonable basis.

The Second Circuit recognized this reasonable basis in *PPX Enterprises* as well. 746 F.2d 120. The court found that defendants' sales of its mislabeled Jimi Hendrix albums were competing directly with albums in which the plaintiffs had a royalty interest. "Every time a record in which they have a royalty interest is sold, they earn money; every time a sale is lost to a competitor, they lose a potential profit." *Id.* at 125. Plaintiffs here lose potential profits from each sale of Defendants' falsely advertised, diverted products, and thus have a recognizable injury and a causal nexus under direct Second Circuit precedent.

### (3) False Advertising Damages the Value of Salon Products

As discussed above, Plaintiffs have an interest in maintaining the value of the professional hair care products they offer for sale in their stores. Defendants' false advertising creates consumer confusion and makes purchasers question the professional nature of the products for sale at Plaintiffs' salons, ultimately lowering the value of the Plaintiffs' products. Complaint ¶ 82. This lower value results in "fewer sales of hair care products for Plaintiffs, and

correspondingly reduced profits." *Id.* Thus, Plaintiffs are both injured, and a causal nexus exists between this injury and Defendants' actions. *Id.*

Again *PPX Enterprises* shows that this injury can serve as a reasonable basis under Section 43(a) of the Lanham Act. The Second Circuit stressed in its opinion that the value of plaintiffs' properly-labeled Jimi Hendrix albums would be harmed by defendant's falsely advertised Jimi Hendrix albums because consumers would "be reluctant to buy other Hendrix recordings" after purchasing defendant's mislabeled albums. 746 F.2d at 125. Thus, the value of plaintiff's recordings was reduced by defendant's false advertising, and this properly served as a reasonable basis. Here, Defendants' false advertising lowers the value of Plaintiffs' professional products, resulting in fewer sales; this injury is a direct result of Defendants' actions.

The court reached a similar conclusion in *Ferrer v. Maychick*, 69 F. Supp. 2d 495 (S.D.N.Y. 1999). Before Plaintiffs were scheduled to release the authorized biography of Audrey Hepburn, Defendant released an unauthorized biography falsely labeled as endorsed by the Hepburn family. *Id.* at 496-97. Plaintiffs presented an expert who testified that "the second endorsed biography is made less valuable by the first," and the court held that this is "a reasonable basis to believe that [plaintiffs'] commercial interest in endorsing and participating in a Hepburn biography is damaged" by the defendant's advertising. *Id.* at 501. Plaintiffs have presented a similar allegation here. Defendant's false advertising and has caused Plaintiffs' salons and products to be less valuable, a direct correlation between Defendants' actions and Plaintiffs' injury. This meets the reasonable basis requirement.

### (4)    Defendants' False Association Creates a Reasonable Basis

Plaintiffs also established that Defendants' advertising creates a false affiliation and association with Plaintiffs, and that this is a reasonable interest to be protected. This false

affiliation is also sufficient to meet the reasonable basis prong as well. In *Societe des Hotels Meridien*, simply creating a false affiliation was itself sufficient to meet the reasonable basis prong. Noting that Defendant was "creating a false affiliation between [plaintiff and defendant] and benefiting from the goodwill associated with [plaintiff]" 380 F.3d 126, the court found this was sufficient to show reasonable basis: "On these allegations, we conclude that [plaintiff] has demonstrated a reasonable basis for asserting that this conduct might cause it commercial injury under the Lanham Act. Consequently, [plaintiff] has standing." Thus, under *Societe des Hotels Meridien*, simply creating a false affiliation is on its face sufficient to form a reasonable basis. This binding precedent ensures that Plaintiffs have standing in this case.

> **(5)   Plaintiffs Have an Interest in Maintaining Their Reputation and Customer Goodwill**

Plaintiffs have already properly alleged that Defendants will damage their reputation and harm their goodwill with customers. Complaint ¶¶ 71-75. There is a direct connection between this reputational damages from Defendants' false advertising and injury to Plaintiffs, as the "loss of goodwill directly harms . . . the Plaintiffs." *Id.* ¶ 74. "If customers believe that . . . advertised product characteristics are false or misleading and that Plaintiffs are involved with the misleading statements, they will be reluctant to purchase salon goods and services, adversely affecting Plaintiffs' current and future sales." *Id.* This allegation provides the nexus between the injury to Plaintiffs' and Defendants' false advertising.

This reputational damage – and the corresponding commercial harm – is recognized as a reasonable basis under Second Circuit precedent. In *Coca-Cola Co. v. Tropicana Products, Inc.*, 690 F.2d 312, 316 (2d Cir. 1982), the Second Circuit noted that when proving harm, a plaintiff did not have to prove that "one's sales will be lost <u>or that one's goodwill will be damaged</u> as a direct result of the competitor's advertisement." This inclusion of goodwill – separate from lost sales – shows that reputational harm is a commercial harm sufficient for

Lanham Act standing. In *Omega Engineering, Inc. v. Eastman Kodak Co.*, 30 F. Supp. 2d 226, 257 (D. Conn. 1998), the court noted that Lanham Act standing could come from "any customer confusion or <u>dissatisfaction</u>, lost sales, <u>lost goodwill</u> or other damages," again recognizing reputational harm and goodwill injury as a reasonable basis. Defendants' false advertising causes Plaintiffs harm, and provides a reasonable basis for standing under Section 43(a).

### (6)    Defendants' False Advertising Causes Consumer Confusion that Harms Plaintiffs

Finally, Plaintiffs also have a reasonable basis for alleging that Defendants' false advertising creates confusion for customers of salon products, and this confusion causes Plaintiffs' injury. Defendants' false advertisements create confusion for a variety of reasons listed in paragraph 70 of Plaintiffs' Complaint. Consumers will be unsure of what products are truly professional grade, and whether Plaintiffs are truthfully affiliated with any hair care products. Because Defendants' false advertising causes this confusion, and because this confusion reduces sales for Plaintiffs, the necessary injury and nexus exist to provide a reasonable basis under Section 43(a).

### E.    Defendants' Three Primary Arguments are Incorrect

Defendants submitted six different motions to dismiss Plaintiffs' claims, but they present essentially three arguments why Plaintiffs lack standing under the Lanham Act: (1) Plaintiffs and Defendants are not competitors; (2) Plaintiffs are unhappy customers and therefore cannot recover; and (3) diversion, not false advertising, causes the harm. All three of these agreements are unpersuasive.

### (1)    Plaintiffs and Defendants are Indirect Competitors

Defendants first argue that Plaintiffs do not have standing because they are not competitors with Defendants. Some Defendants go further and argue that Plaintiffs must be direct competitors with Defendants to have standing in this case. This misstates the law of this

circuit.  The Second Circuit has a "flexible approach toward the showing a Lanham Act plaintiff must make on the injury and causation component of its claim."  *Ortho Pharm.*, 32 F.3d at 694. Under this approach, a Plaintiff "<u>need not demonstrate that it is in direct competition with the defendant</u> or that it has definitely lost sales because of the defendant's advertisements."  *Id.* (emphasis added) (citations omitted).

Indirect competition is a broadly-defined concept under Section 43(a), as demonstrated in decisions on several false advertising claims.  In *PPX Enterprises*, the plaintiff was the owner of certain music licenses while defendants were manufacturers and marketers of records.  746 F.2d 121-22.  Despite the different competitive fields, the Second Circuit still held that there was sufficient indirect competition, because "[w]hat matters is whether a commercial party has a reasonable interest to be protected against the alleged false advertising."  *Id.* at 125 (citation and internal quotation marks omitted).   Because Plaintiffs are "a commercial party" with a "reasonable interest to be protected," it meets the *PPX Enterprises* requirement for indirect competition.

In *Bangkok Craft*, plaintiffs were the owner of licenses to religious art work, while defendants were manufacturers and art distributors; like *PPX Enterprises*, very different fields. 2005 WL 1595285, at *1-*2.  Defendant argued that plaintiffs could not prevail because they were not engaged in the same business, but the court rejected this argument.  "[Defendant] has cited no precedent that supports the proposition that [the plaintiff] must itself be actually engaged in the distribution of religious-themed products in order to assert a Section 43(a) claim, and <u>there is ample authority to support the contrary position</u>."  *Id.* at *5 (emphasis added).  The court rejected the defendants' narrow conception of competition.

Plaintiffs' relationship with Defendants meets the requirements needed for indirect competition under Section 43(a).

Plaintiffs are also placed in competition with Defendants through the combination of their false advertising and permitting of diversion.  Plaintiffs are both purchasers of Defendants' products and re-sellers of the products; it is this second role that makes them competitors of Defendants.  <u>Defendants make additional profits selling their hair care products outside of salons.  Plaintiffs earn profits only if the products are sold in salons.  Defendants profit by falsely advertising their diverted products, while Plaintiffs suffer from lost sales and reduced profits because of this advertising.</u>  Every time Plaintiffs sell hair care products, they earn money; every time they lose a sale because the potential customer purchased diverted, falsely advertised hair care products, Plaintiffs lose a potential profit. This places Defendants and Plaintiffs in competition with one another.

Complaint ¶ 78 (emphasis added).  This allegation is sufficient to establish the competitive relationship between Plaintiffs and Defendants, and rebuts Defendants' arguments that there is no competition in this case.

### (2)   Plaintiffs Are Not "Unhappy Customers"

Defendants also claim that Plaintiffs are simply unhappy customers, and this is a class of individuals that cannot have standing under Section 43(a).  Defendants are legally correct that unhappy customers do not have the right to sue under Section 43(a) of the Lanham Act. *See, e.g., Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 659 (S.D.N.Y. 1996) (recognizing that customers do not have standing to sue for false advertising under the Lanham Act). Defendants' accusation, however, fails because Plaintiffs are not just customers of Defendants but are also competitors.  Because Plaintiffs re-sell the same goods that Defendants are also selling with false advertising, indirect competition is taking place.  Complaint ¶ 78.  This indirect competition moves Plaintiffs outside the role of unhappy customers, and allows for standing under Section 43(a) of the Lanham Act.

Defendants' reliance on *Crab House of Douglaston, Inc. v. Newsday, Inc.*, 418 F. Supp. 2d 193 (E.D.N.Y. 2006) is telling.  In *Crab House*, the plaintiffs were purchasers of advertisement space in the defendant's newspaper.  *Id.* at 198.  The plaintiffs claimed that defendants falsified their circulation figures and charged plaintiffs too much for newspaper

advertisements. *Id.* at 201.  They sued for, among other things, false advertising.  The court determined that they did not have standing; the plaintiffs were not newspapers and had no commercial interest in the advertisement of circulation figures for defendant's newspaper.  As the court noted, "[n]owhere in [the complaint] do the Plaintiffs allege that they were in direct, <u>or even indirect competition</u> with Defendants . . . ."  *Id.* at 214 (citation omitted).  This case is different.  Plaintiffs are indirect competitors with Defendants, and have properly established the nature of this competition in the Complaint.

### (3)   Diversion, Combined with False Advertising, Causes Plaintiffs' Harm

Defendants' final argument is that Plaintiffs' harm is caused by diversion, and not by Defendants' false advertising, and therefore a Section 43(a) claim is inappropriate.  This allegation misses the very nature of Plaintiffs' claim.  The advertising is false because Defendants permit the sale of salon products outside salons.  If Defendants stopped diversion, then their advertising would not be false.  Or if Plaintiffs' products were sold without the false advertising, diversion would not be taking place.

> This competition could not exist without the false advertising: <u>diversion of hair care products without the false advertising would make the products nonprofessional, and thus not in competition with Plaintiffs' professional hair care products.</u> But for the false advertising on diverted products, Plaintiffs would not be injured.

Complaint ¶ 79 (emphasis added).  Plaintiffs' Complaint describes how diversion could not harm Plaintiffs without Defendants' false advertising.  For all of these reasons, Plaintiffs have standing to bring a false advertising claim under Section 43(a) of the Lanham Act.

### 2.

### Plaintiffs Have Article III Standing

Several Defendants also challenge Plaintiffs' standing under Article III of the Constitution.  The Defendants' single challenge to Article III standing is that Plaintiffs' injury is

not fairly traceable to the challenged advertisements. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). As discussed in the prudential standing section, Plaintiffs plausibly allege that their injuries are the result of Defendants' false advertising and thus satisfy the "fairly traceable" requirement of Article III standing. At the pleading stage, those allegations are sufficient to defeat Defendants' motions to dismiss regarding Article III standing. *Bennett v. Spear*, 520 U.S. 154, 168 (1999) (quoting *Lujan*, 504 U.S. at 560-61). Defendants' substantial reliance on *Ford v. NYLCare* recognizes the need for a full record on summary judgment before the issue can be adequately addressed. *Ford v. NYLCare Health Plans of Gulf Coast, Inc.*, 301 F.3d 329, 333 (5th Cir. 2002) (noting that "at the summary judgment stage plaintiff can no longer rest on mere allegations" of injury to satisfy Article III standing).

### 3.

### Plaintiffs State a Claim for False Advertising

In addition to standing, all Defendants except L'Oreal and Farouk argue that Plaintiffs have not adequately pled certain elements of a false advertising claim. These Defendants contend that Plaintiffs have not adequately alleged that: (1) their advertising is material to consumers' purchasing decisions, (2) their advertising is false or misleading, or (3) that their advertising is likely to cause confusion.

In determining whether a statement in an advertisement is false or material Second Circuit precedent requires trial courts to consider the total effect of the challenged words. "In considering a false advertising claim, 'fundamental to any task of interpretation is the principle that text must yield to context.'" *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 238 (2d

Cir. 2001) (quoting *Avis Rent A Car Sys., Inc. v. Hertz Corp.*, 782 F.2d 381, 385 (2d Cir. 1986)). The court "must consider the advertisement in its entirety and not engage in disputatious dissection.  The entire mosaic must be viewed rather than each tile separately." *Id.*  Moreover, the claim includes – and the court should consider – the "innuendo, indirect intimations, and ambiguous suggestions" of the challenged statements.  *Vidal Sassoon, Inc. v. Bristol-Myers Co.*, 661 F.2d 272, 277 (2d Cir. 1981).

An examination of the "entire mosaic" of each Defendants' advertising shows that the advertisements are false, confusing, and material for consumers.  The statements at issue which appear on product labels, print, and internet advertising – are set forth in the Complaint in paragraphs 39, 41, 42, 43, 50, 57, 59, and 62.  The Sexy Hair statements include:

- "Sold Only in Professional Salons."

- "Sexy Hair is available for sale only in professional salons."

- "Retail sale of Sexy Hair products is authorized only in professional beauty salons including chain salons such as JCPenny and Trade Secret."

- "Sexy Hair manufactures high-quality products for distribution within the professional beauty industry, and our hair and body collections can be found in over 60,000 licensed salons throughout the US and in more than 25 countries across the globe."

- "Diversion has multiple affects on those in the salon industry.  It corrupts our synergy, weakens our strength as opinion leaders, and diminishes our capacity to earn."

- "Authorized distribution of our products is through professional salons via a select group of distributors. Unauthorized distribution - diversion - results in our professional products sharing a shelf with OTC products in retail stores and chain outlets."

- "Diversion has multiple affects on those in the salon industry. It corrupts our synergy, weakens our strength as opinion leaders, and diminishes our capacity to earn. I, as stylist, salon owner, and manufacturer, am incensed from all perspectives."

- "We at Sexy Hair Concepts are committed to: Terminating any distributors we find diverting products directly or indirectly. Ensuring distributors stop shipping to any salons known to be or suspected of diverting products. Working with other manufacturers to implement procedures which will minimize the ability to divert our product and to trace

those responsible. Doing everything in our power to legally stop retailers from selling diverted products."

The Conair statements include:

- "Sold Exclusively in professional salons."

- "The Professional Products Division. The Division features both toiletries and appliances . . . which are exclusively for salon use and resale. . . The premium Rusk brand of hair care products. . . . A valuable part of the Professional Products Division, Rusk products continue to define the profession."

The Tigi statements include:

- "Sold Only in Professional Salons."

- "At TIGI, we work with designers and hairdressers worldwide to ensure that the latest styles and products are in salons — and salons only."

- "On behalf of TIGI, I want you to know that our commitment to fighting diversion does not stagger. In fact, TIGI is aggressively fighting those who counterfeit and divert our products to large, well-known, unauthorized, mass-market retailers."

The P&G statements include:

- "Guaranteed only when sold in professional salons."

- "Wella Sebastian products should only be sold in authorized salons and beauty supply stores. Purchasing them elsewhere is as unethical as someone selling them elsewhere."

- "Diversion directly interferes with the manufacturer's distribution channels and legitimate salon revenue. When diverted product shows up in your local grocery store or department store, it hurts your salon business, it hurts the overall profession, and ultimately it can hurt the consumer."

- "We are taking a stand against diversion. For the growth of our industry. For the success of our salon partners. For the respect and creativity of the stylist . . . Here's how we're putting an end to diversion. We have implemented an aggressive program to stop diversion."

- "Sebastian Professional is firmly committed to devoting the resources necessary to fight diversion and support the professional salon business."

- "OUR PROMISE TO YOU. As part of the Procter & Gamble Professional group of brands, Wella • Sebastian is clearly committed to administering the resources necessary to fight diversion and support the professional salon business."

- "We have instituted a 'zero tolerance approach' and are committed to providing the best anti-diversion plan of any manufacturer of professional hair products. We have a state of the art coding system that allows us to identify products found in an unauthorized retail outlet."

- "Wella Sebastian has implemented a state-of-the-art tracking and coding system that enables us to know where our products are at all times."

The Paul Mitchell statements include:

- "Guaranteed only when sold by a professional hairdresser, otherwise it may be counterfeit, old, or tampered with"

- "The real Paul Mitchell . . . guaranteed only in salons and Paul Mitchell schools."

- "John Paul Mitchell Systems is the most recognized professional manufacturer of salon products worldwide."

- "John Paul refuses to sell the company because of the initial vow he took to stand by the professional beauty industry. Since no public corporation can guarantee it will market John Paul Mitchell Products exclusively through salons, for John Paul - selling is simply not an option."

- "Diversion is the ugly side of the beauty industry. The professional salon products you buy in the grocery stores, drug stores, or on the internet are black market, counterfeit, or tampered with. Please call 1-888 398-8884 to report diverted product."

The context for these claims is clear: Defendants sell purely professional products intended for sale only in salons, and Defendants have the commitment and ability to stop sales outside salons. Over the past 10 years, these Defendants have sold hundreds of millions of dollars of their products outside salons: <u>P&G (Wella-Sebastian): $455 million</u>; <u>Paul Mitchell: $407 million</u>; <u>Tigi: $326 million</u>; <u>Conair (Rusk): $128 million</u>; <u>Sexy Hair: $140 million</u>. Complaint ¶ 52.

## A.    Defendants' Advertising is Material

Defendants urge the Court to find that a key aspect of their advertising does not concern the qualities or characteristics of their products and does not affect consumers' purchasing decisions. The rule in this circuit is that a false advertising claim must concern statements about "an inherent quality or characteristic of the product." *S.C. Johnson & Son*, 241 F.3d at 238.

"This requirement is essentially one of materiality" and requires that the challenged advertising would have some effect on consumers purchasing decisions. *Nat'l Basketball Ass'n. v. Motorola, Inc.*, 105 F.3d 841, 855 (2d Cir. 1997) (*hereinafter "NBA"*) (citing 5 *McCarthy on Trademarks* § 27:35.

### (1)    Defendants' Statements Concern the Inherent Quality of the Products

Defendants argue that the statements address only where the products can be purchased and therefore do not concern a quality or characteristic of their products.   But Defendants' argument requires the Court to ignore the context and overt suggestion of the advertising.   As alleged in the Complaint (¶¶ 36, 44, 45), the challenged statements convey a message of product superiority.   The message of superiority springs from Defendants' statements tying their products to professional salons.    Advertising that their products are exclusively available in salons suggests that: (1) the products are professional grade, (2) the products are used and sold by professional stylists, (3) the products are thus inherently superior to non-professional products, and (4) lends the products a special cachet associated with limited availability. *Id.*

The Second Circuit's *Vidal Sassoon* decision is instructive.   In that case, the defendant advertised that 900 women were surveyed and gave higher ratings to its "Body on Tap" shampoo than to plaintiff's shampoo.   Plaintiff challenged the validity of the tests.   The defendant argued that the test results – whether valid or invalid – did not concern an inherent quality or characteristic of the either parties' shampoo because the results only referenced women's opinions of the products.   The Second Circuit rejected this defense, holding that the total effect of the advertisement communicated the products' superiority:

> [W]hile we recognize that § 43(a) encompasses only misrepresentations with reference to the 'inherent quality or characteristic' of defendant's product, we are nevertheless convinced that Judge Stewart was correct in concluding that Sassoon would probably succeed in showing that the intent and total effect of the advertisements were to lead consumers into believing that Body on Tap was competitively superior, surely a representation regarding its "inherent quality".

*Vidal Sassoon*, 661 F.2d at 278.  *Vidal Sassoon* teaches that any statement that has the total effect of portraying a product as competitively superior is a representation regarding the products inherent quality.  That is precisely what Plaintiffs pleaded in the Complaint.

Defendants mistakenly rely on *Abernathy & Closther, Ltd v. E & M Advertising, Inc.*, 553 F. Supp. 834 (E.D.N.Y. 1982) for the proposition that statements concerning where or how a product is sold do not pertain to its inherent qualities.  The *Abernathy* plaintiff challenged TV commercials claiming that a product was an "exclusive TV offer" and available "for the first time on TV."  *Id.* at 836.  The court found that while the statements were false, they "did not suggest to the consumer any misinformation regarding the quality of the rope chains and watch being offered by the Defendants."  *Id.* at 837.  *Abernathy* is off point because the statements that the jewelry was available on television did not suggest or imply it was superior to other jewelry.  Unlike *Abernathy*, these Defendants' statements that their hair products are only available through professional salons tout their products' superiority to other hair products and thus address an inherent quality or characteristic of the products.

### (2)    The Statements Affect Consumers' Purchasing Decisions.

Defendants also argue that their advertising is not material because it would not affect consumers' purchasing decisions.  The only significant discussion of this point is in Tigi and Conair's brief in which they argue that the Complaint does not explain why qualities such as superiority and cachet would drive a consumer to purchase a product.  But L'Oreal explains why advertising a product as exclusively available in salons affects consumer decisions:

> Matrix adopted a system of salon-only distribution, which relies on professional hair stylists' use and recommendation, as an alternative to the elaborate and expensive advertising and marketing campaigns that mass-market manufacturers use to promote hair-care products sold in grocery and drug stores . . . This demand is further fostered by L'Oreal's pledge to allow Matrix products to be sold only to professional salons and contracts promising to sell only via L'Oreal's professional salon distribution system.

Complaint ¶ 33.

Defendants' association of their hair care products with professional salons is an alternative to other forms of advertising; they use the salons to create consumer demand.  *Id.* ¶¶ 33-38.  L'Oreal's statements are true for all defendants, who also intentionally affiliate and advertise their affiliation with professional salons to create product demand and thus influence consumer purchasing decisions.

Courts readily find that advertisements claiming that a product is related to a trusted source are material and affect consumer purchasing decisions.  *See L. & J.G. Stickley v. Cosser,* 255 Fed. App. 541, 543, 2007 WL 4171651 *1 (2d Cir., Nov. 27, 2007) (defendant made repeated "claims that their furniture polish derives from a formulation of Gustav Stickley.  These misrepresentations are clearly material, and they therefore suffice to make out a Lanham Act violation"); *Hearst Bus. Publishing, Inc. v. W.G. Nichols, Inc.,* 76 F. Supp. 2d 459, 469 (S.D.N.Y. 1999) ("Customers who wanted to purchase Chilton manuals that they relied upon and trusted would believe that Nichols was the source from which to obtain those products.")

Defendants rely on *NBA* for the proposition that statements concerning the source of a product do not affect purchasing decisions.  In *NBA*, defendant Motorola falsely advertised that its pager service sent scores directly from arenas and stadiums, when, in fact, the scores were originated from "reporters" watching broadcasts.  *NBA,* 105 F.3d at 844.  The Second Circuit affirmed dismissal of the Lanham Act claim, noting that the consumers were only interested in the scores, not the source of the information.  But the court highlighted the importance of context: "if the NBA were in the future to market a rival pager with a direct datafeed from the arenas – perhaps with quicker updates than SportsTrax and official statistics – then Motorola's statements regarding source might well be materially misleading." *NBA,* 105 F.3d at 855 (emphasis added).

1255034v1/010760                                    27

This case is similar to the market envisioned by the Second Circuit where there is competition for the product. The hair products market has many competitors, and an important aspect of Defendants' effort to distinguish their products from their competitors is to claim a superiority based on affiliation and availability through professional salons. As alleged in the complaint, that advertised distinction is intended to drive consumer demand for the products and is thus a material aspect of Defendants' advertising.

### B.       The Advertising Is False and Misleading

Defendants also argue that their advertising is not false. The falsity element requires that either (1) an advertisement is literally false as a factual matter, or (2) although the advertisement is literally true, it is likely to deceive or confuse customers. *S.C. Johnson & Son,* 241 F.3d at 238. An advertisement can be literally false either on its face or by necessary implication: "An advertisement can be literally false even though it does not explicitly make a false assertion, if the words or images, considered in context, necessarily and unambiguously imply a false message." *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 148, 158 (2d Cir. 2007). Advertisements that are only impliedly false are actionable if they have a "tendency to mislead, confuse, or deceive". *Schering*, 189 F.3d at 229 (2d Cir. 1999).

Plaintiffs that allege "a literal falsehood are claiming that a statement, on its face, conflicts with reality, a claim that is best supported by comparing the statement itself with the reality it purports to describe." *Id.* In assessing literal or implied falsity of a claim "text must yield to context" and "[t]he entire mosaic should be viewed rather than each tile separately." *Avis Rent A Car Sys,* 782 F.2d at 385. When viewed in context and not in isolation, Defendants' advertising conflicts with the reality it purports to describe.

P&G and Paul Mitchell argue that their labels' "guarantee" is not an expression that their products are sold only in salons. Tigi and P&G argue that their statements about diversion are

only opinion statements. These arguments fails to consider the entire label, the implication of the label, and the label in the context of these Defendants' other advertising about their products.

First, the labels place the guarantee in the context of sale from a "professional salon" or from a "professional hairdresser." These references on the product label imply that the product is only properly available through professional salons. The intended effect of this label is, like the other Defendants' labels, to convey a message that this is a professional product that is superior to non-professional products and the manufacturer limits its availability to professional salons.

Second, when viewed in the context of these Defendants' statements on the web and in print, the message that these are professional products sold only through salons is even clearer. Paul Mitchell states on its web site: "Since no public corporation can guarantee it will market John Paul Mitchell Products exclusively through salons, for John Paul - selling [the company] is simply not an option." Complaint ¶ 42. Likewise P&G's Sebastian states on its web site: "Wella Sebastian products should only be sold in authorized salons and beauty supply stores." *Id.* These Defendants' advertisements, when viewed in context and not in isolation, convey the same false message as the other Defendants: that their products are available only through salons and that their products are therefore superior to mass market products.

Third, these claims of guarantees must be considered in the context of the Defendants' statements that they have committed all necessary resources to stopping diversion and have a zero tolerance policy for diversion. Complaint ¶ 62. These claims are false or at least misleading, as demonstrated by the sales of their products outside salons. Thus the P&G and Paul Mitchell "guarantee" statements, even if not literally false, when viewed together, are likely to deceive or confuse consumers as to whether the products sold are professional products or

mass market products, whether the products are superior to mass market products, and whether the products sold in salons and mass market stores are genuine, untainted and safe. *Id.* ¶ 70.

P&G cites *Brooks ex rel. Estate of Bell v. Topps Co., Inc.*[8] for the proposition that guarantee statements are immaterial and not actionable under the Lanham Act.  (Paul Mitchell cites no cases in this section of its brief).  No such principle can be drawn from *Brooks*, where the Court found that "taken in context" a footnote in miniscule print on promotional materials about baseball cards stating that the card manufacturer could not guarantee that players autographs would be received in time for inclusion with the baseball cards, was not material. Because the context of the P&G and Paul Mitchell guarantee statements – which expressly reference professional salons – conveys a message of product superiority, P&G and Paul Mitchell's guarantee statements are material.

P&G and Tigi also claim that their statements concerning diversion are inactionable expressions of opinion.  An opinion statement is one that cannot not reasonably be seen as stating or implying provable facts, or is "rhetorical hyperbole."  *Groden v. Random House, Inc.,* 61 F.3d 1045, 1051-2 (2d Cir. 1995).  But these Defendants' advertising – that they oppose diversion, that they can stop diversion, that they have committed the resources to stop diversion, and that diversion harms salons – are provable factual assertions.  The statements that they can stop diversion and that diversion harms salons are true; the statements that the Defendants oppose diversion and have committed the resources to stop diversion are false.  These points are all factual and provable.  The effect of these representations and misrepresentations – fully intended by the Defendants – is to confuse consumers and salons into believing Defendants oppose the sale of their salon products in the mass market.  In truth, Defendants want the revenues from diverted sales and do not try to halt diversion.  These allegations have already

---

[8] No. 06 CIV. 2359(DLC), 2007 WL 4547585 (S.D.N.Y. Dec. 21, 2007) (Cote, J.).

been proven against L'Oreal, Complaint ¶60, and will be proven against the other Defendants in this case.

### C.      The Advertising is Likely to Confuse Consumers

Sexy Hair and P&G argue that Plaintiffs have not adequately alleged how their advertising can cause consumer confusion.  In this circuit, a literally false statement does not require proof of consumer confusion.  Plaintiffs that allege "a literal falsehood are claiming that a statement, on its face, conflicts with reality, a claim that is best supported by comparing the statement itself with the reality it purports to describe."  *Schering Corp.,* 189 F.3d at 229. Further, statements that are false by necessary implication require no evidence of consumer confusion.  *See Time Warner*, 497 F.3d at 158.  Implied falsehoods require extrinsic evidence of consumer confusion, but not at the pleading phase.

Because the Complaint plausibly alleges that the advertisements are literally false and conflict with the reality of widespread sale of salon products outside of salons, there is no ground to dismiss related to consumer confusion. Complaint ¶ 68.  Further, the Complaint plausibly alleges that Defendants' advertising tends to mislead consumers as to, among other things, the professional character of Defendants' products and the superiority of the Defendants' products compared to mass market products.  Complaint ¶ 70.

### D.      The First-Sale Doctrine Is Inapplicable to Plaintiffs' Claims

Paul Mitchell asserts that the "first sale" doctrine, a <u>trademark infringement</u> defense, bars Plaintiffs' damages for Defendants' <u>false advertising</u> and <u>unfair competition</u>.  This is wrong for several reasons.  First, the "first sale" doctrine is limited to trademark infringement claims. Plaintiffs have not alleged that Defendants' false advertising and unfair competition infringe any trademark.  Indeed, none of the cases cited by Paul Mitchell include a claim for false advertising. *See Sebastian Int'l Inc. v. Longs Drug Stores*, 53 F.3d 1073 (9th Cir. 1995) (examining

trademark infringement & unfair competition claims); *John Paul Mitchell Systems v. Randalls Food Markets, Inc.*, 17 S.W.3d 721 (Tex. App. 2000, pet. denied) (same).[9]

Second, the cases cited by Defendants indicate that the "first sale" doctrine protects a purchaser of trademarked goods from liability for reselling those goods. Here, Paul Mitchell seeks to expand that doctrine to protect a manufacturer of goods from its own false advertising. Such an expansion is unwarranted and unsupported by the case law.

### E.    Plaintiffs Are Entitled to an Injunction Against Defendants' False Advertising

Paul Mitchell also contends that Plaintiffs are not entitled to a permanent injunction. The sole argument it advances is that the request for a permanent injunction "is entirely derivative" of Plaintiffs' claims for false advertising and unfair competition. *Id.* John Paul Mitchell merely makes the uncontroversial point that if Plaintiffs fail to win on either its substantive claims (Count I or II), it is unlikely to be able to show its entitlement to an injunction (Count III).

### 4.

### Plaintiffs Have Stated a Claim for Unfair Competition

The Complaint also states a claim for unfair competition under the Lanham Act. Under a plain reading of that statute, Plaintiffs have sufficiently alleged that Defendants' advertising constitutes unfair competition. Although Defendants' dismissal motions include footnoted references to Plaintiffs' unfair competition claim (Count II), none of their arguments shows Defendants' entitlement to dismissal as a matter of law.

Under Section 43(a) of the Lanham Act, a Defendant unfairly competes if it:

> uses in commerce any word, term, name, symbol, or device, or any combination
> thereof, or any false designation of origin, false or misleading description of Fact,
> or false or misleading representation of fact, which (A) is likely to cause

---

[9] The first case Paul Mitchell cites in support of its "first sale" defense doesn't even mention that doctrine. *See Matrix Essential Inv. v. Drug Emporium Drug Mart, Inc.*, 988 F.2d 576 (5th Cir. 1993) (affirming dismissal of trademark infringement and unfair competition claim against unauthorized distributor)

confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.

15 U.S.C. § 1125(a)(1)(A).  "Section 43(a) of the Lanham Act is remedial in nature, and should be interpreted and applied broadly as to effectuate its remedial purpose." *Warner Bros. Inc. v. Gay Toys, Inc.*, 658 F.2d 76, 79 (2d Cir. 1981); *see 5 McCarthy on Trademarks*, § 27.8.

Plaintiffs have stated a claim for unfair competition under the Lanham Act.  Plaintiffs allege that Defendants' advertising of products as "salon only" is false and misleading.  *See* Complaint ¶¶ 39–56; 68–70.  The Complaint also properly alleges that Defendants' advertising "identifies Defendants' products as distinct from mass market products through their association with professional salons." *Id.* ¶ 72.  By falsely advertising that such products are available only in salons and simultaneously permitting diversion of these "salon-only" products to mass market chains, Defendants falsely identify salon-only products as distinct and superior to mass-market products.  The resulting consumer confusion makes consumers "reluctant to purchase salon goods and services" offered by Plaintiffs. *Id.* ¶¶ 71–84.

Defendants' various arguments to dismiss the unfair competition claim are insufficient.  Defendants TIGI, Conair, and Farouk merely assert that Plaintiffs' unfair competition claim is "conclusory" and fails to allege consumer confusion.  This is plainly wrong:  Count II incorporates by reference several pages of detailed pleading, including ¶¶ 68–84, which specify how Defendants unfairly compete with Plaintiffs through their false advertising and their failure to prevent diversion of salon-only product.  Defendant Farouk also argues that Plaintiffs do not identify their damaged goodwill, but this too is wrong.  Paragraphs 70 through 84 of the complaint provides ample detail on the reputational damage salons suffer from Defendants' unfair competition.

Paul Mitchell asserts that Count II is "derivative" of Plaintiffs' false advertising claim, and it therefore cannot be liable for unfair competition because it denies that it "falsely advertised that its products were available only in salons." Paul Mitchell brief at 7. This argument fails for the same reasons discussed above regarding the false advertising claim. Indeed, Paul Mitchell cites just one unpublished case in its brief to support dismissal of Count II. That decision demonstrates that "Section 43(a) of the Lanham Act is a broad federal unfair competition statute" that bars both false advertising and other forms of unfair competition. *Microsoft Corp. v. AGA Solutions, Inc.*, 2007 WL 777756, at *1 (E.D.N.Y. Mar. 12, 2007) (denying motion to dismiss Lanham Act claims). *AGA Solutions* does not help Defendants' motion to dismiss.

Defendant L'Oreal asserts that Plaintiffs' unfair competition claim must be dismissed because, according to L'Oreal, it is impermissibly based on "an advertising statement that associates the Defendant's product with a generic term such as the word salon." L'Oreal brief at 16. L'Oreal is incorrect. First, as the Complaint shows, the entire basis of Defendants' salon-only advertising depends on associating their products with professional hair salons and the stylists who recommend Defendants' products. *See, e.g.,* Complaint at pp. 8-13 (Tables 1–3). The Lanham Act prohibits the use of "any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin" that "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 11 U.S.C. § 1125. As the Complaint demonstrates, Defendants' advertising depends on creating an "affiliation, connection or association" between Defendants' products with the professional salons and their stylists that sell them.

The cases cited by L'Oreal are inapt.  For instance, it cites *Telecom International America Ltd. v. AT & T Corp*, 280 F.3d 175, 196–97 (2d Cir. 2001), which affirmed summary judgment against a telephone service reseller on its Lanham Act unfair competition claim.  The court's opinion addressed the unfair competition claim in only one sentence, affirming the district court because "there is of course no evidence that AT & T misrepresented the origin of its own international call-turnaround services or attempted to associate its services with those of TIA." *Id.* at 197.  The court did not address whether such facts could form the basis for an unfair competition claim.

The remainder of L'Oreal's cited cases deal with false association claims predicted on a Defendants' use of a protected trademark or trade dress.  Therefore, L'Oreal's cited cases regarding distinctiveness of a plaintiff's mark and whether such a mark had acquired secondary meaning are inapplicable.  Here, the plain terms of the statute require only that Defendants' advertising "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person."  Plaintiffs have sufficient alleged a cause of action for unfair competition under the Lanham Act.

### 5.

### Farouk's Motion to Sever Should Be Denied

In the alternative to its motion to dismiss, Farouk moves to sever itself from the other Defendants under Federal Rule of Civil Procedure 21.  This request should be denied. [10]

---

[10] Alternatively, this Court should not examine a motion to sever until discovery has taken place, as the motion is premature. *See, e.g., Cramer v. Fedco Auto. Components Co.*, No. 01-CV-0757(SR), 2002 WL 1677694 (W.D.N.Y. July 18, 2002) ("[B]ecause this Court is unable to develop its knowledge as to the merits and sustainability of plaintiffs' case beyond what is represented in the pleadings, granting a motion for separate trials at this time would be premature. . . .  Consequently, defendant's request for severance of plaintiffs' claims under Rule 21 is premature.").

### A.   Motions to Sever are Strongly Discouraged

"[T]he party making the motion bears the burden of showing that severance is necessary to prevent prejudice or confusion, and to serve the ends of justice." *Epstein v. Kemper Ins. Cos.*, 210 F. Supp. 2d 308, 313 (S.D.N.Y. 2002) (citation and internal quotation marks omitted). Courts generally are not inclined to grant motions to sever because they strongly encourage the joinder of similar claims in one lawsuit. "[T]he joinder of claims is strongly encouraged, and, concomitantly, severance should generally be granted only in exceptional circumstances." *Compania Embotelladora del Pacifico v. Pepsi Cola Co.*, 256 F.R.D. 131, 133 (S.D.N.Y. 2009) (citations and internal quotation marks omitted). "Under the Rules, the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged." *Warner Bros Entm't Inc. v. Ideal World Direct*, 516 F. Supp. 2d 261 (S.D.N.Y. 2007) (citing *United Mine Workers of Am. v. Biggs*, 383 U.S. 715, 724 (1966)) (emphasis added). With courts so strongly preferring that parties are not severed from cases, Farouk needs to present compelling evidence justifying their request for a severance.

### B.   Four of the Five Factors at Issue Favor Denying Severance

"When deciding a motion to sever, a district court should consider the following factors: (1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims." *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 247 F.R.D. 420, 424 (S.D.N.Y. 2007) (citation omitted). These factors require that Farouk's motion to sever be denied.

This litigation is based on similar occurrences for all Defendants:  the false advertising that expressly associates Defendants' products with Plaintiffs' salons.  The legal questions – whether Plaintiffs have standing and whether the false advertising is actionable under Section 43(a) of the Lanham Act – are identical for Farouk and the other Defendants.  Farouk's brief concedes this point: "Farouk understands that all other Defendants are moving to dismiss the Complaint on grounds similar to those set forth in the Memorandum of Law.  Farouk joins the other Defendants' arguments as expressed in their respective motions to dismiss."  Farouk brief at p. 6 n.1 (emphasis added).  All six motions to dismiss contain similar arguments about Lanham Act standing and the appropriateness of an unfair competition claim in this litigation.  These "question[s] of law . . . common to all defendants" are enough to defeat Farouk's motion to sever.  *See* FED. R. CIV. P. 20(A)(2).

Further, settlement of claims and judicial economy will be facilitated by denying severance.  This Court will decide the key legal questions that determine whether Plaintiffs can recover for Defendants' false advertising; having one answer to these questions decided by this Court alone will facilitate any possible settlement.  If key legal determinations are made by two different courts, it will make settlement more difficult.   Farouk has not made any accusations of prejudice stemming from this case being tried in this Court.  Thus, four of the five factors examined in a severance decision favor not granting the motion – and Farouk does not argue otherwise.

Farouk instead relies on one single factor to justify severance – that different witnesses and evidence will be needed for each Defendant.  Farouk fails to note that there are witnesses and evidence that are shared across all Defendants:

- Expert evidence of false advertising's effect on Plaintiffs' businesses and reputation.
- Plaintiffs' testimony and false advertising's impact on their businesses.

- ▪ Testimony about the interconnected hair care products industry, including evidence regarding the relationship between Plaintiffs and Defendants

- ▪ Customer surveys about the affect of Defendants' false advertising on consumers and product sales.

With this common evidence presented against all Defendants, severing Farouk introduces waste and inefficiency. Without any of the five factors favoring Farouk's request for severance, this Court should dismiss Farouk's motion.

### Conclusion

Defendants hope this Court will preserve the status quo in the hair products industry, in which Defendants make material misrepresentations on their products about their affiliation with professional salons, and Plaintiffs suffer the corresponding lost sales and damaged customer goodwill. Ultimately, Defendants argue that they can continue to harm Plaintiffs and face no consequences. But, Defendants' actions – and the corresponding damage to Plaintiffs – are actionable under the Lanham Act, and Plaintiffs should be permitted to pursue their legitimate grievances against Defendants.

Dated:   October 22, 2010

Respectfully submitted,

SUSMAN GODFREY L.L.P.

/s/ James T. Southwick
James T. Southwick
S.D. Admission No. JS 4264
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone: (713) 651-9366
Fax: (713) 654-6666
jsouthwick@susmangodfrey.com

Attorney-in-Charge for Plaintiffs

OF COUNSEL:

Richard W. Hess (pro hac vice)
Christopher Hogan (pro hac vice)
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone:  (713) 651-9366
Fax:  (713) 654-6666
rhess@susmangodfrey.com
chogan@susmangodfrey.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 22, 2010, I electronically transmitted the attached

document to the Clerk of Court using the ECF System for filing and served the following counsel

by ECF or First Class Mail.

Janet B. Linn
Steven R. Kramer
ECKERT SEAMANS CHERIN & MELLOTT, LLC
10 Bank Street, Suite 1061
White Plains, NY 10606

Frederick B. Warder III
Scott Caplan
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY  10036

Harold P. Weinberger
Norman C. Simon
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York  10036

Michaeline A. Re
LAW OFFICES OF MICHAELINE A. RE
350 W. Colorado Blvd., Suite 200
Pasadena, CA 91105

Lewis Clayton
Susanna M. Buergel
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019

John A. Furutani
FURUTANI & PETERS, LLP
350 W. Colorado Blvd., Suite 200
Pasadena, CA  91105

Joshua G. Graubart
WINSLETT STUDNICKY MCCORMICK &
BOMSER LLP
6 E. 39th Street, 8th Floor
New York, NY  10016

Scott Gelin
Anthony Matheny
GREENBERG TRAURIG, LLP
1000 Louisiana Street, Suite 1700
Houston, TX  77002

Roberta Jacobs-Meadway
ECKERT SEAMANS CHERIN & MELLOTT, LLC
Two Liberty Place
50 South 16th Street, 22nd Floor
Philadelphia, PA  19102


/s/ James T. Southwick
James T. Southwick