IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SALON FAD,<br>CINDY'S HAIR SALON,<br>CHU'S HAIR SALON,<br>CARASTRO & COMPANY HAIR DESIGN, EnV STUDIO SALON LLC,<br>NEW MILLENNIUM SALONS L.L.C. D/B/A SALON 2000, SALON 1325,<br>SASSY & CLASSY SALON AND SPA,<br>THE WORKS HAIR AND NAIL SALON,<br>THE VERANDA SALON AND SPA, INC.,<br>WILLIAM DAVID SALON, VIDA SPA SALON,<br><br>        **Plaintiffs,**<br>    – v. –<br><br>L'ORÉAL USA, INC.,<br>CONAIR CORPORATION<br>JOHN PAUL MITCHELL SYSTEMS,<br>THE PROCTER AND GAMBLE COMPANY, TIGI LINEA, LP<br><br>        **Defendants.** | Case No. 10-cv-5063  (DLC) |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR
MOTIONS FOR CLASS CERTIFICATION**

## Table of Contents

TABLE OF AUTHORITIES ..................................................................................... iii

PRELIMINARY STATEMENT .............................................................................. 1

FACTS ...................................................................................................................... 2

    A.    Hair care industry.................................................................................... 2

    B.    Defendants' False Advertising and Unfair Competition ........................ 4

    C.    The Proposed Classes ............................................................................. 9

        1.    The L'Oreal Class ........................................................................ 9

        2.    The TIGI Class........................................................................... 11

        3.    The Conair Class........................................................................ 12

        4.    The Paul Mitchell Class............................................................. 13

        5.    The Procter and Gamble Class................................................... 15

    D.    Class Representatives............................................................................. 16

        1.    Salon FAD .................................................................................. 16

        2.    Sassy & Classy Salon and Spa................................................... 18

        3.    Salon 1325 .................................................................................. 19

        4.    EnV Studio Salon LLC .............................................................. 20

        5.    New Millennium Salons L.L.C. d/b/a Salon 2000.................... 21

        6.    The Works Hair and Nail Salon................................................. 22

        7.    The Veranda Salon and Spa ....................................................... 23

        8.    Cindy's Hair Salon..................................................................... 24

        9.    Carastro & Company Hair Design.............................................. 26

        10.    The William David Salon .......................................................... 27

        11.    Chu's Hair Salon........................................................................ 28

    E.    Areas of Dispute on Class Certification................................................ 29

ARGUMENT ........................................................................................................ 30

    A.    Standards Governing Class Certification ................................................. 30

    B.    The Proposed Class Action Satisfies Rule 23(a) Requirements ........................ 31

        1.    Each class satisfies the numerosity requirement ...................................... 32

        2.    This case involves questions of law and fact common to each class ........ 32

        3.    The Class Representatives' claims are typical of class claims ................. 34

        4.    The Class Representatives will fairly and adequately protect the
            interests of their respective classes .......................................................... 36

    C.    The Proposed Class Action Satisfies Rule 23(b)(3). ............................................. 37

        1.    Common issues of law and fact predominate over individual issues
            within each proposed class ........................................................................ 38

        2.    Common proof establishes the nature of the advertising,  its falsity,
            and that the advertising was nationwide. .................................................. 40

        3.    Injury to all class members can be proven using evidence common
            to all members of each class. ..................................................................... 42

        4.    Common economic evidence can also be used to calculate
            aggregate damages. ................................................................................... 45

        5.    Materiality and causation can be proven using evidence common
            to all class members .................................................................................. 45

        6.    This Class Action is Superior to Individual Actions ............................... 49

    D.    Alternatively, Plaintiffs' claims for injunctive relief are appropriately
        certified under Rule 23(b)(2). ................................................................................ 50

CONCLUSION .................................................................................................... 51

CERTIFICATE OF SERVICE ............................................................................. 53

# TABLE OF AUTHORITIES

## Cases

*Aspinall v. Philip Morris Cos., Inc.,*
  813 N.E.2d 476 (Mass. 2004) .................................................................................. 42

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,*
  22 F.3d 52 (2d Cir. 2000) ........................................................................................ 36

*Bolanos v. Norwegian Cruise Lines Ltd.,*
  212 F.R.D. 144 (S.D.N.Y. 2002) ......................................................................... 32, 35

*Brazil v. Dell Inc.,*
  No. C-07-01700 RMW, 2010 WL 5387831 (N.D. Cal. Dec. 21, 2010) .................... 42

*Brown v. Kelly,*
  609 F.3d 467 (2d Cir. 2010) ............................................................................... 35, 50

*Caridad v. Metro-North Commuter R.R.,*
  191 F.3d 283 (2d Cir. 1999) ................................................................................... 35

*Cashmere & Camel Hair Mfrs. Institute v. Saks Fifth Ave.,*
  284 F.3d 302 (1st Cir. 2001)................................................................................... 46

*Cent. States S.E. & S.W. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.,*
  504 F.3d 229 (2d Cir. 2007) ......................................................................... 30, 32, 36

*Consol. Rail Corp. v. Town of Hyde Park,*
  47 F.3d 473 (2d Cir. 1995) ..................................................................................... 32

*Cordes & Co. Fin. Servs. v. A.G. Edwards & Son, Inc.,*
  502 F.3d 91 (2d Cir. 2007) ..................................................................................... 38

*Curtis v. Altria Group, Inc.,*
  792 N.W.2d 836 (Minn. App. 2011).......................................................................... 42

*Erica P. John Fund, Inc. v. Halliburton Co.,*
  131 S.Ct. 2179 (2011).............................................................................................. 39

*Gelb v. Am. Tel. & Tel. Co.,*
  150 F.R.D. 76 (S.D.N.Y. 1993) ................................................................................ 52

*Gen. Tel. Co. of Southwest v. Falcon,*
  457 U.S. 147 (1982).......................................................................................... 35, 36

*Harper v. 24 Hour Fitness, Inc.,*
  84 Cal. Rptr. 3d 532 (Cal. App. 2008) .................................................................... 42

*Hi-Lo Auto Supply, L.P. v. Beresky,*
   986 S.W.2d 382 (Tex. App. 1999) ............................................................ 42

*In re Brazilian Blowout Litig.,*
   No. CV 10-8452-JFW (C.D. Cal. Apr. 12, 2011) ................................. 33, 41

*In re Frontier Ins. Group, Inc. Sec. Litig.,*
   172 F.R.D. 31 (E.D.N.Y. 1997) ............................................................... 36

*In re Initial Public Offerings Sec. Litig.,*
   471 F.3d 24 (2d Cir. 2006) ................................................................. 31, 39

*In re Nassau County Strip Search Cases,*
   461 F.3d 219 (2d Cir. 2006) .......................................................... 2, 38, 40

*Jackowski v. Guardian Protection Servs. Inc.,*
   No. 233, 2001 WL 34117810 (Pa. C.P. June 29, 2001) ........................... 42

*Jermyn v. Best Buy Stores,*
   256 F.R.D. 418 (S.D.N.Y. 2009) ............................................................. 41

*Johnson & Johnson v. Smithkline Beecham Corp.,*
   960 F.2d 294 (2d Cir. 1992) .................................................................. 46

*Johnson & Johnson Vision Care v. CIBA Vision Corp.,*
   348 F. Supp. 2d 165 (S.D.N.Y. 2004) ..................................................... 40

*Kropinski v. Johnson & Johnson,*
   No. A-3979-97T1, 1999 WL 33603132 (N.J. Super. App. Div. Jan. 7, 1999) ......................... 42

*Lee v. Carter-Reed Co., LLC,*
   4 A.3d 561 (N.J. 2010) ......................................................................... 42

*Marisol A. v. Giuliani,*
   126 F.3d 372 (2d Cir. 1997) ............................................................. 32, 35

*Moore v. PaineWebber Inc.,*
   306 F.3d 1247 (2d Cir. 2002) ................................................................ 39

*Nat'l Basketball Ass'n v. Motorola, Inc.,*
   105 F.3d 841 (2d Cir. 1997) .................................................................. 46

*Rexall Sundown, Inc. v. Perrigo Co.,*
   651 F. Supp. 2d 9 (E.D.N.Y. 2009) ........................................................ 40

*Robinson v. Metro N. Commuter R.R. Co.,*
   267 F.3d 147 (2d Cir. 2001) .................................................................. 35

*Rose v. United Equitable Ins. Co.*,
    651 N.W.2d 683 (N.D. 2002) ............................................................ 42

*S.C. Johnson & Son, Inc. v. Clorox Corp.*,
    241 F.3d 232 (2d Cir. 2001) ............................................................ 46

*Sharif ex rel. Salahuddin v. New York State Educ. Dep't.*,
    127 F.R.D. 84 (S.D.N.Y. 1989) ........................................................ 30

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
    546 F.3d 196 (2d Cir. 2008) ............................................................ 31

*Trief v. Dun & Bradstreet Corp.*,
    144 F.R.D. 193 (S.D.N.Y. 1992) ...................................................... 32

*Wal-Mart Stores, Inc. v. Dukes et al*,
    No. 10-277, slip op. (June 20, 2011) ........................................ 33, 35, 36

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc. (In re Visa Check/MasterMoney Antitrust Litig.)*,
    280 F.3d 124 (2d Cir. 2001) ............................................................ 39

*Weiner v. Snapple Beverage Corp.*,
    No. 07 Civ. 8742(DLC), 2010 WL 3119452 (S.D.N.Y. Aug. 5, 2010) .................. 42

*Zeisel v. Diamond Foods, Inc.*,
    No. C 10-01192 JSW (N.D. Cal. June 6, 2011) .................................. 33, 41

**Statutes**

15 U.S.C. § 1117(a) ........................................................................ 40

15 U.S.C. § 1125 ........................................................................ 9, 39

Fed. R. Civ. P. 23 ................................................................... passim

**Other Authorities**

A. Conte & H. Newberg, Newberg on Class Actions (4th ed. 2002) ................ 2, 51, 52

J. Thomas McCarthy, McCarthy on Trademarks .................................... 46

## PRELIMINARY STATEMENT

This action seeks to hold the five manufacturers of professional hair care products accountable for their illegal advertising practices. The five Defendants falsely advertise that their professional hair products are available only in professional salons. They do this on the products' own labels, on the internet, in popular consumer publications like *InStyle* and *Elle,* and in industry magazines. Nevertheless, Defendants knowingly permit those products to be diverted and sold in large volumes through mass retail channels such as CVS, Walgreens, Target, and Wal-Mart. This diversion renders the Defendants' advertising false and misleading.

The Defendants' actions are not accidental. Sales of "salon-only" products in Plaintiffs' salons make the Defendants' advertising credible. This drives demand for the products because consumers consider the professional grade products as higher quality than mass retail products. The Defendants substantially increase their revenues and profits by permitting widespread sales of their salon-only products through mass retail channels. They do so, however, at the expense of professional salons and in violation of the Lanham Act's false advertising proscriptions.

Plaintiffs ask the Court to certify five separate classes under Federal Rule of Civil Procedure 23: one class for each defendant, with each class comprising salons and stylists who sold that defendant's products during the six years prior to the filing of this suit.

False advertising cases are well-suited to class treatment because the crux of the case—the advertiser's liability for falsely promoting its products—involves only proof of the defendant's advertising campaign. Those acts are, of course, common to the entire class. "When plaintiffs are allegedly aggrieved by a single policy of defendants, such as the blanket policy at issue here, the case presents precisely the type of situation for which the class action device is suited since many nearly identical litigations can be adjudicated in unison." *In re Nassau County*

*Strip Search Cases*, 461 F.3d 219, 228 (2d Cir. 2006). This is an especially strong case for class treatment because:

1. A single federal statute, the Lanham Act, governs all claims.

2. There is no dispute that Defendants' advertising was national in scope and uniform across the country.

3. The falsity of the advertising requires only common proof: the advertising itself, and, where the advertising may not be literally false, consumer surveys.

4. The nature of the industry lends itself to class treatment. Economist Dr. Paul Rubin—who supervised the entire consumer protection mission of the FTC's Bureau of Consumer Protection—opines that standard regression analysis can readily demonstrate both the common impact of the advertising on all class members as well as total class-wide damages.

Class treatment is the superior method of deciding these claims. No individual salon or stylist could afford to bring this kind of action; nor has any to counsel's knowledge. The efficiencies gained through class treatment of these false advertising claims—brought against the Defendants' nationwide advertising campaigns, under a single statute with national reach—are enormous and make class certification highly appropriate.

Class actions are intended to advance five essential objectives: (1) judicial economy and efficiency; (2) protection of defendants from inconsistent obligations; (3) protection of the interests of absentees; (4) access to judicial relief for small claimants; and (5) enhanced means for private attorney general suits to enforce laws and to deter wrongdoing. *See* 1 A. CONTE & H. NEWBERG, NEWBERG ON CLASS ACTIONS § 1:6 (4th ed. 2002). Granting Plaintiffs' motions for class certification in this case would promote all of these objectives.

## FACTS

### A.    Hair care industry

Hair care products fall into two broad categories: (1) mass market products that are marketed and sold through chain drug stores, grocery stores, department stores, and mass

retailers such as Target, Walgreens, and Kroger; and (2) professional or salon-only products that are intended for sale only through professional salons and are more expensive than mass market products. Professional hair care products are an important part of salons' integrated products and services offerings.[1] Stylists use the products on and educate their clients about these products, and then sell the products to generate revenue.[2] The profit margin on these products is generally higher than the margin for hair care services provided in salons.[3] As well, the salon may be able to cross-sell clients on services when clients come into the salon to purchase more hair care products.[4]

The Defendant manufacturers use the salons to generate demand for their professional salon-only products. As L'Oreal explained regarding its Matrix brand of professional products, "Matrix adopted a system of salon-only distribution, which relies on professional hair stylists' use and recommendation, as an alternative to the elaborate and expensive advertising and marketing campaigns that mass-market manufacturers use to promote hair-care products sold in grocery and drug stores." *See* Ex. 3 (Complaint, 2:09-cv-01484, *L'Oreal USA S/D, Inc. v. Hair Casino Venture, LLC,* in the U.S. District Court, District of Nevada). Salons invest time, energy, and resources educating their clients about professional products with the expectation that the

---

[1] *See* Ex. 42 (Pelfrey Dep.) at 126:11–13 ("Retail is a huge, huge thing for salons and [diversion] has taken it out of the salons"); *see also* Ex. 62 (LOREAL000234) ("To be successful in today's competitive marketplace, your salon must be in the business of selling products, not just services—it's key for maximizing profitability!"). All exhibits are attached to the Declaration of Nabeel H. Peracha submitted in support of Plaintiffs' Motion for Class Certification.

[2] *See* Ex. 32 (Elrod Dep.) at 113:17–25 ("I have educated my customer on how to use this salon professional product and they know how to use that product that they would not have known how to use and I am [promoting] this product as a salon product and then when they go to CVS they see a mass amount on the shelf.").

[3] *See e.g.,* Ex. 1 (Wood Dep.) at 105:10 ("we do a hundred percent markup"). Defendants acknowledge the importance of this revenue source: "It matters to us where you buy your professional products. Much of what you experience and enjoy at our salon is made possible by the profits from these products." *See* Ex. 2 (JPMS 106).

[4] *See* Ex. 1 (Wood Dep.) at 68:5–11 ("When people would come into our salon just to purchase the shampoo, they would come in and nine times out of ten, we would talk them into getting a service while they were there, whether it be just a $10 eyebrow wax, we could talk them into a service.").

manufacturers will abide by their advertising and therefore ensure that the products will only be sold in salons.[5]

**B.      Defendants' False Advertising and Unfair Competition**

Recognizing the market demand, Defendants advertise and promote the hair products that they sell through salons as "professional" and available "only in salons." Yet, these same Defendants knowingly permit large quantities of their purportedly salon-only products to be sold through mass market channels—a practice known in the industry as "diversion." By permitting and tolerating expansive diversion, Defendants' advertising of their products as salon-only is rendered false; the act of widespread diversion falsifies the Defendants' advertising claims that their products are professional and sold only in salons.

Indeed, Defendants themselves admit that they could—if they truly wanted—keep their products out of mass market stores and restrict their distribution to salons, but they do not. Table 1 shows Defendants' statements regarding their ability to police and prevent diversion of salon-only products:

---

[5] *See* Ex. 1 (Wood Dep.) at 37:25-38:9 ("My understanding is that I am representing salons and stylists in the United States that [are] affected by the diversion of these products that we sell, educate and teach our clients on, that they would not even know what this product is sitting on the shelf if it hadn't been for us putting all of our time into teaching them on."), 68:12-18 ("When they are not walking through our door, we can't talk them into anything and the product they are buying there, they wouldn't even know about if we hadn't educated them on it, they would think it was a $20 bottle of shampoo sitting next to a $5 bottle of shampoo."); *see also* Ex. 4 (Liston Dep.) at 18:16-20 ("Selling [professional] products that we market and advertise and put time and educate people with and get everyone confident in the product and knowledgeable and then they go in the [mass market] stores and they can buy it.")

| Table 1 | |
|---|---|
| **Defendants' Ability to Stop Diversion** | |
| L'Oreal | "We have launched a new state-of-the-art product coding system that is 100% accurate in tracking products to diverters." *See* Ex. 5 (www.matrixbeautiful.com/about_matrix/diversion,aspx, 6/2/2008)<br><br>"We ensure that our teams closely monitor what our distributors do and require them to report and take executive action against diverters. All of this is possible now because we've got the most sophisticated and robust primary and secondary-coding system in the business. It allows us to be able to, in a very short amount of time, identify exactly which distributor our products have been sold to, and from there, it enables us to identify which salon the distributor has sold the products to because our distributors are all obliged to code at the secondary level.  This system gives us very accurate traceability."  *See* Ex. 6 (L'Oreal's President of Professional Products Division, David Craggs, interview in American Salon magazine, July 1, 2007) |
| Paul Mitchell | "[We have] binding non-diversion contracts with our distributors and salons" and "enhanced security coding on all products." Ex. 7 (JPMS 0018) |
| P&G-Wella | "We have instituted a 'zero tolerance approach' and are committed to providing the best anti-diversion plan of any manufacturer of professional hair products. We have a state of the art coding system that allows us to identity products found in an unauthorized retail outlet."  *See* Ex. 8 (http://www.sebastianprofessional.com/en_US/anti_diversion/index.jsp, 6/22/10).<br><br>"Wella Sebastian has implemented a state-of-the-art tracking and coding system that enables us to know where our products are at all times. At the time our products leave our warehouse for shipping, they are scanned by a handheld device that records: where the product is being shipped, the date of shipment & the quantity being shipped.  Products being shipped by our distributors are handled in the same manner."  *See* Ex. 9 (www.sebastianfightsdiversion.com/antidiversion.html, 12/22/2008) |

Defendants refuse to stop diversion because they want to "have their cake and eat it, too." They want to brand their products as superior in quality by advertising that their products are available only through professional salons and by having salons substantiate that claim.  Yet,

they simultaneously want to reap the additional profits that flow from selling large quantities of their products in grocery and drug stores.

| Table 2<br>Professional Products Sold Outside Salons 2004-2010<br>(thousands of dollars)[6] | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Defendant | 2004 (Q3-Q4) | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | Totals '04-'10 |
| Matrix (L'Oreal) | 57,302 | 78,243 | 93,941 | 122,086 | 127,415 | 99,649 | 80,958 | $633,024 |
| Redken (L'Oreal) | 12,162 | 17,876 | 33,969 | 45,497 | 48,109 | 27,302 | 21,895 | $200,653 |
| Pureology (L'Oreal) | 0 | 555 | 3,921 | 9,988 | 17,400 | 8,498 | 5,680 | $46,042 |
| Wella-Sebastian | 52,546 | 50,362 | 53,133 | 51,409 | 43,168 | 21,183 | 17,524 | $262,003 |
| Paul Mitchell | 44,943 | 56,562 | 54,685 | 34,536 | 38,748 | 43,579 | 42,347 | $294,422 |
| Tigi | 25,263 | 32,939 | 45,185 | 51,878 | 57,721 | 60,313 | 63,099 | $323,959 |
| Rusk | 12,879 | 13,764 | 14,987 | 15,334 | 15,635 | 14,853 | 13,859 | $95,071 |
| Totals | $105,389 | $250,301 | $299,821 | $330,728 | $348,196 | $275,377 | $245,362 | $1,855,174 |

By trying to have it both ways, Defendants engage in false advertising.  And although Defendants enjoy increased profits through their misrepresentations, they do so at the expense of the salons, which **both** (a) lose revenues from sales of products and cross-sold services, and (b) suffer from an adverse impact on their reputations and goodwill.

The false advertising of professional products is a problem that pervades the professional hair care industry.  On July 9, 2010—nine days after Plaintiffs filed this lawsuit—Defendant Procter & Gamble (P&G) began a survey of hair salons to determine the impact of diversion on salon behavior.  In a remarkable affirmation of the complaints Plaintiffs advance in this case,

---

[6] *See* Ex. 10 (Beauty Industry Fund AC Nielsen/Market Decisions data concerning diversion of salon-only products).

P&G's researchers concluded that 89% of the salons surveyed had complained about diversion to professional product manufacturers and were often unhappy with the manufacturers' responses. *See* Ex. 19 (Wella 000120–122).

But such acknowledgements of the harm that salons suffer because of diversion are not limited to internal research documents like the P&G survey. In public documents, Defendants acknowledge how salons are harmed: "Diversion hurts us all—from inflated prices and the risk of contaminated or counterfeit product, to lost sales for our salons." *See* Ex. 20 (L'Oreal 000501). Defendants specifically recognize that the sale of professional products outside of salons harms the salons' reputations and customer relations. As Defendant John Paul Mitchell Systems admits in its standard-form salon agreement:

> SALON acknowledges that the sale of JPMS products to anyone other than the intended user or consumer, known as the diversion of JPMS products, seriously damages the reputation and goodwill established by JPMS and the Distributor and interferes with their relationship and *with other SALON customers* as well as the consumer.

Ex. 21 (JPMS 77) (emphasis added).

| Table 3 | |
|---|---|
| **Defendants Acknowledge that Diversion Harms Salons** | |
| L'Oreal | "Why Diversion is Bad? *Diversion hurts your business*. If clients purchase professional products outside the salon, for what they believe to be a cheaper price (it usually isn't), then they're not going to buy it from you. Also, *it hurts the professional industry* by weakening the stylist-client relationship and the credible need for professional recommendation of the best products for the clients' hair." *See* Ex. 11 (www.redkensalon.com/difference/anti-diversion, 6/2/08, also 6/22/10)<br><br>"Most importantly, these products are sold without the service and recommendation of your stylist who knows the best product for your hair, and *deprives them of the sale of this product and their service*." *See* Ex. 12 (www.matrix.com/about_matrix/diversion, 12/15/08)<br><br>"Diversion is a serious problem facing our industry today. It *effects* [sic] *the entire salon industry by degrading the professionalism and* |

|  | |
|---|---|
|  | *credibility of professional products from both an ethical and financial standpoint.* PureOlogy firmly prohibits diversion and supports a manufacturer's right to dictate where its products are sold." *See* Ex. 13 (www.pureology.com, 12/15/08)<br><br>"[Diversion] damages the reputation of the manufacturer of the Professional Beauty Product, the goodwill with the manufacturers' customers and damages the manufacturers' business relations with distributors and salon customers." *See* Ex. 14 (LOREAL000028)<br><br>"By adopting a treatment culture, grounded in signature services and the 4 step systems, salons have been shown to realize at least a 30% incremental increase in their service revenue with the same number of salon services. In addition, clients who experience treatment services are more likely to purchase retail products" *See* Ex. 15 (LOREAL 000214) |
| P&G-Wella | *"Diversion directly interferes with the manufacturer's distribution channels and legitimate salon revenue.* When diverted product shows up in your local grocery store or department store, *it hurts your salon business, it hurts the overall profession and ultimately it can hurt the consumer."* *See* Ex. 16 (www.sebastianfightsdiversion.com, 12/22/08)<br><br>"Diversion directly interferes with the manufacturer's distribution channels and legitimate salon revenue. When diverted products are sold at an unauthorized retail outlet it hurts the salon business and ultimately the overall beauty profession." *See* Ex. 8 (http://www.sebastianprofessional.com/en_US/anti_diversion/index.jsp, 6/22/10)<br><br>"DIVERSION harms both Salon and Wella" *See* Ex. 17 (Wella000155) |
| Paul Mitchell | "Diversion may be the beauty industry's dirty little secret, but salons across the country are stepping up and fighting back against individuals and organizations that take sales away from them." *See also* Ex. 18 (JPMS 0053)<br><br>"Salons and stylists are not only the victims of diversion, but they are also the first line of defense." *Id.* (JPMS 0012) |

The Defendants' misconduct also constitutes unfair competition under the Lanham Act. Section 1125 of the Act prohibits the use of "any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin" that "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with

another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125. Defendants' advertising depends on creating an "affiliation, connection or association" between Defendants' products with the professional salons and their stylists that sell them. It is thus actionable under the Act's prohibition on unfair competition.

To halt Defendants' false advertising and unfair competition, Plaintiffs filed this class action lawsuit. Plaintiffs now seek certification of the follow classes to pursue their claims.

## C.    The Proposed Classes

Plaintiffs propose five separate classes, one for each class of salons and stylists that purchased products for resale from each Defendant.

### 1.    The L'Oreal Class

Plaintiffs seek to certify a L'Oreal Class consisting of:

all professional hair salons and licensed cosmetologists that purchased L'Oreal professional products for resale to their customers within the United States from July 1, 2004, to the present. Excluded from the class are any salons L'Oreal previously identified as having diverted L'Oreal's professional products during the class period.

L'Oreal advertises its professional products as for sale only in professional salons:

| Table 4 | |
| :---: | :---: |
| **L'Oreal Advertising** | |
| **Product Labeling** | |
| "For Sale Only In Professional Beauty Salons" | (*See* Ex. 22 (LOREAL000542)) |
| "For Professional Use Only" | (*See* Ex. 23 (LOREAL000543)) |
| "Exclusive to Your Professional Hairdresser" | (*See* Ex. 24 (LOREAL000563)) |
| "Available Only at Fine Salons and Spas" | (*See* Ex. 25 (LOREAL00599)) |

| | |
|---|---|
| "Genuine Products Guaranteed Only in Salons" | (*See* Ex. 26 (LOREAL000262)) |
| "Exclusive Salon Distribution" | (*See* Ex. 27 (LOREAL000608)) |
| **Magazine Ads** | |
| "Hair Therapie Only From The Salon"<br><br>"See Your Stylist"<br><br>"Only Professional"<br><br>"Genuine Products Guaranteed Only in Salons"<br><br>"Reserved for a select top 1% of salons"<br><br>"Salon Beautiful" | (*See* Ex. 28 (Ads from *Elle* magazine and *American Salon* magazine))<br><br>(*See* Ex. 28A (LOREAL000513, 537-39, 632)) |
| **Display Ads** | |
| "Matrix—Only Professional"<br><br>"Thank you for buying Biolage only in Salons"<br><br>"Buy Biolage Only at Salons"<br><br>"Get real serie expert products only in salons" | (*See* Ex. 29 (LOREAL000483))<br><br>(*See* Ex. 29A (LOREAL000102, 625-26, 634, 637-39, 642-45)) |
| **Internet Ads** | |
| "PureOlogy is sold only in fine salons and spas." | (*See* Ex. 30 (www.pureology.com 12/15/08)) |

Plaintiffs EnV Studio, The Works, Salon 2000, Carastro & Company, Salon 1325, Veranda, William David, Cindy's Hair Salon, Chu's Hair Salon, and Sassy & Classy, all of whom sold L'Oreal professional products during the class period, seek to serve as representatives of the L'Oreal Class.[7]   Cindy's Hair Salon, Chu's Hair Salon, and Salon 1325 continue to sell L'Oreal professional products.[8]

---

[7] *See* Ex. 31 (NeSmith Dep.) at 46:9-15, 155:21-24, 157:21-158:8; Ex. 32 (Elrod Dep.) at 40:20-41:2;  Ex. 33 (Morrow Dep.) at 266:15-267:12, 275:2-8, 277:15-22; Ex. 34 (Carastro Dep.) at 270:20-271:2; Ex. 4 (Liston Dep.)

2.    **The TIGI Class**

Plaintiffs seek to certify a TIGI Class consisting of:

all professional salons and licensed cosmetologists that purchased professional
hair products manufactured by TIGI for resale to their customers within the
United States from July 1, 2004, to the present. Excluded from the class are any
salons TIGI previously identified as having diverted TIGI's professional products
during the class period.

TIGI advertises its products as sold only in professional salons:

| Table 5 | |
|---|---|
| **TIGI Advertising** | |
| **Product Labeling** | |
| "SOLD ONLY IN PROFESSIONAL SALONS" | (*See* Ex. 39 (TIGI-FAD 00000003)) |
| **Magazine Ads** | |
| "Sold only in professional salons" <br><br> "Available only in Professional Salons" <br><br> "Available in Professional Salons" <br><br> "Only Available in Professional Salons" | (*See* Ex. 40 (TIGI-FAD 00000006–13, 15–17, 20–22, 27–29, 47–48)) <br><br> (*See* Ex. 40A (ads from *InStyle* magazine and *Elle* magazine)) |
| **Internet Ads** | |
| "At TIGI, we work with hairdressers across the Globe ensuring the latest styles and products are in salons—for the use of the professional hairdresser and their clients." | (*See* Ex. 41 (www.tigihaircare.com /consumer/en-US/about/default.asp, 1/7/09)) |

Plaintiffs EnV Studio, The Works, Salon 2000, Carastro & Company, Chu's Hair Salon,

Salon FAD, and Sassy & Classy, all of whom sold TIGI products during the class period, seek to

---

at 37:16-21, 46:22-47:15; Ex. 35 (Cretors Dep.) at 187:5-14; Ex. 36 (Murphy Dep.) at 99:3-23; Ex. 37 (Poss Dep.) at 160:10-18; Ex. 38 (Jarmon Dep.) at 45:10-17; Ex. 1 (Wood Dep.) at 247:12-249:12.

[8] *See* Ex. 4 (Liston Dep.) at 46:22-47:15; Ex. 37 (Poss Dep.) at 20:4-21:3, 152:9-15; Ex. 38 (Jarmon Dep.) at 45:10–17.

serve as representatives of the TIGI Class.[9]  Chu's Hair Salon continues to sell TIGI professional products.[10]

3.    **The Conair Class**

Plaintiffs seek to certify a Conair Class consisting of:

all professional salons and licensed cosmetologists that purchased Rusk brand hair products manufactured by Conair Corporation for resale within the United States from July 1, 2004, to the present.  Excluded from the class are any salons Conair previously identified as having diverted Conair's professional products during the class period.

Conair labels its professional products as sold exclusively in professional salons:

| Table 6 | |
|---|---|
| **Conair Advertising** | |
| **Product Labeling** | |
| "Sold exclusively in professional salons" | (*See* Ex. 43 (CONAIR-FAD 00000002)) |
| "AVAILABLE ONLY AT FINE SALONS" | (*See* Ex. 44 (CONAIR-FAD 00000015)) |
| **Magazine Ads** | |
| "A SALON EXCLUSIVE RUSK PRO ELEMENTS PRODUCT" | (*See* Ex. 45 (CONAIR-FAD 00000009)) |
| "Professional Hair Care"<br><br>"Rusk is available at ULTA, Trade Secrets, and leading salons in the United States and Internationally"<br><br>"Ask your stylist today!"<br><br>"AVAILABLE AT FINE SALONS" | (*See* Ex. 45A (CONAIR-FAD 000000010-14, 17-19, 21))<br><br>(*See* Ex. 45B (ad from *Elle* magazine)) |

---

[9] *See* Ex. 31 (NeSmith Dep.) at 46:9-14, 73:4-6; Ex. 32 (Elrod Dep.) at 40:20-41:2; Ex. 33 (Morrow Dep. at 76:9-21); Ex. 34 (Carastro Dep. at 43:25-44:15, 94:24-95:10, 116:17-117:10); Ex. 38 (Jarmon Dep.) at 246:2-15; Ex. 42 (Pelfrey Dep.) at 335:6-336:5; Ex. 1 (Wood Dep.) at 233:19-234:5, 235:24-237:14.

[10] *See* Ex. 38 (Jarmon Dep.) at 45:10-17, 249:24-250:6.

| "AVAILABLE AT RUSK SALONS INTERNATIONALLY" "AVAILABLE ONLY AT FINE SALONS" | |
|---|---|
| **Internet Ads** | |
| "The Professional Products Division. The Division features both toiletries and appliances . . . which are exclusively for salon use and resale" | (*See* Ex. 46 (www.conair.com/corporate-cn-10.html, 6/17/10)). |

Plaintiffs Salon 2000, Carastro & Company, Sassy & Classy, and The Works, all of whom sold Conair professional products during the class period, seek to serve as representatives of the Conair Class.[11]

### 4.   **The Paul Mitchell Class**

Plaintiffs seek to certify a Paul Mitchell Class consisting of:

all professional salons and licensed cosmetologists that purchased professional hair products manufactured by John Paul Mitchell Systems for resale within the United States from July 1, 2004 to the present. Excluded from the class are any salons Paul Mitchell previously identified as having diverted Paul Mitchell's professional products during the class period.

Paul Mitchell promotes its professional products with advertising designed to misleadingly suggest that those products are only available in salons:

---

[11] *See* Ex. 33 (Morrow Dep.) at 79:9–80:7; Ex. 34 (Carastro Dep.) at 95:3–10; Ex. 1 (Wood Dep.) at 237:22–238:15; Ex. 32 (Elrod Dep.) at 126:21–127:9.

| Table 7 | |
|---|---|
| **Paul Mitchell Advertising** | |
| **Product Labeling** | |
| "Guaranteed <u>only</u> when sold by a professional hairdresser, otherwise it may be counterfeit, black market, old or tampered with." | (*See* Ex. 47 (JPMS 161)) |
| **Magazine Ads** | |
| "Only in salons and Paul Mitchell schools."<br><br>"Only in salons." | (*See* Ex. 48 (Paul Mitchell ads from *Elle* magazine, *American Salon* magazine, and *InStyle* magazine))<br><br>(*See* Ex. 48A (JPMS 67)) |
| **Internet Ads** | |
| "Our products are only guaranteed when sold by a professional hair salon." | (*See* Ex. 49 (www.paulmitchell.com/ Salons/Pages/Salons.aspx, 6/21/10)) |
| "John Paul refuses to sell the company because of the initial vow he took to stand by the professional beauty industry. Since no public corporation can guarantee it will market John Paul Mitchell Products exclusively through salons, for John Paul—selling is simply not an option." | (*See* Ex. 50 (www.paulmitchell.com/ About_Us /Pages/TheStory.aspx, 12/22/08)) |

Plaintiffs Carastro & Company, Salon 1325, Veranda, Cindy's Hair Salon, Chu's Hair Salon, and Sassy & Classy, all of whom sold Paul Mitchell professional products during the class period, seek to represent the Paul Mitchell Class.[12]  Salon 1325, Cindy's Hair Salon, and Chu's Hair Salon continue to sell Paul Mitchell professional products.[13]

---

[12] *See* Ex. 34 (Carastro Dep.) at 28:8-14, 308:24-309:10, 323:3-22; Ex. 4 (Liston Dep.) at 36:19-24, 47:4-48:7; Ex. 35 (Cretors Dep.) at 34:20-25; Ex. 37 (Poss Dep.) at 19:4-11, Ex. 38 (Jarmon Dep.) at 92:6-8, 93:2-14; Ex. 1 (Wood Dep.) at 93:23-94:2, 209:24-210:2.

[13] *See* Ex. 37 (Poss Dep.) at 20:4-21:3, Ex. 38 (Jarmon Dep.) at 97:15-98:11; Ex. 4 (Liston Dep.) at 47:18-48:7.

5.    **The Procter and Gamble Class**

Plaintiffs seek to certify a P&G Class consisting of:

> all professional salons and licensed cosmetologists that purchased Sebastian brand
> hair products manufactured by P&G or The Wella Corporation for resale within
> the United States from July 1, 2004 to the present. Excluded from the class are
> any salons P&G or Wella previously identified as having diverted P&G's
> professional products during the class period.

P&G promotes its professional products with advertising designed to suggest
misleadingly that those products are only available in salons.

| Table 8 | |
|---|---|
| **Procter and Gamble Advertising** | |
| **Product Labeling** | |
| "Guaranteed only when sold by an authorized salon" | (*See* Ex. 51 (Wella 000049) |
| "Guaranteed only when purchased at an authorized salon" | (*See* Ex. 52 (Wella 000058) |
| **Magazine Advertising** | |
| "WELLA PASSIONATELY PROFESSIONAL" | (Ex. 52A (Wella 000071)) |
| "Sebastian Professional" | (*See* Ex. 52B (ads from *Elle* magazine and *American Salon* magainze)) |
| **Internet Advertising** | |
| "Wella-Sebastian products should only be sold in authorized salons and beauty supply stores. Purchasing them elsewhere is as unethical as someone selling them elsewhere." | (Ex. 53 (www.sebastianfightsdiversion.com/top_5reasons.html, 12/22/08)) |

Plaintiffs Salon 2000, Carastro & Company, the William David Salon, Cindy's Hair

Salon, Chu's Hair Salon, Salon FAD, Sassy & Classy, and Veranda, all of whom sold Sebastian

professional products during the class period, seek to serve as representatives of the Procter &

Gamble class.[14]  Cindy's Hair Salon and Chu's Hair Salon continue to sell Sebastian professional products.[15]

**D.**     **Class Representatives**

The proposed class representatives are an industry non-profit organization, Salon FAD, and 10 salons:  Cindy's Hair Salon, Chu's Hair Salon, Carastro & Company Hair Design, EnV Studio Salon LLC, New Millennium Salons L.L.C. d/b/a Salon 2000, Salon 1325, Sassy & Classy Salon and Spa, The Works Hair and Nail Salon, The Veranda Salon and Spa, Inc., and The William David Salon (collectively, the "Class Representatives").  Each Class Representative has been harmed by Defendants' false advertising and unfair competition, demonstrates a desire to act as a class representative, a willingness to participate in the litigation, and an understanding of the claims.

**1.**     **Salon FAD**

Salon FAD serves as a class representative as the assignee of the claims of Daily Trends Salon, a salon located in St. Mary's, Georgia, that has sold TIGI professional products and Procter and Gamble professional products.  Ex. 42 (Pelfrey Dep.) at 214:17–19, 218:20–219:6, 222:9–20, 335:6–336:5  Dixie Pelfrey, the CEO and founder of Salon FAD has been in the hair care industry for almost 40 years.  *Id.* at 23:3–10.  Before founding Salon FAD, she was a senior executive at Farouk Systems (a manufacturer of professional products), an employee of Matrix (owned by Defendant L'Oreal), and a salon owner.  *Id.* at 32:5–34:2, 26:23–29:18.

Salon FAD is a non-profit organization that Ms. Pelfrey founded in 2008 to bring salons and stylists together to fight diversion.  *Id.* at 9:22–10:5.  Ms. Pelfrey has long been devoted to

[14] *See* Ex. 33 (Morrow Dep.) at 150:25–152:9; Ex. 34 (Carastro Dep.) at 224:23–225:17; Ex. 36 (Murphy Dep.) at 105:6–9; 311:3–14; Ex. 37 (Poss Dep.) at 20:4–21:3; Ex. 38 (Jarmon Dep.) at 45:10–17, 220:12–20; Ex. 42 (Pelfrey Dep.) at 222:9–20; Ex. 1 (Wood Dep.) at 184:15–19, 188:17–189:9; Ex. 35 (Cretors Dep.) at 169:15–170:4.

[15] *See* Ex. 37 (Poss Dep.) at 20:4-21:3; Ex. 38 (Jarmon Dep.) at 220:12-20.

fighting diversion and has invested substantial amounts of her own money in Salon FAD to cover Salon FAD's expenses. *Id.* at 254:15–254:23. Ms. Pelfrey demonstrated her thorough understanding of diversion when she testified about how diversion harms salons:

> Q:   What is the harm that Salon FAD believes diversion causes to the salons?
>
> A:   It is devastating to their income, retail used to pay my rent when I was a Matrix salon, it paid my rent, and salons are backing away from selling retail and that's one of the things I try to encourage them to do, because retail, they make a 40 percent [margin]… [now] if you're lucky you might make 8 percent. Retail is a huge, huge thing for salons. . . .
>
> Q:   How does the advertising that you have just described injure salons? [. . .]
>
> A:   Because it does confuse, it leads clients to believe that, hey, and this is a great product, my stylist uses it, she is in her salon, it says professional on it, I'm at the grocery store, I'm going to purchase it, so that is a sale away from the salon. [. . .]
>
> Q:   What is your understanding of the allegation in the complaint with respect to reputation?
>
> A:   My understanding that when you speak of hurting a salon's reputation, back what I said earlier, if I have a product sitting in my station and I am the licensed professional and I am using it and recommending it, that's making a strong statement that I endorse this product and I see that it hurts my reputation when it is over in Walgreen's.
>
> Q:   How does it hurt your reputation? […]
>
> A:   Because it hurts my image, it hurts everything that I stand for as a licensed cosmetologist.

*Id.* at 125:24–126:13, 127:21–128:7, 129:15–130:9. Salon FAD has been engaged in this litigation, and Ms. Pelfrey testified that Salon FAD serves as "primary contact with the attorneys" for the Class Representatives. Ms. Pelfrey further testified that she reviewed Plaintiffs' Complaint and Plaintiffs' First Amended Complaint before they were filed. *Id.* at 183:25–184:5, 185:14–186:23. Additionally, Salon FAD showed its commitment to the class by seeking additional salons to become class representatives. *Id.* at 186:24–188:2.

2.    **Sassy & Classy Salon and Spa**

Sassy & Classy Salon and Spa ("Sassy & Classy") is located in Grey, Georgia and opened in 2008.  Sassy and Classy is owned by Ms. Shana Wood.  Sassy and Classy sold Procter & Gamble professional products, TIGI professional products, L'Oreal professional products, Conair professional products, and Paul Mitchell professional products.  *See* Ex. 1 (Wood Dep.) at 93:1–94:24.  Sassy and Classy is an adequate class representative, as demonstrated by Ms. Wood's testimony.  Ms. Wood testified that diversion has cost her sales:

> Q:    Do you believe you have lost money as a result of the advertising that is complained about in this case?
>
> A:    Yes.
>
> Q:    Tell me how you have lost money....
>
> A:    Because [clients] don't come to the salon to buy [a professional product], they go to—it is about convenience in the United States now, people are lazy and it is about convenience.  If they are at Kroger buying their groceries and they can grab it off the shelf and put it in their buggy, they are going to do it instead of making an additional trip to a salon

*Id.* at 66:20–25, 67:13–22.  Ms. Wood testified that customers who buy professional products in mass retailers blame her for undesirable results.  *Id.* at 119:14–120:18 ("I told you of one instance where a client, that I recommended something and they saw it there and got it and got the wrong thing and it dried their hair out.").  Additionally, Ms. Wood demonstrated her commitment to the class:

> A:    I knew that with any case that I would have to do my part and that I would have to provide stuff and we all agreed—I told [Ms. Pelfrey] I would do whatever was necessary and whatever I needed to do because I was passionate about what this has done.  I have been in this business for 17 years and I have contacted—the defendants have an 800 number, it says if you see any of our products diverted out, please call us and let us know. Over the years I have called these companies over and over and over again and said your products are on CVS shelves, Walgreen, okay, ma'am, thank you so much, they take my name and number, my salon, all the way

down to my cosmetology license number, I will have return your call, thank you, have a nice day; I have never received a call back.

Q:      I appreciate that, but what I am trying to find out now —

A:      That's why I said I will do whatever I have to.

*Id.* at 36:2–14.   Ms. Wood further testified that she reviewed and provided comments on Plaintiffs' Complaint and Plaintiffs' First Amended Complaint, and keeps informed of the lawsuit by communicating with Plaintiffs' counsel via telephone and email. *Id.* at 38:22–39:9, 40:13–17.

### 3.      Salon 1325

Salon 1325 is located in Stockbridge, Georgia, and has been open since November 2008. Salon 1325 is owned by Ms. Brenda Liston.   Salon 1325 currently sells L'Oreal professional products and Paul Mitchell professional products.   *See* Ex. 4 (Liston Dep.) at 36:19–37:3.   Salon 1325 will be an adequate class representative.   Ms. Liston testified about the harm that diversion causes salons:

Q:      What's the harm that diversion causes salons generally?

A:      Well, it is going to reduce our profits, it is going to also harm our reputation, credibility, stylists' relationship with the client.

*Id.* at 85:14–19.  Ms. Liston further demonstrated an understanding of what it means to be a class representative:

Q:      What is your understanding of what it means to be a class representative?

A:      My understanding is as a salon, you know, we're representing salons and hair stylists to stop, in my case, selling Redken and Paul Mitchell products outside of a salon or outside of a licensed hair stylist. [...]

Q:      Is it your understanding you have certain responsibilities as a class representative?

A:      Yes.

Q:      What are those responsibilities?

A:     To stand up for other salons and other hair stylists.

*Id.* at 20:6–21:2.   Ms. Liston further testified that she keeps informed of the litigation by communicating with plaintiffs' counsel via phone and email.  *Id.* at 21:8–17.  Ms. Liston also reviewed Plaintiffs' Complaint and Plaintiffs' First Amended Complaint.  *Id.* at 19:8–22.

### 4.     <u>EnV Studio Salon LLC</u>

EnV Studio Salon LLC ("EnV Studio") is located in Roswell, Georgia and has been open since November 2006.   EnV Studio is co-owned by Ms. Gena NeSmith and Ms. Jennifer Howard.  EnV studio has sold L'Oreal professional products, TIGI professional products, and Paul Mitchell professional products.  *See* Ex. 31 (NeSmith Dep.) at 46:7–12.  EnV Studio will be an adequate class representative.  Ms. NeSmith described how diversion harms salons generally, and EnV Studio specifically:

Q:     How does diversion harm salons generally?

A:     I think that we lose profits because of it and I think that our credibility is affected and we have a strong relationship with our clients, they trust us to offer them what we say we're offering them.

Q:     When you say your credibility is affected, how do you mean?

A:     Just that I am offering them exclusive products in my salon and when they find it somewhere else, it is not exclusive to them any longer. Also, you know, they purchase something that's the same brand name but it is not the product I would have recommended, it could affect the service I performed adversely.

*Id.* at 120:9–121:3.  Ms. NeSmith further testified that clients have told her that they have purchased professional products outside of her salon.  *Id.* at 108:22–109:9.  Ms. NeSmith further demonstrated an understanding of what it means to be a class representative: "That means that [I am] representing other professionals in the industry, salons, and licensed stylists, who have purchased the same products that I have and are being affected by diversion."  *Id.* at 36:5–15. Additionally, Ms. NeSmith has been engaged in the case—she has reviewed both complaints

filed in the case, and has communicated regularly with Plaintiffs' counsel. *Id.* at 31:9–32:5, 38:24–40:16.

### 5. New Millennium Salons L.L.C. d/b/a Salon 2000

New Millennium Salons L.L.C. d/b/a Salon 2000 ("Salon 2000") is located in Milledgeville, Georgia and has been open for twelve years. Ex. 33 (Morrow Dep.) at 9:3–12. Salon 2000 is owned by Ms. Barbara Morrow. Salon 2000 has sold L'Oreal professional products, Procter and Gamble professional products, Conair professional products, and TIGI professional products. *Id.* at 245:13–22, 266:15–267:12. Salon 2000 will serve as an adequate class representative. Ms. Morrow testified about how diversion harms her reputation and costs her sales:

> Q: And you think you're hurt by the fact that these products are available in outlets other than salons, right?
>
> A: Yes.
>
> Q: And the reason you're hurt is that you think you lose some sales to those other outlets, right?
>
> A: Yes....
>
> Q: And as more and more of the products are available in grocery stores, the more they are available, the more the reputation of the products goes down, right?
>
> A: The reputation of the products.
>
> Q: The products go[] down, right?
>
> A: And the reputation of the products sold in my salon.
>
> Q: Correct, but that's different from the reputation of your salon, right?
>
> A: No, I think they go hand-in-hand.

*Id.* at 25:10–17, 44:6–18.  Ms. Morrow provided examples of customers that complained about the availability of her products in mass market retailers.  *Id.* at 230:15–234:16.  Ms. Morrow also demonstrated her commitment to the lawsuit:

> Q:  What are your responsibilities, as you understand them, as a class representative?
>
> A:  To represent the whole group of people, some of them don't even know about this lawsuit. . . . To my knowledge, it was something that we have all been waiting for for years, to try to stop diversion of professional products sold in grocery stores and drugstores.

*Id.* at 86:20–25, 180:2–6.

### 6.  **The Works Hair and Nail Salon**

The Works Hair and Nail Salon ("The Works") is located in Centre, Alabama and has been open since 2003.  *See* Ex. 32 (Elrod Dep.) at 19:15–18.  The Works should be appointed as a class representative.  The Works sold L'Oreal professional products, TIGI professional products, and Conair professional products.  *Id.* at 40:20–41:2, 126:21–127:9.  Ms. Kathy Elrod, owner of The Works, testified as to how diversion harms salons generally and The Works specifically:

> Q:  Does diversion harm salons generally?
>
> A:  Yes.
>
> Q:  How?
>
> A:  Loss of sales.
>
> Q:  Because the products are available elsewhere?
>
> A:  Yes. [. . .]
>
> Q:  How does diversion harm you in relation to the education that you provided your customers?
>
> A:  Are they going to—it kind of makes them wonder, you know, of everything I have told them.

*Id.* at 113:8–15, 114:18–23.  Ms. Elrod demonstrated an understanding of the class she seeks to represent ("I represent hair stylists of salons that have sold diverted products in the United States from the year 2000") and what it means to be a class representative ("I have to come here and give a deposition, I have to provide all my—the information that I know that I have, I have read all the e-mails and consult[ed] with my lawyer").  *Id.* at 57:19–24, 59:22–60:2.  Ms. Elrod further testified that she reviews the filings in this case and has stayed in contact with plaintiffs' counsel since May 2010.  *Id.* at 60:8–12.

### 7.    The Veranda Salon and Spa

The Veranda Salon and Spa ("Veranda") also seeks to serve as a class representative. Veranda is a salon located in Kathleen, Georgia that has been open since 2007.  *See* Ex. 35 (Cretors Dep.) at 28:3–18.  Veranda has sold L'Oreal professional products, Paul Mitchell professional products, and Procter and Gamble professional products.  *Id.* at 187:5–14, 34:20–25, 169:15–170:4.  Ms. Kelley Cretors, owner of Veranda, testified that diversion hurts her business and her credibility with her clients:

> Q:    Are you a member of Salon FAD?
>
> A:    Yes.
>
> Q:    When did you join that organization?
>
> A:    January 2010.
>
> Q:    Why did you join?
>
> A:    Because I want to stop diversion.
>
> Q:    Why?
>
> A:    Because I feel like it hurts my business and my credibility with my clients.

*Id.* at 48:24–49:11.  Ms. Cretors further demonstrated an understanding of the class she is seeking to represent:

Q:    Who do you think you're serving as a class representative for in this case?

A:    Salon owners and licensed cosmetologists.

Q:    Any salon owner?

A:    No, that have sold L'Oreal or Procter & Gamble and Paul Mitchell since year 2000 in the United States.

Q:    And if a salon were to carry product—withdrawn.   If a salon has participated in diversion, could such a salon be a party to this lawsuit, to your knowledge?

A:    No.

*Id.* at 182:17–183:7.   Additionally, Ms. Cretors showed that she is committed to fighting diversion:

Q:    Do you anticipate that you will receive any kind of money as a result of this lawsuit?

A:    No.

Q:    Why not?

A:    I just want to stop diversion.

*Id.* at 185:8–13.

### 8.   Cindy's Hair Salon

Cindy Poss, owner of Cindy's Hair Salon, demonstrated that Cindy's Hair Salon will be an adequate class representative in this case.   Cindy's Hair Salon is located in Augusta, Georgia and has been open for thirteen years.   *See* Ex. 37 (Cindy Poss Dep.) at 16:3–14.   Cindy's Hair Salon sells L'Oreal professional products, Paul Mitchell professional products, and Procter and Gamble professional products.   *Id.* at 160:10–18, 20:4–21:3.   Ms. Poss testified that her salon, like other salons throughout the country, has lost sales as a result of diversion:

Q:    Can you tell me what the harm is of diversion that you believe you're suffering?

A:    I feel like the products are sitting on my shelf more than what they used to be and this helps keep the doors open as far as rent, electricity, it compensates when we're not standing behind the chair, I'm not getting any younger and I would like to start, you know, not having to work as hard and that would be part of it, is the products that I'm selling, that I'm buying and they are sitting on the shelves.

Q:    Is there any specific sale losses that you have incurred that you attribute to diversion?

A:    Oh, absolutely. […]

Q:    Was there ever an instance where a client came in and complained to you about the fact that the price was higher in a retail outlet as compared to your salon?

A:    No, they would just say, since I was there I decided to go ahead and pick it up there instead of buying it, you know, and I'm like, okay.

*Id.* at 29:19–30:12, 27:20–28:4.   Additionally, Ms. Poss demonstrated her willingness to represent the class:

Q:    What, if anything, did you do as part of your decision-making process to join this lawsuit?

A:    I was just trying to represent all the other hair salons and the other cosmetologists, you know, that are having trouble with this. […]

A:    [Ms. Pelfrey] asked me if I would be interested [in the lawsuit] and I told her, yeah, I would do whatever it takes, you know to fight for it.

Q:    Fight for it meaning?

A:    To fight against diversion

*Id.* at 135:18–24; 51:3–10.   Ms. Poss further demonstrated that she has an understanding of the class she is seeking to represent.

Q:    What is the class that you understand you're representing, what is it comprised of?

A:    The other hairdressers that are licensed cosmetologists that sell our products.

Q:    That sell the professional products?

A:      Right.

Q:      That are at issue in this case?

A:      Right.

*Id.* at 136:6–16. Lastly, Ms. Poss has kept herself apprised of the litigation by communicating with class counsel approximately ten times since this suit was filed. *Id.* at 177:14–18.

### 9.      Carastro & Company Hair Design

Carastro & Company Hair Design ("Carastro & Company") will serve as an adequate class representative. Carastro & Company is a salon located in Marietta, Georgia that has been open since 1997. *See* Ex. 34 (Carastro Dep.) at 57:16–18. Carastro & Company is co-owned by Ms. Sheri Carastro and her husband, Dr. Lawrence Carastro. *Id.* at 14:20–22. Carastro & Company has sold L'Oreal professional products, TIGI professional products, Conair professional products, Paul Mitchell professional products, and Procter and Gamble professional products. *Id.* at 28:8–14, 43:25–44:15, 94:24–95:10, 116:17–117:10, 224:23–225:17, 270:20–271:2, 308:24–309:10, 323:3–22. Dr. Carastro testified to the type of harm that diversion causes salons generally and Carastro & Company specifically:

Q:      What harm does diversion cause salons generally?

A:      First, [it] create[s] unfair competition.

Q:      Explain what you mean by unfair competition.

A:      When I did my feasibility study, I looked at my competitors; they weren't Publix, CVS, these other places, they weren't, because they were excluded from selling via the manufacturers. […]

Q:      How else does diversion harm salons, if at all?

A:      Those are the two major [ones.] So monetarily and accusing [mass market retailers] and these stores are stores that have a lot of reputation, people get prescriptions in these stores, people have confidence in these stores, me attacking these stores with talk of rogue salesmen they are dealing with, especially because it is not true, does not make me look good.

*Id.* at 193:22–194:8, 196:10–22.

Dr. Carastro also demonstrated an understanding of the class Carastro & Company is seeking to represent and what it means to be a class representative:

Q:    Are you representing anyone else other than salons?

A:    Salons and stylists, professionally; anybody who sells beauty products, salons, professional stylists, and excluding known diverters. [...]

Q:    What's your understanding of the qualifications a salon has to have in order to be a part of this lawsuit?

A:    You have to represent the other salons that have fallen victim to diversion.

*Id.* at 23:10–13, 39:9–14. Additionally, Dr. Carastro has kept himself apprised of the litigation, reviewing both complaints before they were filed and conferring with counsel on conference calls. *Id.* at 20:21–21:8, 39:3–5.

### 10.    The William David Salon

The William David Salon will be an adequate class representative, as shown by the testimony of Mr. William Murphy, owner of the William David Salon. The William David Salon is located in Alpharetta, Georgia and has been open since 2005. Ex. 36 (Murphy Dep.) at 82:18–83:2. The William David Salon has sold L'Oreal professional products and Procter and Gamble professional products. *Id.* at 99:3–23, 105:6–9, 311:3–14. Mr. Murphy testified that diversion costs him sales and hurts the goodwill of his salon:

Q:    Focusing now on the William David Salon particularly, what harm would you say that diversion causes your salon?

A:    It definitely impacted retail sales as well as service sales. [...]

A:    I believe that diversion was allowed by the manufacturer, therefore it was a blatant lie. Since it was a lie, it damaged my business because they both lied to me, by lying to me it ruined my integrity, it ruined my brand worth and on top of it, I could not compete, it was unfair to compete against me by selling to people who shouldn't sell the product because that's what they told me.

*Id.* at 266:6–10, 286:5–15.   Mr. Murphy also gave anecdotal evidence of customers telling him

that they purchased professional products outside of salons.   *Id.* at 140:8–141:18.

Additionally, Mr. Murphy understands the nature of the class he is seeking to represent:

Q:      Of what salons is William David representative?

A:      All salons from 2000 to the present that have carried Procter & Gamble
        products and L'Oreal products and also licensed cosmetologists that
        would have sold those brands during that period of time. [...]

Q:      [I]s there any other limitation that you're aware of on membership in the
        class that you represent?

A:      Yes.

Q:      What is that?

A:      People that are known diverters.

*Id.* at 299:21–300:4, 301:8–14.   Mr. Murphy further demonstrated an understanding of his

responsibilities as a class representative—"To provide all the information that I have that will

help support the case and to participate and to take deposition and to tell the truth."   *Id.* at

305:11–14.

**11.    Chu's Hair Salon**

Ms. Hyon Chu Jarmon, Chu's Hair Salon's owner, demonstrated that Chu's Hair Salon

will be an adequate class representative.   Chu's Hair Salon is located in Columbus, Georgia and

has been open since 1993.   Ex. 38  (Jarmon Dep.) at 36:20–23, 43:21–44:3.   Chu's Hair Salon

sells L'Oreal professional products, TIGI professional products, Paul Mitchell professional

products, and Procter and Gamble professional products.   *Id.* at 45:10–17, 92:6–8, 93:2–14,

246:2–15, 249:24–250:6.   Ms. Jarmon testified that diversion has harmed her salon's reputation

and cost her sales:

Q:      How does that affect your reputation if your product is sold in the market?

A:    Because clients are coming in, say drugstore or supermarket, they complain about us, they saw the products that hurts our reputation and they distrust us. We sold not professional products they feel. [...]

A:    Most [professional products] I see in [mass market] store[s] I try to stop, not all, because customer not trust us no more, our reputation go bad and I tell them lie because this is products that they see market, so I also will loss profit, reputation not good, that they can trust us anymore and that's why I lost sometime customer.

Q:    How many customers have you lost because you retailed products?

A:    15 percent.

*Id.* at 63:16–64:9, 101:11–22. Ms. Jarmon also demonstrated an understanding of the class she is seeking to represent: "I represent for all salons, just like professional salons that sell professional products, not diverted salons." *Id.* at 115:6–9. Ms. Jarmon also testified that she reviewed Plaintiffs' Complaint and Plaintiffs' First Amended Complaint. *Id.* at 59:15–63:15.

## E.    Areas of Dispute on Class Certification

Issues Defendants Do Not Contest.  At the Court's March 1, 2011 telephone conference, Defendants conceded that they do not contest, for class certification purposes, "the issue about the falsity of the advertising or the fact of diversion." Ex. 54 at 20:2–6. For these class certification motions, therefore, the Court must assume that Defendants' advertising is literally false and that Defendants purposely divert their professional products to mass market retailers.

Defendants instead declared that they would only contest class certification on predominance, adequacy, and typicality grounds. *Id.* at 20:24–21:4. The predominance inquiry mainly goes to injury, that is, whether Plaintiffs can prove by common evidence that Defendants' false advertising harmed the proposed classes' members. The Court denied Plaintiffs' request for discovery of Defendants' internal documents concerning the effects that their advertising has on salons and on consumers. Thus, for purposes of this motion, Plaintiffs rely principally on

public statements and expert work to demonstrate how Defendants' false advertising harms each proposed class.

Stipulations.   The parties stipulated that the members of each class are sufficiently numerous, that Defendants' products travel in interstate commerce, and that Defendants' advertising is national in scope.  Ex. 55 (2/17/11 email from J. Janghorbani to J. Southwick). Defendants have further stipulated that they are not contesting whether individualized proof would be required to show (1) the falsity of the defendants' ads; (2) the content of defendants' ads, or (3) availability of products outside of salons.  Ex. 54 (3/1/11 Teleconference Transcript), at 16:10–25.

## ARGUMENT

### A.   Standards Governing Class Certification

Pursuant to Federal Rule of Civil Procedure 23, a district court should certify a class where, as here, Plaintiffs satisfy both Rule 23(a) and one subsection of Rule 23(b).  Plaintiffs move that each proposed class be certified pursuant to Rule 23(a) and Rule 23(b)(3).

Rule 23 "is given liberal rather than restrictive construction, and courts are to adopt a standard of flexibility. . . ." *Sharif ex rel. Salahuddin v. New York State Educ. Dep't.*, 127 F.R.D. 84, 87 (S.D.N.Y. 1989).  Rule 23(a)'s four requirements are usually described as "(1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation." *Cent. States S.E. & S.W. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 244 (2d Cir. 2007).  Once these four requirements are met, a party seeking certification under Rule 23(b)(3) must also demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members," and that class treatment would be superior to individual litigation. *See* FED. R. CIV. P. 23(b)(3).

*In re Initial Public Offerings Securities Litigation* sets forth the evidentiary requirements

needed to certify a class:

> We reach the following conclusions: (1) a district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met; (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement; (4) in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement; and (5) a district judge has ample discretion to circumscribe both the extent of discovery concerning Rule 23 requirements and the extent of a hearing to determine whether such requirements are met in order to assure that a class certification motion does not become a pretext for a partial trial of the merits.

471 F.3d 24, 41 (2d Cir. 2006); *see also Teamsters Local 445 Freight Div. Pension Fund v.*

*Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008) ("the preponderance of the evidence standard

applies to evidence proffered to establish Rule 23's requirements.").

**B.     The Proposed Class Action Satisfies Rule 23(a) Requirements**

Federal Rule of Civil Procedure 23(a) sets the following requirements for a class action:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a).

Each of the five proposed classes meets Rule 23(a)'s requirements for certification. Each

proposed class consists of hundreds, perhaps thousands, of salons. Common issues unite the

members of each class. Each class representative's claims, which necessarily focus on the

Defendants' conduct, are typical of those of the entire class. Each class is adequately

represented by these representatives and their counsel. Neither faces any conflicts and counsel will continue to vigorously pursue the classes' claims against the Defendants.

1.      **Each class satisfies the numerosity requirement**

Defendants do not contest that each of the five classes includes enough members to satisfy the numerosity requirement. Ex. 55 (2/17/11 email from J. Janghorbani to J. Southwick). In any event, "[t]he numerosity requirement in Rule 23(a)(1) does not mandate that joinder of all parties be impossible—only that the difficulty or inconvenience of joining all members of the class make use of the class action appropriate." *Cent. States*, 504 F.3d at 244–45. Numerosity is "presumed" when a class has 40 members. *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995). In this case, Defendants have rightly acknowledged that there are as many as 70,000 hair salons across the country. *See* Ex. 54 at 16. This easily satisfies the requirement even absent the Defendants' agreement not to contest numerosity.

2.      **This case involves questions of law and fact common to each class**

"The commonality requirement is met if plaintiffs' grievances share a common question of law or of fact." *Cent. States,* 504 F.3d at 245. A single shared question of law or fact will suffice. *See Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997); *Trief v. Dun & Bradstreet Corp.*, 144 F.R.D. 193, 198–99 (S.D.N.Y. 1992). Commonality "does not mean that all issues must be identical as to each member, but it does require that plaintiffs identify some unifying thread among the members' claims that warrant[s] class treatment." *Bolanos v. Norwegian Cruise Lines Ltd.*, 212 F.R.D. 144, 153 (S.D.N.Y. 2002).

The Supreme Court explained last month that a "common question of law or fact" means that plaintiffs' claims

> must depend upon a common contention—for example, the assertion of discriminatory bias on the part of the same supervisor. That common contention, moreover, must be of such a nature that it is capable of class-wide resolution—

which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

*Wal-Mart Stores, Inc. v. Dukes et al*, No. 10-277, slip op. (June 20, 2011) at 9.

Here, Plaintiffs' claims share numerous common contentions, each of which is capable of class-wide resolution.  Whether each Defendant has violated the Lanham Act and engaged in unfair competition depends in large part on resolving common factual and legal questions about the Defendant's salon-only advertising.  For example, each Defendant advertises the professional nature of its products, that is, that the products are only sold or available in salons.  Plaintiffs' contention that this advertising is false will be resolved on a class-wide basis.

Indeed, the very nature of a false advertising lawsuit implicates questions that can be resolved on a class basis because each Defendant's advertising uses the same words and phrases on labels and other advertising to describe their products as a professional, salon-only product. *See, e.g., Zeisel v. Diamond Foods, Inc.*, No. C 10-01192 JSW (N.D. Cal. June 6, 2011) (certifying class and finding sufficient commonality under Rule 23(a)(2) because case involved "the same misleading and misbranded labels") (attached as Ex. 56); *In re Brazilian Blowout Litig.*, No. CV 10-8452-JFW (C.D. Cal. Apr. 12, 2011) (certifying class and finding sufficient commonality under Rule 23(a)(2) because case involved false or misleading advertising labels on hair care products) (attached as Ex. 57).  Whether each Defendant's salon-only advertising was false or misleading in violation of the Lanham Act is a common question that itself embeds numerous common questions, including:

- Is the advertising literally false?

- Is the advertising misleading?

- Does the advertising have capacity to deceive a substantial portion of potential customers?

- Is the advertising material, *i.e.*, likely to influence consumer behavior?

Each of these questions can and ought to be resolved on a class-wide basis, and the evidence obtained during class certification discovery allows this Court to conclude that common questions of fact and law exist. The evidence proffered strongly suggests that the Defendants' salon-only advertising is false and misleading. Based on survey evidence, substantial percentages of consumers believe that Defendant's "salon only" labels mean that their product is sold only in salons and that is of higher quality than non-salon brands. *See* Ex. 58 (Expert Report of T. Maronick at 3). That Defendants divert, or permit the diversion of, these products into mass retain chains—a fact Defendants do not contest at this class certification stage[16]— renders this advertising literally false or at least misleading.

Whether the Defendants' false and misleading advertising injures salons and stylists in each proposed class is also capable of class-wide resolution: survey evidence also shows that when consumers find salon-only brands in mass retailers, substantial numbers of consumers question whether:

- the salon lied about hair care products being available only in salons;
- the stylist (who may have recommended the product) lacks expertise and;
- the other hair products at the salon are of questionable quality.

*See* Ex. 58, Maronick Report at 13 (table 10); 17 (table 16); 21 (table 22); 25 (table 28); 29 (table 34); 33 (table 40) and 37 (table 46).

Because Plaintiffs' claims entail numerous common contentions that are capable of resolution on a class-wide basis, Plaintiffs satisfy Rule 23(a)(3)'s commonality requirement.

### 3.   The Class Representatives' claims are typical of class claims

Plaintiffs' ability to satisfy the commonality requirement also informs the Court's typicality analysis. As the Supreme Court has repeatedly noted,

---

[16] *See* Ex. 54 at 20:2–19.

> The commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.

*Wal-Mart*, Slip op. at 8–9 n.5, *quoting Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 157–58 n. 13 (1982); *Brown v. Kelly*, 609 F.3d 467, 475 (2d Cir. 2010) ("The commonality and typicality requirements often tend to merge into one another, so that considerations animate analysis of both.")

To be sure, Rule 23(a)'s typicality requirement "is not highly demanding." *Bolanos*, 212 F.R.D. at 155. Typicality "requires that the claims of the class representatives be typical of those of the class, and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Robinson v. Metro N. Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001); *see also Marisol A.*, 126 F.3d at 376.

Typicality "does not require that the factual background of each named plaintiff's claim be identical to that of all class members; rather, it requires that the disputed issue of law or fact occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class." *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 293 (2d Cir. 1999). Although typicality is related to the commonality inquiry, "the commonality inquiry establishes the existence of a certifiable class," whereas "the typicality inquiry focuses on whether the claims of the putative class representatives are typical of the class sharing common questions." *In re Frontier Ins. Group, Inc. Sec. Litig.*, 172 F.R.D. 31, 41 (E.D.N.Y. 1997).

Here, the Class Representatives suffered the same type of injuries as each class member's injury. Those injuries stem from the same misconduct by the Defendants. Each Class Representative purchased professional hair products from a Defendant manufactured for resale

within the United States from 2004 to the present.   They must all prove the same central elements of a Lanham Act violation, and proof of that claim will depend on proof that Defendants violated the statute.  It will not depend on the individual positions or circumstances of each class plaintiffs.  Here, the Class Representatives all purchased the same hair products from the same companies through the same distribution channels.  *See* Facts, Part D *supra*.  The proposed Class Representatives' claims are therefore typical of those of their respective class.

### 4.   The Class Representatives will fairly and adequately protect the interests of their respective classes

Rule 23(a)'s commonality and typicality requirements are also closely related to the question of whether class representatives satisfy Rule 23(a)(4)'s adequacy test.

> Those [commonality and typicality] requirements therefore also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest.

*Wal-Mart*, slip op. at 8–9 n.5, *quoting Falcon*, 457 U.S. at 157–58 n.13.

"Adequacy of representation means that the class representatives will fairly and adequately protect the interests of the class." *Cent. States*, 504 F.3d at 245.  Adequacy also "entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 22 F.3d 52, 60 (2d Cir. 2000).

There are no conflicts of interest between the Class Representatives and the rest of their respective classes.  They are all motivated by the same goal of proving Defendants' liability for false and misleading advertising in violation of the Lanham Act. The Class Representatives and their respective classes likewise seek the same redress—that is, enjoining the Defendants' false advertising and recovering damages for the harms that the members of the Classes have suffered. All will present the same basic theory of injury: Defendants' false advertising and unfair

competition injured each Class by, among other things, reducing salon sales of professional products and injuring the salons' reputations.

Plaintiffs have retained capable counsel with extensive experience litigating complex lawsuits in general, including Lanham Act suits and class actions. The firm retained by proposed Class Representatives, Susman Godfrey L.L.P., has been recognized as one of the premier firms of trial lawyers in the United States. *See* Ex. 59 (Firm Resume at http://www.susmangodfrey.com/default/aboutthefirm/firmresume.pdf (last visited June 30, 2011)). Plaintiffs' counsel also developed this case and have pursued it vigorously for the benefit of the entire class.

Plaintiffs have demonstrated that Rule 23(a)'s requirements are fully satisfied by the proposed Class Representatives and their retained counsel. Defendants do not dispute numerosity. Plaintiffs' claims, which are typical of those of the Class, share numerous common contentions capable of class-wide resolution, and both the Class Representatives and their counsel will adequately protect Class interests. Plaintiffs also meet the requirements of Rule 23(b)(3).

## C.    **The Proposed Class Action Satisfies Rule 23(b)(3).**

The next certification issue is whether the claims meet the requirements of Rule 23(b)(3), which permits certification if "the court finds that the questions of fact or law common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include: (A) the class members interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the

desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties of managing a class action." FED. R. CIV. P. 23(b)(3).

1.   **Common issues of law and fact predominate over individual issues within each proposed class.**

Turning first to the predominance inquiry, common questions of law or fact concerning Defendants' Lanham Act violations predominate over the need for individualized proof from class members because:

1.   The law is common to all members of each class;
2.   The facts concerning each Defendants' advertising—which is the crux of liability—is common to all members of each class;
3.   The fact of injury to all class members can be proven through economic evidence common to all plaintiffs in each class.

The purpose of the predominance requirement is to assure that the proposed classes are sufficiently cohesive to warrant adjudication by representation, and to "ensure that the class will be certified only when it would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results. *Cordes & Co. Fin. Servs. v. A.G. Edwards & Son, Inc.*, 502 F.3d 91, 104 (2d Cir. 2007).

"An issue is common to the class when it is susceptible to generalized, class-wide proof." *In re Nassau County Strip Search Cases*, 461 F.3d 219, 227 (2d Cir. 2006). "The predominance requirement calls only for predominance, not exclusivity, of common questions." *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc. (In re Visa Check/MasterMoney Antitrust Litig.)*, 280 F.3d 124, 140 (2d Cir. 2001), *overruled on other grounds by In re Initial Public Offerings*, 471 F.3d. at 40. Indeed, "common issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues." *In re Visa Check*, 280 F.3d at 139. Class-wide issues predominate if resolution of some of the legal or factual questions that

qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Moore v. PaineWebber Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002).

As the Supreme Court recently stated, "considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S.Ct. 2179, 2184 (2011). The Lanham Act declares that:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a). Once a violation is established:

> . . . the plaintiff shall be entitled . . . subject to the principles of equity, to recover
>
> > (1) defendants' profits
> >
> > (2) any damages sustained by the plaintiff, and
> >
> > (3) the costs of the action.
>
> The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. . . .

15 U.S.C. § 1117(a).

> To prove a false advertising claim under the statute, the Plaintiff must show that:
>
> 1. The defendant made a false or misleading statement in commercial advertising or promotion;
>
> 2. The statement has the capacity to deceive a substantial portion of the intended audience;

3. The deception is material, in that it is likely to influence consumer behavior;

4. Plaintiffs are likely to be damaged, either by declining sales or loss of goodwill;

5. The misrepresentation was made in interstate commerce.

*Johnson & Johnson Vision Care v. CIBA Vision Corp.*, 348 F. Supp. 2d 165, 178 (S.D.N.Y. 2004); *Rexall Sundown, Inc. v. Perrigo Co.*, 651 F. Supp. 2d 9, 20 (E.D.N.Y. 2009).

Defendants do not contest that the first, second, and fifth elements of Plaintiffs' false advertising claim can be demonstrated through common proof. *See* Ex. 54 (March 1, 2011 transcript) at 16. That three of the five elements of the claim are not contested by the defendants is a significant step towards establishing that common issues predominate. "Just as much as do contested issues, resolved issues bear on the key question that the analysis seeks to answer: whether the class is a legally coherent unit of representation by which absent class members may fairly be bound." *In re Nassau County Strip Search Cases*, 461 F.3d at 228.

## 2.   <u>Common proof establishes the nature of the advertising, its falsity, and that the advertising was nationwide.</u>

<u>The applicable law is common to all members in each class.</u>  The predominance inquiry considers what law applies to class members' claims. Common issues tend to predominate, and class actions significantly promote efficiency and uniform adjudication of claims, if the same law applies to each class member's claims. In this case, each class alleges a violation of the Lanham Act. Because the Lanham Act is a federal statute that governs Defendants' advertising practices anywhere in the country, the same law will apply to all claims. There are no individualized issues concerning what law applies to different class members.

<u>Defendants' advertising facts are common to all members of each class.</u>  The core liability facts of this case, as in most false advertising cases, all concern Defendants' advertising. The core liability facts that must be proven are all common issues:

- Defendants stipulate that their advertising is national in scope and therefore uniform throughout the country. There are no regional differences referenced in their advertising.

- Defendants' advertising refers to salons and hairdressers, but otherwise makes no meaningful distinction among them, other than to emphasize that the products are sold in superior quality, professional salons. The advertising refers to "salons," "fine salons," "professional salons," "professional hairdresser[s]," beauty salons," "hairdressers," "stylists," and "professionals."

- The advertising does not distinguish among consumers. No Defendant produced any advertising that differentiates among the customers for that brand based on race, ethnicity, or age.

Because false advertising cases focus on the defendant's advertising, the liability proof is usually common to all plaintiffs, and the issues subject to this common proof predominate over any individual issues that may be unique for particular plaintiffs. Quite recently, other courts have certified nationwide and statewide false advertising classes pursuant to Rule 23(b)(3), especially if the advertising is uniform across the state or nation. *See In re Brazilian Blowout Litig.*, No. CV 10-8452-JFW (C.D. Cal. Apr. 12, 2011) (certifying a nationwide class under Rule 23(b)(3) where plaintiffs alleged false advertising because the defendants used a standardized marketing campaign across the country) (attached as Ex. 57); *Zeisel*, No. C 10-01192 JSW (certifying nationwide class in false advertising case under Rule 23(b)(3)) (attached as Ex. 56); *Jermyn v. Best Buy Stores*, 256 F.R.D. 418 (S.D.N.Y. 2009) (certifying false advertising class under New York law and holding that "the predominant issue before the Court is whether Best Buy's advertisements about its price match guarantee were false and misleading because the company had a secret Anti-Price Matching Policy"); *Brazil v. Dell Inc.*, No. C-07-01700 RMW, 2010 WL 5387831 (N.D. Cal. Dec. 21, 2010) (certifying California class under California false advertising statute).[17]

---

[17] *See also Curtis v. Altria Group, Inc.*, 792 N.W.2d 836 (Minn. App. 2011) (affirming certification of false advertising class action regarding "light" cigarettes); *Lee v. Carter-Reed Co., LLC*, 4 A.3d 561 (N.J. 2010)

**3.** **Injury to all class members can be proven using evidence common to all members of each class.**

Proof of injury can be bound up with proof of causation in a false advertising case. *See, e.g., Weiner v. Snapple Beverage Corp.*, No. 07 Civ. 8742(DLC), 2010 WL 3119452, at *6 (S.D.N.Y. Aug. 5, 2010). "At the class certification stage, plaintiffs may demonstrate that these elements are susceptible to generalized proof by disclosing a suitable methodology." *Id.*

A methodology for demonstrating that all class members were likely injured is set forth in the report of Dr. Paul Rubin, which is submitted with this motion. *See* Ex. 60. Dr. Rubin is an economist who is currently serves as a professor of economics and law at Emory University. Rubin ¶ 8. Dr. Rubin served as the Assistant Director of the Bureau of Economics for Consumer Protection at the Federal Trade Commission. At the FTC, he oversaw the economics of the entire consumer protection mission, including advertising regulation; he also supervised all proposed advertising actions of the FTC's Bureau of Consumer Protection. Rubin ¶¶ 9–10. At other times, Dr. Rubin also served as the chief economist of the U.S. Consumer Product Safety Commission and as Senior Economist at the President's Council of Economic Advisers. Rubin ¶ 10.

Based on the discovery available at this class certification stage, Dr. Rubin concludes that common proof can be used to demonstrate the common, negative impact of Defendants' acts on all class members because of the following:

---

(reversing the trial court's denial of class certification where plaintiffs claimed that defendant's dietary supplement was falsely marketed as having weight-reducing benefits); *Harper v. 24 Hour Fitness, Inc.*, 84 Cal. Rptr. 3d 532 (Cal. App. 2008) (reversing trial court's decertification of class action where plaintiffs claimed false advertising of fitness club membership terms); *Aspinall v. Philip Morris Cos., Inc.*, 813 N.E.2d 476 (Mass. 2004) (affirming certification of class action for marketing of "light" cigarettes); *Rose v. United Equitable Ins. Co.*, 651 N.W.2d 683 (N.D. 2002) (affirming class certification of case for false advertising in the sale of insurance policies); *Jackowski v. Guardian Protection Servs. Inc.*, No. 233, 2001 WL 34117810 (Pa. C.P. June 29, 2001) (certifying class action arising out of false advertising of an offer for a "free" alarm system); *Hi-Lo Auto Supply, L.P. v. Beresky*, 986 S.W.2d 382 (Tex. App. 1999) (certifying class action based on claims that defendant sold "old" and "used" automotive batteries as "new"); *Kropinski v. Johnson & Johnson*, No. A-3979-97T1, 1999 WL 33603132 (N.J. Super. App. Div. Jan. 7, 1999) (affirming certification of a class action for claims for consumer fraud in the marketing of contact lenses).

1. The appropriate lens for analyzing the way salons compete in the sale of hair care products is monopolistic competition. This means that even though salons sell different brands and the services offered by one stylist are not exactly the same as those of another stylist, the demand for the products and services offered by salons are nonetheless closely related because they are all selling similar things: hair care products and cutting and styling services. This relationship between demand curves creates the commonality needed for class certification. Rubin ¶¶ 4, 23–24.

2. Because the demand curves that all salons face are related, economic modeling can determine whether the demand for professional hair care products declined as a result of Defendants' actions. A decline in demand as a result of the Defendants' acts results in a decline in revenue for all salons. Rubin ¶ 6.

3. Introducing a large volume of professional hair product into the mass merchandise channel makes the advertising false (Rubin ¶ 3), with the following impact on all salons:

   a. It reduces the demand for hair care products in the salon channel. This degrades the quality of the product offered by the salons and decreases salon's sales, but without the expansion in output enjoyed by the Defendant manufacturers. Rubin ¶ 26.

   b. It directly harms the salons' reputation and goodwill, as customers cannot disentangle the behavior of the Defendants from those of the salons. This further contributes to a decline in demand for salon products and services. Rubin ¶ 27.

   c. It requires salons to either retrain, retool, and resell their customers on different non-diverted products, all of which consumes salon resources. Rubin ¶ 28.

4. Using standard economic regression analysis, Dr. Rubin can measure the fall in demand for professional hair care that results from the Defendants' acts. Rubin ¶¶ 30–34. Although each salon's demand may not fall by exactly the same degree as another salon, all salons will have their demand reduced. Actually performing the analysis requires data on Defendants' sales that were not available during class certification discovery, but should be available during merits discovery. *Id.* ¶ 31.

5. Finally, Dr. Rubin opines that he can reliably calculate aggregate damages to all class members using standard economic methods. Rubin ¶¶ 7, 40–42.

In addition to economic modeling, Dr. Rubin concludes that the common impact of advertising products as "salon-only" while selling large quantities of the products outside of salons is also established using the contracts the Defendants present to salons. These contracts

specifically recognize the harm to reputation and goodwill that occurs when "salon-only" products are sold outside of salons. In particular:

- The John Paul Mitchell contract states: "SALON acknowledges that the sale of JPMS products to anyone other than the intended user or consumer, known as the diversion of JPMS products, seriously damages the reputation and goodwill established by JPMS and the Distributor and interferes with their relationship and with *other SALON customers* as well as the consumer." *See* Ex. 21 (JPMS 77).

- The L'Oreal contract states that "Salon acknowledges that the diversion of Professional Beauty Products to non-salon outlets damages the reputation of the manufacturer of the Professional Beauty Product, the goodwill with the manufacturers' customers and damages the manufacturers' reputation with distributors and salon customers." *See* Ex. 61 (LOREAL000001).

- The Wella contract indicates that "DIVERSION harms both Salon and Wella." *See* Ex. 17 (Wella 000154–156)

- Moreover, these contracts have explicit liquidated damage clauses for salons that divert product in violation of those contracts. For example, the John Paul Mitchell contract calls for "liquidated damages of at least $25,000 plus all profits and costs of recovering such diverted product as well as reasonable attorney fees and costs incurred…" The P&G (Wella) contract calls for "liquidated damages a sum equal to the full retail price normally charged by the salon…" *See* Exs. 21 and 17.

While some of the contracts expressly note the harm to salons, others only identify harm to the manufacturing defendants. But in Dr. Rubin's judgment as an economist,

> harms to manufacturers from salons violating the contract are symmetric with harms to salons from manufacturers tolerating diversion. Indeed, because the salons actually interface directly with the customers, the salons arguably suffer even greater reputation harm from diversion than do manufacturers. Thus, it is economically appropriate to use these contractual formulas to calculate goodwill damages. Rubin ¶ 38.

The fact of damage to salons' reputation and goodwill is also established by the common proof of Defendants' statements admitting the harm that is caused when their products are diverted for sales outside the salon channel. *See* Facts Section, Part B, Table 3.

Thus, the fact that Defendants' false advertising causes a common, negative impact on all salons can be proven by at least three kinds of common proof available in this case: (1) Dr. Rubin's economic model showing how the availability of the falsely advertised products outside of salons harms all salons by shifting the demand curves for their products and services; (2) Defendants' own contracts with salons proving the Defendants believe that diversion harms the goodwill and reputation of both manufacturers and salons; and (3) Defendants' additional public pronouncements acknowledging that diversion harms salons.

### 4. <u>Common economic evidence can also be used to calculate aggregate damages.</u>

In addition to proving impact, common economic evidence can be used to calculate aggregate class damages. Dr. Rubin explains how he can calculate total damages across each class using economic analysis. Rubin ¶ 40–42. This is true "despite the fact that different class members may have experienced different levels of diversion, my damage formula allows one to make use of industry averages to compute aggregate damages." Rubin ¶ 42.

### 5. <u>Materiality and causation can be proven using evidence common to all class members</u>

The materiality and causation aspects of Plaintiffs' Lanham Act claims can also be demonstrated with common proof. The materiality element of a Lanham Act claim requires that the challenged advertising must concern an inherent quality or characteristic of the product, such that it would have some effect on consumers purchasing decisions. *S.C. Johnson & Son, Inc. v. Clorox Corp.*, 241 F.3d 232, 238 (2d Cir. 2001); *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 855 (2d Cir. 1997) (citing 5 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS § 27:35). "It is important to reiterate, as the case law explicitly states, that plaintiffs are not required to present evidence that the defendant's misrepresentations actually influenced

consumer' purchasing decisions, but that it was likely to influence them." *Cashmere & Camel Hair Mfrs. Institute v. Saks Fifth Ave.*, 284 F.3d 302, 311–12 (1st Cir. 2001).

The principal evidence of whether the advertising concerns an inherent quality or characteristic of the products will be the advertising itself, which is common to all members of each class. In this case, there should be little dispute that the advertising speaks to an inherent quality of the products, as the purpose of the advertising is to identify the products as superior because they are used and sold in professional salons.

Common evidence of whether the advertising is likely to influence consumers is also available through consumer surveys. Survey evidence is widely used in false advertising cases. *See, e.g., Johnson & Johnson v. Smithkline Beecham Corp.*, 960 F.2d 294, 297 (2d Cir. 1992). Plaintiffs submit the expert report of Dr. Thomas Maronick in support this motion for class certification. *See* Ex. 58. Dr. Maronick holds a doctor of business administration degree and is a professor of strategic marketing and market research at Towson University's College of Business and Economics in Maryland. *Id.* at 2. He served as the director of Impact Evaluation in the Bureau of Consumer Protection at the Federal Trade Commission from 1980–1997, where he was the in-house marketing expert for all divisions of the Bureau and advised on marketing aspects of cases being considered by FTC attorneys. *Id.* at 2. Dr. Maronick was also responsible for evaluating research submitted by firms being investigated by the FTC, and for designing and implementing all consumer research undertaken by the Bureau. *Id.* On these credentials, Dr. Maronick is fully qualified to design and implement an appropriate consumer survey in this action.

Dr. Maronick surveyed purchasers of professional hair products and asked whether the "salon-only" language of the Defendants' print advertisements and product labels indicated

anything about the quality of the products.  For each of the seven defendant brands tested, substantial percentages of people responded that the "salon-only" language indicated high quality.

|  | Matrix | Redken | Pureology | Tigi | Sebastian | Rusk | Paul Mitchell |
|---|---|---|---|---|---|---|---|
| Good/high/ higher quality | 57% | 37% | 48% | 62% | 35% | 51% | 54% |

Dr. Maronick's survey also found that substantial numbers of respondents understand the "salon-only" language to mean that the product will only be available through salons.

| Brand | Claim | Percent saying Only Available in Salons |
|---|---|---|
| Matrix | "Hair Therapie.  Only from the Salon" and "Matrix—only professional" | 64% |
| Redken | "Exclusive salon distribution" | 78% |
| PureOlogy | "Available only in fine salons and spas" | 51% |
| TIGI Bed Head | "Sold only in professional salons" | 72% |
| Rusk | "Sold exclusively in professional salons" | 89% |
| Sebastian | "Guaranteed only when sold by an authorized salon" | 63% |
| Paul Mitchell | "Only in salons and Paul Mitchell schools" | 75% |
| Garnier (control) | "Sold only in salons" | 64% |
| Average (not including control) = 70.3% | | |

Dr. Maronick's survey also showed that if consumers saw that the product advertised as salon-only was available outside of salons, more than half believed the advertising was false and more than one-third believed the salon lied to them.

| Brand | Claim | Percent questioning did salon lie re: "salon only" | Percent questioning truthfulness of "salon only" claim | Percent agreeing more convenient to buy |
|---|---|---|---|---|
| Matrix | "Hair Therapie. Only from the Salon" and "Matrix—only professional" | 39% | 53% | 55% |
| Redken | "Exclusive salon distribution" | 36% | 63% | 59% |
| PureOlogy | "Available only in fine salons and spas" | 37% | 73% | 86% |
| TIGI Bed Head | "Sold only in professional salons" | 31% | 68% | 58% |
| Rusk | "Sold exclusively in professional salons" | 53% | 73% | 67% |
| Sebastian | "Guaranteed only when sold by an authorized salon" | 50% | 44% | 56% |
| Paul Mitchell | "Only in salons and Paul Mitchell schools" | 25% | 52% | 50% |
| Garnier (control) | "Sold only in salons" | 36% | 64% | 41% |
| Average (not including control) | | 38.7% | 60.8% | 61.6% |

To summarize, materiality can be proven through common evidence because:

- The advertising is material on its face. It addresses an inherent quality or characteristic of the product, namely, the good or superior quality of the product.

- The advertising is material because survey evidence shows that a substantial number of consumers believe that the advertising conveys a message of good or superior quality.

- The advertising is material because survey evidence shows that large percentages of consumers believe the advertising conveys a message that the product is only available in salons.

- The advertising is material and causes harm to salons because when consumers learn that the product is available outside salons, more than half of respondents believe the advertising is false and nearly a third believe the salon has lied to them.

### 6.    **This Class Action is Superior to Individual Actions**

The final aspect of Rule 23(b)(3) that must be satisfied for class certification is that the class action is superior to individual adjudication.   According to Rule 23(b)(3), the matters pertinent to these findings include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

FED. R. CIV. P. 23(b)(3); *Brown v. Kelly*, 609 F.3d at 476.

Certifying this case as a class action would serve these goals.  At the hearing on March 1, 2011, Defendants did not indicate that they contest that a class action is superior to individual actions.   Regardless of whether Defendants contest the point, the evidence supports the superiority of resolving these claims through a class action.

First, salons have little interest in controlling their claims individually.  Each salon's claim is a negative value claim that would be impractical to litigate individually because the costs of litigating would likely exceed the benefit.  *See, e.g.,* Ex. 38 (Jarmon Dep.) at 247:5–22 (total professional product purchases less than $10,000 per year); Ex. 1 (Wood Dep.) at 80:17–81:23 (professional product sales decreased by approximately $500 per month).  Moreover, even if having thousands of individual suits could be possible (it is not), doing so would raise the risk of inconsistent outcomes.

Second, counsel is not aware of any other pending cases brought by individual salons on similar claims of false advertising.  Nor do Defendants seek to move the case out of this Court.

One Defendant in this action moved to transfer the case to Texas and the court granted that motion. None of the remaining Defendants sought such relief and thus have no quarrel with having this Court adjudicate this dispute.

Third, resolving these claims on a class basis would undoubtedly generate huge efficiencies, as they will resolve all claims nationwide against advertising that ran nationwide. It would make little sense to force individual salons to prove the same points about the Defendants' advertising in individual cases, especially where each class member's claim is not sufficiently large to warrant the time and expense. Moreover, if the Court grants the injunctive relief that Plaintiffs have requested, there will be a single court to manage that injunction and address any questions about compliance.

Finally, the case does not pose any special problems of manageability, and Defendants do not claim the case is unmanageable.

**D.**   **Alternatively, Plaintiffs' claims for injunctive relief are appropriately certified under Rule 23(b)(2).**

This case meets the requirements of Rules 23(a) and 23(b)(3) and should be certified. Alternatively, and in the event the Court disagrees that Plaintiffs meet the predominance and superiority requirements, the Court should certify the requested classes under Rule 23(b)(2).

Rule 23(b)(2) classes "have no requirement that the common questions predominate over individual questions, or that the class action be superior to other available methods for the fair and efficient adjudication of the controversy. Such predominance and superiority tests are applicable only for Rule 23(b)(3) class actions." 2 NEWBERG ON CLASS ACTIONS § 4:11. Instead, a class must be certified under Rule 23(b)(2) when it satisfies both Rule 23(a) and when "the party opposing the class has acted or refused to act on grounds that apply generally to the

class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2).

As shown above, the proposed classes satisfy Rule 23(a). Plaintiffs also meet Rule 23(b)(2)'s requirements because the Defendant manufacturers—the parties opposing class certification—have acted and refused to act on grounds that apply generally to salons. Specifically, each Defendant continues to advertise its professional products falsely as available only in salons. Each Defendant continues to allow its professional products to be diverted into mass market retail channels, rendering the "salon-only" advertising false. As requested in Count III of Plaintiffs' Amended Class Action Complaint, a permanent injunction is appropriate to enjoin Defendants' false advertising and to require the Defendants to publish corrective advertising. Certification of a Rule 23(b)(2) class to curtail misleading advertising is routine and appropriate. *See, e.g., Gelb v. Am. Tel. & Tel. Co.*, 150 F.R.D. 76, 78 (S.D.N.Y. 1993) (certifying 23(b)(2) class in fraud case seeking injunction to end Defendants' misleading advertising of long distance telephone cards).

## CONCLUSION

This case presents claims that are well-suited to class treatment and will achieve all of the objectives that Rule 23 is intended to advance. *See* 1 NEWBERG ON CLASS ACTIONS § 1:6. Each Defendant's liability to class members can be proven by looking to that Defendant's acts, which were uniform across the country. The materiality of the advertising to consumers and its resulting harm to salons' business and reputation can be proven by survey evidence. The fact of injury to all class members can be proven by standard economic analysis, as well as the aggregate damages to the class. Finally, because the law and fact issues common to all class members are so many and so central to their claims, resolving their claims through a class action

poses little threat to the due process rights of class members or defendants and achieves the considerable efficiencies for which Rule 23 was intended.

For too long, Defendants have been able to have it both ways—promoting their products as exclusively professional but selling them everywhere—all at the salons' expense. Their hope is that the salons are powerless to seek redress for the harms they suffer from Defendants' false advertising. But this case is suitable for class treatment and Plaintiffs' motions for class certification should be granted.

Dated:  July 8, 2011

Respectfully submitted,

SUSMAN GODFREY L.L.P.

/s/ James T. Southwick
James T. Southwick (JS-4264)
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone:  (713) 651-9366
Fax:  (713) 654-6666
jsouthwick@susmangodfrey.com

Attorney-in-Charge for Plaintiffs

OF COUNSEL:

Suyash Agrawal (SA-1058)
SUSMAN GODFREY L.L.P.
560 Lexington Avenue, 15th Floor
New York, New York  10022-6828
Telephone: (212) 336-8330
Fax:  (212) 336-8340
sagrawal@susmangodfrey.com

Richard W. Hess (pro hac vice)
Nabeel H. Peracha (pro hac vice)
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
rhess@susmangodfrey.com
nperacha@susmangodfrey.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 8, 2011, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and served the following counsel by ECF and/or First Class Mail.

Michaeline A. Re
LAW OFFICES OF MICHAELINE A. RE
350 W. Colorado Blvd., Suite 200
Pasadena, CA 91105


John A. Furutani
FURUTANI & PETERS, LLP
350 W. Colorado Blvd., Suite 200
Pasadena, CA  91105

Frederick B. Warder III
Scott Caplan
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY  10036

Harold P. Weinberger
Norman C. Simon
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York  10036

Lewis Clayton
Susanna M. Buergel
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019


/s/ James T. Southwick
James T. Southwick