**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

SALON FAD,
CINDY'S HAIR SALON,
CHU'S HAIR SALON,
CARASTRO & COMPANY HAIR
DESIGN, EnV STUDIO SALON LLC,
NEW MILLENNIUM SALONS L.L.C.
D/B/A SALON 2000, SALON 1325,
SASSY & CLASSY SALON AND SPA,
THE WORKS HAIR AND NAIL SALON,
THE VERANDA SALON AND SPA, INC.,
WILLIAM DAVID SALON, VIDA SPA
SALON,

          **Plaintiffs,**

     **– v. –**

L'ORÉAL USA, INC.,
CONAIR CORPORATION
JOHN PAUL MITCHELL SYSTEMS,
THE PROCTER AND GAMBLE
COMPANY, TIGI LINEA, LP

         **Defendants.**

Case No. 10-cv-5063  (DLC)

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF THEIR
MOTIONS FOR CLASS CERTIFICATION**

**Table of Contents**

PRELIMINARY STATEMENT ........................................................................... 1

ARGUMENT ................................................................................................ 7

    A.    Plaintiffs Easily Satisfy Rule 23(a)'s Threshold Requirements ........................... 7

        1.    Defendants Ignore the Governing Standard, Which Requires Showing a Single Common Issue of Law or Fact .................................... 8

        2.    Proposed Representatives' Injuries Are Typical of the Class ................. 14

        3.    Plaintiffs and Their Attorneys Will Adequately Represent Class Interests ....................................................................... 18

        4.    Plaintiffs' Classes Proposed Are Easily Identifiable by Objective Criteria ........................................................................ 21

    B.    The Proposed Class Action Satisfies Rule 23(b)(3) ........................................ 26

        1.    Fact of Injury Can Be Demonstrated By Common Proof ...................... 26

        2.    Plaintiffs Have Demonstrated That Causation Can Be Proven Using Common Evidence ..................................................... 35

        3.    Plaintiffs Can Demonstrate Aggregate Damages With Common Evidence ............................................................... 36

        4.    Plaintiffs Will Establish Materiality With Common Evidence ................ 42

        5.    Plaintiffs Will Demonstrate Consumer Deception With Common Evidence ............................................................... 44

        6.    Defendants' Affirmative Defenses of Limitations, Laches and Mitigation Should Not Preclude Certification ........................... 46

    C.    Alternatively, the Classes Are Certifiable Under Rule 23(b)(2) .......................... 51

    D.    The Individual Opposition Briefs Raise No Additional Meritorious Points to Defeat Class Certification ........................................................... 53

        1.    John Paul Mitchell Systems ................................................... 53

        2.    L'Oreal ............................................................................. 55

        3.    P&G ................................................................................. 56

        4.    Conair & Tigi ..................................................................... 58

CONCLUSION..........................................................................................................................59

## **Table Of Authorities**

**Cases**

*Andre H. by Lula H. v. Ambach*,
　104 F.R.D. 606 (S.D.N.Y. 1985) ............................................................. 25

*Avagliano v. Sumitomo Shoji America, Inc.*,
　614 F. Supp. 1397 (S.D.N.Y. 1985) .......................................................... 48

*Avritt v. Reliastar Life Ins. Co.*,
　Civil No. 07-1817 (JNE/JJG), 2009 U.S. Dist. LEXIS 14000 (D. Minn. Feb. 23, 2009) ........ 49

*Axcan Scandipharm Inc. v. Ethex Corp.*,
　585 F. Supp. 2d 1067 (D. Minn. 2007).......................................................... 49

*Barban v. Rheem Textile Sys., Inc.*,
　No. 01–CV–8475, 2005 WL 387660 (E.D.N.Y. Feb. 11, 2005) ............................................. 28

*Caro v. Proctor & Gamble*,
　22 Cal. Rptr. 2d 419 (Cal. Ct. App. 1993) ............................................... 44

*Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*,
　284 F.3d 301 (1st Cir. 2002)................................................................... 43

*Charron v. Pinnacle Group N.Y. LLC*,
　269 F.R.D. 221 (S.D.N.Y. 2010) .................................................... 22, 25

*Coach, Inc. v. Kmart Corp.*,
　756 F. Supp. 2d 421 (S.D.N.Y. 2010) ..................................................... 51

*Cruz v. Hook-Superx, LLC*,
　No. 09 Civ. 7717(PAC), 2010 WL 3069558 (S.D.N.Y. Aug. 5, 2010)................................ 48

*Doe v. Chao*,
　306 F.3d 170 (4th Cir. 2002) ................................................................ 16

*Folsom v. Blum*,
　87 F.R.D. 443 (S.D.N.Y. 1980) ............................................................... 24

*Grant Airmass Corp. v. Gaymar Indus., Inc.*,
　645 F. Supp. 1507 (S.D.N.Y. 1986) ..................................................... 18, 50

*Gross v. Bare Escentuals Beauty, Inc.*,
　641 F. Supp. 2d 175 (S.D.N.Y. 2008) .......................................................... 47

*Hearst Bus. Publ'g, Inc. v. W.G. Nichols, Inc.*,
　76 F. Supp. 2d 459 (S.D.N.Y. 1999) .......................................................... 43

*In re Brazilian Blowout Litig.*,
No. 2:10-cv-8452 JFW (MANx) (C.D. Cal. Feb. 28, 2011).....................................12

*In re Citigroup Pension Plan ERISA Litig.*,
241 F.R.D. 172 (S.D.N.Y. 2006) .............................................................................16

*In re Drexel Burnham Lambert Group, Inc.*,
960 F.2d 285 (2d Cir.1992) .....................................................................................14

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
574 F.3d 29 (2d Cir. 2009) ......................................................................................19

*In re NASDAQ Market-Makers Antitrust Litig.*,
172 F.R.D. 119 (S.D.N.Y. 1997) ............................................................................15

*In re Nassau County Strip Search Cases*,
461 F.3d 219 (2d Cir. 2006) ....................................................................................48

*In re Sumitomo Copper Litig.*,
182 F.R.D. 85 (S.D.N.Y. 1998) ..............................................................................34

*In re Visa Check/MasterMoney Antitrust Litig.*,
280 F.3d 124 (2d Cir. 2001) ................................................................................2, 37

*In re Vivendi Universal, S.A. Sec. Litig.*,
242 F.R.D. 76 (S.D.N.Y. 2007) ..............................................................................15

*Jackson v. Foley*,
156 F.R.D. 538 (E.D.N.Y. 1994)............................................................................24

*Jim Moore Ins. Agency v. State Farm Mut. Auto. Ins. Co.*,
No. 02-80381, 2003 WL 22097937 (S.D. Fla. Sept. 2, 2003) ................................32

*John Paul Mitchell Sys. v. Randalls Food Markets, Inc.*,
17 S.W.3d 721 (Tex. App. 2000).............................................................................55

*Johnson & Johnson Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*,
960 F.2d 294 (2d Cir. 1997) ............................................................................. passim

*Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*,
348 F. Supp. 2d 165 (S.D.N.Y. 2004) ...............................................................43, 46

*Kelly v. City and County of San Francisco*,
No. C 05-1287 SI, 2005 WL 3113065 (N.D. Cal. Nov. 21, 2005).........................50

*L. & J.G. Stickley, Inc. v. Cosser*,
255 Fed. Appx. 541 (2d Cir. 2007).........................................................................43

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*,
   501 U.S. 350 (1991) ........................................................................................ 47

*Laugh Factory Inc. v. Basciano*,
   608 F. Supp. 2d 549 (S.D.N.Y. 2009) .......................................................... 59

*Lee v. ITT Corp.*,
   No. C10–0618–JCC, 2011 WL 2516367 (W.D. Wash. June 24, 2011) ................... 49

*Lorber v. Beebe*,
   407 F. Supp. 279 (S.D.N.Y. 1975) ............................................................... 48

*Matrix Essential, Inc. v. Drug Emporium Drug Mart, Inc.*,
   988 F.2d 587 (5th Cir. 1993) ...................................................................... 55

*McLaughlin v. American Tobacco Co.*,
   522 F.3d 215 (2d Cir.2008) ......................................................................... 49

*Merck & Co., Inc. v. Mediplan Health Consulting, Inc.*,
   425 F. Supp. 2d 402 (S.D.N.Y. 2006) .......................................................... 44

*Milberg v. Lawrence Cedarhurst Fed. Sav. and Loan Ass'n*,
   68 F.R.D. 49 (E.D.N.Y. 1975) ..................................................................... 50

*Nat'l Basketball Ass'n v. Motorola, Inc.*,
   105 F.3d 841 (2d Cir. 1997) ....................................................................... 42

*Newman v. RCN Telecom Servs. Inc.*,
   238 F.R.D. 57 (S.D.N.Y. 2006) ................................................................... 16

*Nimely v. City of New York*,
   414 F.3d 381 (2d Cir. 2005) ....................................................................... 26

*O'Connor v. Boeing N. Am., Inc.*,
   184 F.R.D. 311 (C.D. Cal. 1998) ................................................................. 25

*Park West Radiology v. CareCore Nat. LLC*,
   675 F. Supp. 2d 314 (S.D.N.Y. 2009) .......................................................... 28

*PPX Enters., Inc. v. Audiofidelity Enters., Inc.*,
   818 F.2d 266 (2d Cir. 1987) ................................................................ 43, 45

*Prowley v. Hemar Ins. Corp. of Am.*,
   No. 1:05 CV. 981(KTD), 2010 WL 1848222 (S.D.N.Y. May 7, 2010) .................. 59

*Quality King Distrib., Inc. v. L'Anza Research Int'l, Inc.*,
   523 U.S. 135 (1998) ................................................................................... 55

*Resource Developers, Inc. v. The Statue of Liberty – Ellis Island Found., Inc.*,
926 F.2d 134 (2d Cir. 1991) ........................................................................... 46

*Robidoux v. Celani*,
987 F.2d 931 (2d Cir. 1993) ..................................................................... 14, 15

*Rosado v. Wyman*,
322 F. Supp. 1173 (E.D.N.Y. 1970), *order aff'd*, 437 F.2d 619 (2d Cir. 1970),
*judgment aff'd*, 402 U.S. 991 (1971) ............................................................. 21

*S.C. Johnson & Son, Inc. v. The Clorox Co.*,
241 F.3d 232 (2d Cir. 2001) ......................................................................... 42

*Sebastian Int'l, Inc. v. Longs Drug Stores*,
53 F.3d 1073 (9th Cir. 1995) ......................................................................... 55

*Smilow v. Southwestern Bell Mobile Sys., Inc.*,
323 F.3d 32 (1st Cir. 2003) ........................................................................... 49

*State Teachers Ret. Bd. v Fluor Corp.*
80 F.R.D. 142 (S.D.N.Y. 1978) ..................................................................... 47

*Steinberg v. Nationwide Mut. Ins. Co.*
224 F.R.D. 67 (E.D.N.Y. 2004) ..................................................................... 48

*Sugai Products, Inc. v. Kona Kai Farms, Inc.*,
No. 97-00043, 1997 WL 824022 (D. Haw. Nov. 19, 1997) ......................... 32

*Thorogood v. Sears, Roebuck and Co.*,
547 F.3d 742 (7th Cir. 2008) .................................................................... 29, 31

*Tiffany (NJ) Inc. v. eBay Inc.*,
600 F.3d 93 (2d Cir. 2010) ........................................................................... 57

*Time Warner Cable, Inc. v. DirecTV, Inc.*,
497 F.3d 144 (2d Cir. 2007) ............................................................... 42, 43, 45

*Uniondale Beer Co., Inc. v. Anheuser-Busch Inc.*,
117 F.R.D. 340 (E.D.N.Y. 1987) ................................................................... 20

*Vidal Sassoon v. Bristol-Myers, Inc.*,
661 F.2d 272 (2d. Cir. 1981) ......................................................................... 43

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. ___ (June 20, 2011) ............................................................ 8, 9, 10, 14

*Weiner v. Snapple Beverage Corp.*,
No. 07 Civ. 8742 (DLC), 2010 WL 3119452 (S.D.N.Y. Aug. 5, 2010) ................. 31

*Zeisel v. Diamond Foods, Inc.*,
   No. C 10-01192 JSW (N.D. Cal. June 27, 2011)................................................ 12, 25

## Other Authorities

1 A. CONTE & H. NEWBERG, 1 NEWBERG ON CLASS ACTIONS § 3:10 (4th ed. 2002)........... 8, 9, 16

1 NEWBERG ON CLASS ACTIONS § 3:11 (4th ed. 2002) ............................................... 10

1 NEWBERG ON CLASS ACTIONS § 3:16 .................................................................. 14

1 NEWBERG ON CLASS ACTIONS § 3:26 .................................................................. 19

5 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 23.25[2][b][ii] (3d ed. 2011) ...................................................................................................................... 19

5 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION §27.44 ........................... 37

6 NEWBERG ON CLASS ACTIONS § 18.27 ............................................................... 37

NEWBERG ON CLASS ACTIONS § 10:12 .................................................................. 50

NEWBERG ON CLASS ACTIONS § 22:66 .................................................................. 47

## Statutes

FED. R. CIV. P. 23 ............................................................................................ 3, 31

FED. R. CIV. P. 23(a) ..................................................................................... passim

FED. R. CIV. P. 23(a)(2) ............................................................................ 8, 10, 12

FED. R. CIV. P. 23(a)(3) ................................................................................. 14, 17

FED. R. CIV. P. 23(a)(4) ................................................................................. 18, 19

FED. R. CIV. P. 23(b)(2) ...................................................................... 52, 53, 58, 59

FED. R. CIV. P. 23(b)(3) ...................................................................... 26, 37, 49, 51

FED. R. CIV. P. 26(a)(2) ....................................................................................... 10

FED. R. CIV. P. 26(b)(2) ....................................................................................... 59

FED. R. EVID. 702 ............................................................................................... 27

N.Y.C.P.L.R. § 202 .............................................................................................. 47

## PRELIMINARY STATEMENT

Defendants do not deny that the sale of their professional products in mass retail stores costs salons hundreds of millions of dollars in revenue each year.  L'Oreal's full-page ad in the July 2011 issue of Modern Salon magazine proclaims: "Diversion Hurts Everyone." Ex. 63.[1]  But they oppose class certification by arguing that "the chances are so slim that any member of the class was injured in any way."  *See* Opp'n (Dkt. #158) p. 2 (hereinafter referred to as "Opp'n").  To get from "diversion hurts everyone" to salons are not "injured in any way," Defendants ask the Court to accept two false premises.

First, Defendants ask the Court to accept a distinction between the harm caused by Defendants' advertising and the harm caused by sales outside of salons.  Defendants argue that Plaintiffs can measure harm only from the diverted sales, not from their false advertising.  This manufactured distinction is false because:

- in nearly all false advertising cases, the injury to the plaintiff is measured by the diversion of sales away from the plaintiff, not the words of the advertising itself.  This case is no different; and

- diversion is integral to the false advertising claim because the sale of diverted products renders the advertising false; without diversion, there is no false advertising.

In Defendants' view, only false advertising that literally disparages a plaintiff would be actionable under the Lanham Act.  That is, of course, not the law.  Defendants' false distinction between diverted sales and their false advertising also ignores the fact that the challenged advertising includes Defendants' false statements that they oppose diversion.  *See* First Am. Compl. (Dkt. #81) ¶¶ 59, 60, 68.

---

[1] Unless otherwise noted, all exhibits are attached to the Declaration of Nabeel H Peracha in Support of Plaintiffs' Reply Memorandum in Support of Their Motions for Class Certification

Defendants' second false premise is that Plaintiffs' claims are limited to reputational injury.  Last year, Defendants moved to dismiss this case.  The Court denied the motions in their entirety.  No part of the motions to dismiss was granted.  Yet Defendants try to construe the Court's ruling as if it had partially granted their motions to the extent that Plaintiffs seek to recover for any injury other than reputational harm.  Plaintiffs' claims are not so limited.  As the Court stated, "Defendants do not dispute that plaintiffs have alleged an 'injury-in-fact' that is concrete and particularized—namely, damage to reputation and *loss of sales* . . . ."  Opinion & Order (Dkt. #114) at 8 (emphasis added).  Although the Court focused its threshold standing analysis on reputational harm, once the Court found standing on that point, there was no need to go further.  The Court denied Defendants' motions to dismiss in all respects, and therefore all of Plaintiffs' claims remain intact.

Building on these faulty premises, Defendants focus their opposition on the individual characteristics of class members' claims, arguing that the class includes salons from different parts of the country, of different sizes, with different numbers of employees.  But the fact that each individual salon differs is true of any group of retailers, is irrelevant to the claims at issue and does not bar class certification.  The Second Circuit has affirmed extremely large and diverse classes—from Wal-Mart to sole proprietorships—whose businesses were similar only to the extent they accepted credit and debit cards as a means of payment.  *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 140 (2d Cir. 2001) (affirming certification of nationwide class of large and small retailers).

All putative class members share the only characteristics central to the claims at issue: they buy Defendants' professional products for resale in their salons and they lose sales as a result of Defendants' false advertising.  The fact that each salon may have lost a different amount of sales

based, in part, on local market conditions does not preclude certification.  The law does not require that each salon suffer the same amount of harm—it only requires some common impact, which is exactly what Plaintiffs' expert methodology demonstrates.

On their motions for class certification, Plaintiffs must prove that the elements of Rule 23 are satisfied by a preponderance of the evidence.  Much of the key evidence submitted is from Plaintiffs' and Defendants' expert witnesses.

Impact and Damages—Dr. Rubin v. Dr.  Burtis.  Plaintiffs' economist, Dr. Paul Rubin, is steeped in the economics of advertising, having served as the Director of Advertising Economics at the Federal Trade Commission, the Chief Economist at the U.S. Consumer Product Safety Commission, and also Senior Economist to the President's Counsel of Economic Advisors. Defendants' expert, Dr. Burtis, has worked on an advertising matter only once in her career.  Dr. Rubin presents a model that can prove common impact of Defendants' advertising on all salons, as well as calculate damages.  He identified various sources of data that could satisfy the needs of his model.  Dr. Burtis presents no model of her own, but only criticizes Dr. Rubin and suggests the data needed for the model does not exist.  She makes this proclamation without having asked Defendants, who retained her and pay her, whether they have the data.  The preponderance of the economic evidence supports Plaintiffs' position that impact and damages can be proven using common evidence, which are the heart of Defendants' predominance challenge.

Causation and Materiality—Dr. Maronick v. Dr. Joachimsthaler. Both sides present consumer survey evidence.  Both experts have experience in the field and each criticizes the other's methods.   The key difference between them is that Plaintiffs' expert, Dr. Thomas Maronick, *actually showed* the challenged advertising to survey respondents and tested their reaction it.   Defendants' expert, Dr. Joachimsthaler, *did not show any of the challenged*

*advertising* to any of the 2000 people in his survey.   Consumer surveys are useful in false advertising cases to test consumers' reaction to the challenged advertising.  *Johnson & Johnson Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.,* 960 F.2d 294, 297 (2d Cir. 1997).  Dr. Maronick's survey is relevant to the advertising in this case, whereas Dr. Joachimsthaler survey has nothing to do with the advertising in this case.  The preponderance of the relevant survey evidence demonstrates that materiality and causation can be proven by common evidence.

    Mr. Stampora.   Defendants also present the report of Geno Stampora, who identified his areas of expertise as being "a great father," "an expert husband," "an expert car driver" who has not had "a ticket in many years," and "an expert at most everything in running a successful salon." Ex. 64, Stampora Tr. at 59:15–60:8.  Mr. Stampora's relevance to this class certification motion is as obscure as his credibility.   Consider, for example, his "Summary of Opinions," where Mr. Stampora writes: "one cannot simply extrapolate from one salon's injury to arrive at the nature and extent of an injury (if any) to another salon or stylist."   But when asked at deposition whether he has any experience extrapolating injury from one business to another, Mr. Stampora replied:  "I don't know what that means."   Ex. 64, Stampora Tr. at 153:7–11.   At least with respect to commonality and typicality, Mr. Stampora adds something with his testimony—something that supports Plaintiffs.   He said that it would not surprise him that P&G's survey of salons revealed that 90 percent of salons complained about diversion, and he "would imagine it could be 99 percent." *Id.* at 110:25–111:23.  Mr. Stampora's admission (and the P&G survey, *see* Ex. 65) add to the preponderance of the evidence showing that common interests unite the class.

    Defendants also put an interesting spin on what constitutes the preponderance of the available evidence.   On several issues, Defendants successfully resisted production of their own documents, claiming those materials were irrelevant to class certification.   Yet in their opposition

brief, Defendants raise the Plaintiffs' lack of those same materials as reasons to deny certification. Three examples:

- Defendants successfully persuaded the Court not to permit discovery into their sales data because "[t]he extent of the defendants' sales we think is irrelevant at the class certification stage, and it certainly is not an issue which we say precludes class certification."  *See* N. Peracha Decl. to Plaintiffs' Brief (Dkt. #152) Ex. 54 (3/1/11 Conference Call with the Court) at 16:13–16.   Yet Defendants now say that individual damages issues will predominate because their economist, Dr. Burtis, opines that the salon-level sales data requested by Plaintiffs to calculate damages are not available.  *See* Opp'n at 53–54.  This tactic is revealing because documents from other sources show that Defendants have access to a wealth of sales data, both their own and from third parties. *See, e.g.,* Ex. 66 (Matrix Distributor Agreement) at A-318, Ex. F (requiring distributors to turn over all of their sales data to Matrix upon Matrix's request and report quarterly and monthly salon sales data to Matrix); Ex. 67 (email from settled former defendant Sexy Hair demonstrating that L'Oreal keeps monthly check-out scan data on diversion from 32,032 food retailers, 40,980 drug stores, and 3,608 mass locations).

- Defendants told the Court that their "documents concerning whether Defendants have the ability to prevent diversion, any investigation or study of diversion, or efforts to enforce sale restrictions have nothing to do with class certification (and likely are irrelevant to any issue in the case)." Ex. 68 (Clayton letter, 2/22/11).  Yet Defendants now claim that the classes cannot be ascertained without "mini-trials" to determine which salons participate in diversion.  Opp'n at 33.  But if Defendants—who publicly claim to carefully code and

track the diversion of their products—have documents showing which salons have been identified and terminated due to diversion, the specter of mini-trials vanishes.

▪ Defendants also told the Court that "nor is the question of, at this point, truth or falsity of the ads [going to be an issue for class certification] because we are not saying there's going to be salon-by-salon proof as to whether the product is available in some store that is not a salon."   *See* N. Peracha Declaration to Plaintiffs' Brief (Dkt. #152), Ex. 54 (3/1/11 Conference Call with the Court) at 16:16–19.   Yet they now argue that "[a]lthough defendants' advertising may be uniform, whether it is false will have to be proved in each geographic market.  Unless the products are available outside of a salon in the same market in which such individual salon is located, the advertising is true in so far as that salon is concerned."  Opp'n at 21.

In light of their opposition to producing documents and backtracking on what is at issue in this motion, Defendants should be estopped (for purposes of this motion) from making these arguments relating to the falsity of the ads, the fact of diversion, and the availability of sales data. Defendants' refusal to produce data should result in a finding, for purposes of this motion, that such data exists.  In granting the limited discovery Defendants requested, the Court warned that if Defendants changed their grounds for opposing certification, the Court could "disregard those additional arguments."  The Court should do so now.

Ultimately, despite Defendants' voluminous briefing, the preponderance of the available evidence shows that these classes should be certified because:

1.      the Lanham Act governs all of the claims at issue,

2.      Defendants' advertising is national in scope and uniform across the country,

3.      the falsity of their ads requires only common proof of the ads themselves or consumer surveys, and

4.      Dr. Rubin has shown that standard regression analysis can readily demonstrate both the common impact of the advertising on all class members as well as calculate damages.

Broadly speaking, all 114 pages of Defendants' briefing is little more than an attempt to shift the Court's focus away from the critical, common aspects of Plaintiffs' claims.

## **ARGUMENT**

### **A.**
### **Plaintiffs Easily Satisfy Rule 23(a)'s Threshold Requirements**

For each of the five Defendants, this proposed class action challenges each Defendants' uniform, false advertising of its professional hair-care products as being available only in salons. Plaintiffs assert claims under only one federal statute that applies nationwide.   Defendants stipulate that their advertising is national in scope and that their ads are the same across geographic regions.[2]   As shown in Plaintiffs' Brief (Dkt. #151) and below, Plaintiffs and the proposed classes are substantially similar in all relevant ways and identically situated relative to how Defendants' false advertising injured them.   In many ways, this is an archetypal proposed class action.

Plaintiffs easily meet the threshold requirements of Rule 23(a).   Numerous commonalities unite the class, and Plaintiffs' individual claims are the same as those of the class they would ably represent.   Given the nature of this proposed class action, Defendants' strategy for opposing certification on Rule 23(a) grounds is two-fold.   First, Defendants erroneously limit the injuries and damages for which Plaintiffs may seek redress to reputational harms.   Then, on the basis of that false limitation, Defendants argue that because every salon in the U.S. has its own reputation, each is far too dissimilar to assert claims in this litigation.   Defendants repeat this supposed

---

[2] *See* N. Peracha Declaration to Plaintiffs' Brief (Dkt. 152) Ex. 55, Feb. 17, 2011 email from J. Janghorbani to J. Southwick.

criticism to dispute commonality, typicality, adequacy and ascertainability.[3]   As shown below, none of the issues contested by Defendants under Rule 23(a) is sufficient, alone or in combination, to defeat class certification.

1.    **Defendants Ignore the Governing Standard, Which Requires Showing a Single Common Issue of Law or Fact**

Defendants attempt to dispute that Plaintiffs meet Rule 23(a)(2)'s commonality requirement, although this criterion is "easily met" because Plaintiffs need only show a single common issue of fact or law.  1 A. CONTE & H. NEWBERG, 1 NEWBERG ON CLASS ACTIONS § 3:10 at 274–78 (4th ed. 2002).  But Defendants do not attempt to dispute that numerous issues of law or fact are common to Plaintiffs.   Instead, Defendants point to what they assert are disabling differences among salons in the proposed class.  Defendants offer three reasons why they believe that Plaintiffs cannot satisfy Rule 23(a)(2)'s commonality requirement.[4]   Their first attack both misreads the applicable law and relies on Defendants' erroneous interpretation of the Court's January 10, 2011 Order.   Defendants' other two arguments attempt to shoe-horn this false advertising case into the Supreme Court's June decision in *Wal-Mart Stores, Inc. v. Dukes*, an employment discrimination case.

a.    **Defendants' Claim of "No Common Injury" Misses the Mark**

Defendants first argue that "the injuries suffered by Plaintiffs are too diverse to satisfy commonality."   Opp'n at 19.   According to Defendants, Plaintiffs are limited to asserting reputational injury, and because individual salons have their own reputations, Defendants

---

[3] As shown in Part B below, this is the same as Defendants' argument disputing that common issues predominate.

[4] During the Court's March 1, 2011 discovery teleconference Defendants did not identify commonality as a basis on which they would contest class certification.  N. Peracha Decl. to Plaintiffs' Brief (Dkt. #152), Ex. 54 at 20–21.   As the Court recognized at the time, the Defendants may decide to "change your theory or theories for opposing class certification, but if you do, we may have expanded discovery and/or I may disregard those additional arguments."   *Id.* at 26.   Given the Defendants' successful efforts to bifurcate discovery, and then to narrow class certification discovery, it is appropriate for the Court to disregard Defendants' arguments other than those attacking adequacy, typicality and predominance.

conclude that their injuries lack anything in common.  But this simplistic view ignores the fact that Defendants' own public statements and supplier contracts acknowledge that diversion hurts all salons and interferes with the business relationships and goodwill that salons establish.  *See* Dkt. 151 at 13, Table 3.

Defendants also disregard a significant injury suffered by Plaintiffs: loss of sales caused when Defendants' falsely advertised products are sold outside of salon channels.  Plaintiffs have therefore suffered the same injuries—including lost sales and diminished reputation.

Even if Defendants were correct that Plaintiffs may only assert reputational injury—they are not—Defendants cite no authority for their sweeping conclusion that "the fact, nature, and extent" of Plaintiffs' injuries share nothing in common.  Why?  Because that is not the law.  What matters, according to the *Dukes* decision, is that Plaintiffs "*claims*…depend upon a common contention."

> Their claims must depend upon a common contention—for example, the assertion of discriminatory bias on the part of the same supervisor. That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

*Wal-Mart Stores, Inc.  v. Dukes*, 564 U.S. __, Slip Op. at 9 (June 20, 2011) (emphasis added); *see also* 1 A. CONTE & H. NEWBERG, 1 NEWBERG ON CLASS ACTIONS § 3:10 at 274–78 (4th ed. 2002) ("[T]here need be only a single issue common to all members of the class.  Therefore, this requirement is easily met in most cases.  When the party opposing the class has engaged in some course of conduct that affects a group of persons and gives rise to a cause of action, one or more of the elements of that cause of action will be common to all of the persons affected.").

In this case, each class will prove that each Defendant separately violated the Lanham Act by that Defendant's uniform, nationwide and false advertising of its salon-only products.  This is not a case, like *Dukes*, where Plaintiffs "wish to sue about literally millions of employment

decisions at once." *Id.* at 12.  Rather, all Plaintiffs are united by a common complaint: that they were injured by Defendants' salon-only advertising of products diverted to non-salon channels, which violated the Lanham Act.

To demonstrate commonality, Plaintiffs need only identify "questions of law or fact common to the class."  FED. R. CIV. P. 26(a)(2).  Indeed, a single contention will satisfy this requirement.  It is undisputed, for example, that determining whether Defendants' advertising is false "will resolve an issue that is central to the validity of each one of the claim claims in one stroke."  *Id.*  That is sufficient to satisfy Rule 23(a)(2).  Defendants' ability to list questions they assert are relevant to determining reputational damages has nothing to do with the commonality inquiry because "the presence of individual questions will not prevent satisfaction of the Rule 23(a)(2) prerequisite."  1 NEWBERG ON CLASS ACTIONS § 3:11 at 294.

Ironically, after asserting that to analyze commonality, "it is not enough to simply provide…a list of questions," Opp'n at 19, Defendants then list over a dozen questions that they believe demonstrate the need for individualized reputational inquiry.  Indeed, Defendants' strategy is to identify as many individualized questions as possible, regardless of whether those questions bear any relationship to determinative issues in the case.  But the test is whether a common contention "is capable of classwide resolution," *Dukes* at 9.

### b.   Each Defendant's Uniform Advertising Satisfies Commonality Requirement

Defendants' uniform advertising compels a commonality finding,  To avoid this natural (and accurate) conclusion, Defendants offer a highly dubious proposition.   According to Defendants, determining whether or not their advertising is false requires a geographical market-by-market determination.  *See* Opp'n at 21 ("[W]hether it is false will have to be proved in each

geographic market.  Unless the products are available outside of a salon in the same market in which such individual salon is located, the advertising is true in so far as that salon is concerned.")

This argument fails on the merits, which the Court need not reach because Defendants waived this argument at the class certification stage.  During the parties' March 3, 2011 telephonic conference with the Court, Defendants expressly assured the Court that for class certification purposes, they were ***not*** contesting whether or not their advertising was false or whether "there's going to be salon-by-salon proof" as to the availability of salon-only products in the diversion channel.  According to Defendants:

> The extent of the defendants' sales we think is irrelevant at the class certification stage, and ***it certainly is not an issue which we say precludes class certification, nor is the question of, at this point, truth or falsity of the ads because we are not saying there's going to be salon-by-salon proof as to whether the product is available in some store that is not a salon***, nor is there going to be salon-by-salon proof as to what the advertising is.

N. Peracha Declaration to Plaintiffs' Brief (Dkt. #152), Ex. 54 at 16 (counsel for Conair & Tigi); *see also id.* at 24 (counsel for L'Oreal joining arguments by Conair & Tigi's counsel).  While Defendants may—at some later point—dispute the falsity of their uniform advertising based on the extent of diversion, they agreed not to contest falsity on that (or any basis) during class certification.

Even if Defendants had not waived this argument, they do not favor the Court with any authority for the idea that uniform, nationwide advertising can be true in New York but false in Connecticut.  The notion reveals its absurdity when applied to other false advertising lawsuits. For example, suppose an orange juice manufacturer advertises its product nationally as containing 100 percent Florida orange juice, but in fact, only juice sold in Florida comes from Florida oranges.  According to Defendants, apparently, the truth of falsity of such advertisements depends on where the juice is sold, where people consume it, or see the advertising.

Plaintiffs' class certification brief identified two cases from 2011 showing that nationwide false advertising lawsuits meet the commonality requirement and are frequently certified as class actions. Defendants' half-hearted attempts to distinguish *In re Brazilian Blowout Litig.* and *Zeisel v. Diamond Foods, Inc.* fall short. As Defendants concede in a footnote, the *Brazilian Blowout* court concluded that exposure to common advertising was "one of several factors that the court concluded constituted common issues" satisfying the commonality requirement. *See* Opp'n at 22 n.2. But the other "several factors" show that Plaintiffs in this lawsuit present an even more compelling case for class certification. The *Brazilian Blowout* defendants had argued that the putative class lacked commonality because (1) the relevant product formulas were non-uniform; (2) defendant's advertising was not standardized; (3) bottle labels were not standardized; and (4) not every class member saw the alleged misrepresentations. *See* Ex. 69, *In re Brazilian Blowout Litig.*, No 2:10-cv-8452 JFW (MANx), Dkt. #44 at 9–12 (C.D. Cal. Feb. 28, 2011). Here, two of these factors are relevant to class certification (factors 2 and 3) and both demonstrate that class certification is at least as appropriate as in *Brazilian Blowout*. Each Defendant's advertising is uniform and nationwide, and each Defendant advertises its salon-only messages, among other places, on standard bottle labels.

Defendants attempt to distinguish *Zeisel* by noting that defendants in that case "did not contest the commonality prong." Opp'n at 22 n.2. This is incorrect: the defendant disputed commonality and predominance on the same grounds (as Defendants do here).[5] The court rejected those arguments, and this Court should as well. *See* Ex. 71, *Zeisel v. Diamond Foods, Inc.*, No. C 10-01192 JSW (N.D. Cal. June 27, 2011) Dkt. # 152 at 12.

---

[5] The *Zeisel* defendant's class certification opposition noted that "[w]hile Diamond does not dispute numerosity, it does dispute commonality under Rule 23(a)(2) for the same reasons Zeisel cannot establish predominance of common questions of law or fact under Rule 23(b)(3)." *See* Ex. 70, *Zeisel v. Diamond Foods, Inc.*, 3:10-CV-01192 JSW (EDL), (N.D. Cal. Apr. 22, 2011) Dkt. # 109 at 20 n. 24.

      **c.**     <u>**Dr. Rubin's Analysis Shows Impact is Subject to Common Proof**</u>

Defendants also argue that Plaintiffs cannot demonstrate commonality on the basis of statistical evidence.  But as shown in his expert report and testimony, Dr. Rubin's regression analysis, using common evidence, can show both that the entire class suffered injury as a result of Defendants' challenged conduct, and that individual salons suffered an injury from diverted sales of falsely-advertised products.

Defendants' only response to this is that Dr. Rubin's regression analysis is irrelevant because it measures diversion of falsely-advertised products directly, rather than measuring the extent of diversion caused by reputational injury.  In other words, Defendants base their criticism on their erroneous belief that the Court limited Plaintiffs to pursuing injury to reputation alone. For the reasons discussed above, this is incorrect.  Moreover, even Defendants' expert conceded that lost sales are one potential result of reputational damage caused by false advertising.  *See* Ex. 72 (Burtis Tr.) at 88:8–89:16.

Dr. Rubin, a Professor of Economics at Emory University for over 20 years, has deep experience with the economics of advertising, having previously served as Chief Economist at the Consumer Products Safety Commission, and as the Director of Advertising Economics at the Federal Trade Commission.  *See* N. Peracha Decl. to Plaintiffs' Brief (Dkt. #152) Ex. 60, Rubin Report, ¶¶ 8–10.  Dr. Rubin has authored, co-authored and edited numerous books, journals and articles on the topic of advertising economics.  *Id.*

For this case, Dr. Rubin developed a regression model to analyze the harm caused to the entire class by the challenged conduct.  As explained in his report, this regression analysis can be run using common evidence (sales data) available from Defendants.  Or, if that is unavailable or unsuitable, Rubin can use publicly-available data from AC Nielsen and the U.S. Census. *Id.* ¶ 31. Once the data are employed in the regression model, Dr. Rubin will be able to isolate the

incremental effect of diversion on sales of products at each salon. *Id.* ¶ 32. After Dr. Rubin determines the quantity effect, he can then use econometric analysis to demonstrate that all members of the class suffered a price effect. That is, Dr. Rubin's analysis will be able to demonstrate that either salon sales of salon-only products declined, or the prices that salon-only products commanded declined as a result of Defendants' false advertising and diversion. *Id.* ¶ 34. This is common injury, demonstrated through common evidence.

Without any particular analysis, Defendants assert that Plaintiffs' statistical evidence fails to satisfy *Wal-Mart v. Dukes*. But the *Dukes* case concerned alleged employment discrimination, and had nothing to do with false advertising, economic analysis or the economic analysis of advertising. Defendants also assert that "any attempt to prove injury will require evidence that will differ from store to store and from customer to customer." Opp'n at 22. But Defendants ignore the fact that the data to run the regression is common evidence. *See* Rubin Report at ¶ 7, 19 & 31 (indicating his regression analysis will use common evidence from defendants' records or from publicly-available records).

### 2.     Proposed Representatives' Injuries Are Typical of the Class

Defendants assert that Plaintiffs' injuries are atypical of the class members' injuries, largely by parroting their same arguments against commonality. Opp'n at 25. But in this Circuit, the typicality requirement is clear, distinct and easily met. "Rule 23(a)(3)'s typicality requirement is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendants liability." *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993) *citing In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2d Cir.1992); 1 NEWBERG ON CLASS ACTIONS § 3:16 at 378 ("A plaintiff's claim is typical if it arises from the same event, practice, or course of conduct that gives rise to the claims of other class members and is based on the same legal theory.").

Establishing typicality requires only that "the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented." *Robidoux*, 987 F.2d at 936. When this is so, "the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Id.* at 936–37; *see also In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 85 (S.D.N.Y. 2007); *In re NASDAQ Market-Makers Antitrust Litig.*, 172 F.R.D. 119, 126–27 (S.D.N.Y. 1997).

Here, Plaintiffs' Lanham Act claims arise from the same practice and course of events as each class member's claim. Each Defendant falsely advertised its products as available only in salons, while knowingly diverting or permitting the diversion of those products to be sold to non-salon outlets. For each Defendant's, advertising is admittedly uniform and nationwide.[6] Each class member will make identical arguments to establish Defendants' liability.

Defendants then dispute typicality by arguing that none of the Plaintiffs demonstrated a reputational injury. Defendants point selectively to Plaintiffs' deposition excerpts to argue that "all plaintiffs testified that their salons have good reputations that have remained steady or even imposed during the class period."[7] Opp'n at 24. This sweeping assertion is belied by Plaintiffs' complete testimony cited in Plaintiffs' Memorandum. *See* Plaintiffs' Brief (Dkt. #151) at 17–29. It is also belied by the very next page of Defendants' own briefing, where they concede that "several salons" testified that their reputations and credibility had been harmed. Opp'n at 25.

To be sure, *see id.*, Defendants discount this testimony because they disbelieve Plaintiffs and consider the testimony "conclusory." But this is hardly a valid typicality attack: Defendants

---

[6] *See* N. Peracha Decl. to Plaintiffs' Brief (Dkt. #152), Ex. 55 (Feb. 17, 2011 email from J. Janghorbani to J. Southwick).

[7] Defendants fault Plaintiffs for failing to "establish" that they had been held accountable by customers for false advertising or lost any customers are a result of reputational injury. This criticism ignores common sense. By definition, former customers are unlikely to contact the salons and stylists they used to patronize. It is unclear how salon owners would learn from former clients that they no longer patronized a salon based on the salon's impaired reputation. Indeed, this is a reason for using Dr. Rubin's econometric analysis of the shifting demand curve for salon-only products, rather than rely on hearsay testimony of former clients to determine impact.

deny that *any* member of the class has been injured by Defendants' false advertising and product diversion.  Defendants' assertion that they should win on the merits is not a basis to contend that Plaintiffs' interests diverge from class members' interests.  *See In re Citigroup Pension Plan ERISA Litig.*, 241 F.R.D. 172, 178 (S.D.N.Y. 2006) (stating that "differences in the degree of harm suffered, or even in the ability to prove damages, do not vitiate the typicality of a representative's claims"); *see also* 1 NEWBERG ON CLASS ACTIONS § 3:10 at 271 (4th ed. 2002). ("A class representative need not show a probability of success on the merits to maintain a class action.").

Two opinions mis-cited by Defendants for the proposition that Plaintiffs must demonstrate that they suffered "the same harm" as the proposed class do not change this analysis.  Opp'n at 24. Both cited cases turn on statutory injury requirements peculiar to two causes of action asserted in those cases, neither of which is based on the Lanham Act.  *See Newman v. RCN Telecom Servs. Inc.*, 238 F.R.D. 57, 64 (S.D.N.Y. 2006) (finding typicality not met because under New York's General Business Law § 349, plaintiff "must suffer material injury resulting from the deceptive act being challenged," but testified that he did not rely on any misrepresentation); *Doe v. Chao*, 306 F.3d 170, 184 (4th Cir. 2002) (dismissing federal Privacy Act case because statute required plaintiffs to show both an "adverse effect on an individual" and actual damages, yet sole proposed class representative could not demonstrate actual damages).

Defendants also dispute typicality on another ground, asserting that "there is evidence that at least two of the Plaintiffs are suspected of having engaged in diversion."  Opp'n at 27. According to Defendants, Plaintiffs thus cannot meet the typicality requirement because these two salons are "subject to unique defenses which threaten to become the focus of the litigation." Opp'n at 27.   A review of the two documents that Defendants cite as support shows how disingenuous this attack is.  The first document (*See* F. Warder Declaration to Opp'n  (Dkt. #164)

Ex. 25, at LOREAL000038) is an unsigned[8] 2009 letter, apparently addressed to the partner of a salon owner.  Neither the salon to which the letter is addressed ("Moda Three Salon"), nor the salon owner (Jeffrey Belles), nor his partner, is a proposed class representative.  No salon owed by Mr. Belles is a proposed class representative.

The second document is a heavily-redacted monthly sales chart of P&G's Sebastian products.  The name of proposed class representative, William David Salon, appears on one page of the chart along with the salon's increasing holiday sales from October to December 2008.  *See* F. Warder Declaration to Opp'n (Dkt. #164) Ex. 26 to Opp'n at Wella 000140.  Under a column titled "Status" appears the word "monitor."  *Id.*  Based on this, Defendants furtively hope that the Court agrees that this is "evidence" that the William David Salon is "suspected of having engaged in diversion."  Opp'n at 27.  But Defendants do not provide the Court with the sworn testimony from the salon owner, William Murphy.  Far from accusing Murphy of engaging in diversion, P&G/Wella *never even contacted him* about what their lawyers now characterize as a suspicious spike in sales.  *See* Ex. 74, Murphy Tr. at 326:25–327:21.  At his deposition, *Defendants did not even ask him* about the one document they claim shows him "suspected" of diverting products.  Defendants' own industry expert, Geno Stampora, agrees that there is nothing unusual about higher seasonal sales: he strongly encourages all salons to overstock during the holidays.  *See* Ex. 64, Stampora Tr. at 248:3–250:15 (noting it is a "great idea" for salons to overstock during holidays, up to triple their normal inventory).

Plaintiffs meet Rule 23(a)(3)'s typicality requirement because their claims are based on the same practice and course of conduct as the rest of the class.  Defendants' beliefs that they will prevail on the merits and that no salon has suffered reputational injury are not legitimate typicality

---

[8] The unsigned letter indicates it is "Certified Mail" yet the salon owner does not recall receiving it.  *See* Exhibit 73, Belles Tr. at 196:25–197:16.  L'Oreal has not produced a returned receipt "green card."  L'Oreal has produced nothing related to this "alleged diversion" other than this letter.

attacks.   And Defendants' spurious claim that a proposed class representative is a suspected diverter disintegrates under the slightest examination.

> ### 3.      Plaintiffs and Their Attorneys Will Adequately Represent Class Interests

Rule 23(a) also requires class representatives to "fairly and adequately protect the interests of the class."  FED. R. CIV. P. 23(a)(4).  This test has two prongs: there must be no material conflicts pertaining to the issues common to the class, and the class action must be vigorously prosecuted on behalf of the proposed class.  Defendants challenge only the conflicts prong of the adequacy test, and assert four arguments.   The first entirely recapitulates Defendants' earlier disputes regarding commonality and typicality.  The last three are insufficient to show any conflict between Plaintiffs and the proposed class.

> #### a.      Plaintiffs Are Adequate Representatives Because They Have Been Harmed and Are Motivated to Seek Redress

Defendants assert that Plaintiffs are inadequate representatives because they "have not lost any customers and have admitted that they suffered no reputational harm."  Opp'n at 28.  As noted in Part 2 above regarding typicality, Plaintiffs have suffered the same injury as the class, and a review of Plaintiffs' testimony contradicts Defendants' selective citation of their deposition transcripts.  Moreover, there is no requirement in a Lanham Act case that a Plaintiff show they have "lost any customers."  *See Grant Airmass Corp. v. Gaymar Indus., Inc.*, 645 F. Supp. 1507, 1514 (S.D.N.Y. 1986) (noting that evidence of a lost customer or one "actually misled by the advertising. . . is not a *sine qua non* of a Lanham Act claim, but rather goes to the quantum of proof").

> #### b.      Plaintiffs' Sales of Other, Non-Diverted Products Do Not Create a Conflict with Class.

Some Plaintiffs sell multiple brands of salon-only products manufactured by different Defendants.  Some Plaintiffs sell Defendants' salon-only products, as well as salon-only products

manufactured by non-defendants.  Under Second Circuit law, not every alleged conflict prevents class certification.  The conflict must be "fundamental" to violate Rule 23(a)(4).  *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009).  A "fundamental" conflict is one where "the interests of the class representative can be pursued only at the expense of the interests of all the class members."  1 NEWBERG ON CLASS ACTIONS § 3:26.  A "fundamental" conflict may not be "merely speculative or hypothetical."  5 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 23.25[2][b][ii] (3d ed. 2011).  That some Plaintiffs sell professional hair care products that are less diverted than Defendants' products does not create a conflict with the class.  All of the class representatives sell the professional products that are at issue.

Defendants speculate about a second potential conflict, claiming a founder of Plaintiff Salon-FAD "has a pecuniary interest that differs from the relief sought by many of the class members."  Opp'n at 28.  The basis of this alleged conflict is that Salon-FAD's founder also owns the Georgia distributorship for a line of salon-only products called J. Beverly Hills.[9]  According to Defendants, should this Court enjoin Defendants' false "salon-only" advertising, J. Beverly Hills "will be able to tout itself as 'salon-only' while defendants cannot, thus gaining a competitive advantage."  *Id.*

First, there is no conflict, fundamental or otherwise.  In this litigation, Salon-FAD is the assignee of the interests of Bobbi Sordelet's Daily Trends Salon.  Salon-FAD does not distribute J. Beverly Hills products.  Even if the alleged economic interests of non-party J. Beverly Hills of Georgia were relevant in this case, this is hardly an intra-class conflict.  The only "conflict," if one exists, is between the interests Plaintiffs seek to vindicate (ending false advertising) and what Defendants seek to preserve (continued false advertising and continued sale of professional, salon-

---

[9] Ms. Pelfrey formed non-profit Salon-FAD in early 2008; she began distributor work the following year through a separate for-profit entity, J. Beverly Hills of Georgia.  *See* Ex. 75, Pelfrey Tr. 44:3–10.

only products in mass market chains).  It is not a conflict to try to stop Defendants' false advertising while permitting their competitors to advertise truthfully.

Defendants' second alleged conflict precluding an adequacy finding is just as illogical. Defendants complain that some Plaintiffs sell J. Beverly Hills products, and "thus profit from the success of a product line that is in competition with the defendants' products."  It is not an intra-class conflict that some class members have opted to sell products that are not (or are less heavily) diverted than Defendants' salon-only products.  If this were a conflict, Plaintiffs could presumably ameliorate it by continuing to sell Defendants' falsely-advertised products.  But then Defendants would accuse Plaintiffs of failing to mitigate their damages.  If Plaintiffs stopped selling salon-only products all together, Defendants would assert that Plaintiffs lack standing.  Defendants have not shown any conflict where Plaintiffs' interests are antagonistic to the class they seek to represent.

**c.      There Is No Requirement That Cosmetologists and Salon Owners in the Class Have Separate Representation**

Defendants third alleged conflict is that each of the named Plaintiffs is either a salon owner, or both a salon owner and cosmetologist.  None is solely a cosmetologist.  Defendants assert, without support, that this is a disabling conflict because cosmetologists' interests in this case are different from salon owners' interests.

But both cosmetologists and salon owners are united in interest via the class definition: to the extent cosmetologists or salons sell Defendants' falsely advertised products, they are members of the proposed class.  It is the sheerest speculation that the interests of cosmetologists (some of whom sell Defendants' salon-only products) diverge from those of salon owners (some of whom also sell Defendants' salon-only products).  *See Uniondale Beer Co., Inc. v. Anheuser-Busch, Inc.*, 117 F.R.D. 340, 343 (E.D.N.Y. 1987) (adequacy test satisfied despite defendant's assertion that

the operation by plaintiffs of a variety of businesses using different types of licenses created antagonistic interests, and noting that defendants were "grasping at straws").

Defendants are, in essence, asserting that cosmetologists should have the right to continue selling falsely-advertised products. Even if some cosmetologists expressed such a desire—they have not—that is not a conflict that the Court should credit. Courts recognize that "[i]n any substantial class action there is always the possibility some members of the class will take a position different from that of those who have assumed the laboring oar in a litigation. But such differences of opinion do not preclude a class action." *Rosado v. Wyman,* 322 F. Supp. 1173 (E.D.N.Y. 1970), *order aff'd*, 437 F.2d 619 (2d Cir. 1970), *judgment aff'd*, 402 U.S. 991 (1971).[10] It is not a conflict that mandates a finding of inadequacy.

### d.     Plaintiffs Claims Are Not Time-Barred

Defendants also assert that certain unnamed Plaintiffs are inadequate because their claims are time-barred. Opp'n at 30. For the reasons explained in Part B.6 below, Defendants' argument has no merit and Plaintiffs' claims are not precluded by any limitations statute.

### 4.     Plaintiffs' Classes Proposed Are Easily Identifiable by Objective Criteria

Defendants also challenge the proposed classes, stating that they do not meet the implied requirement of ascertainability. Opp'n at 30–35. Defendants argue that mini-hearings will be needed to determine which salons suffered reputational injury and which were previously identified by Defendants as diverters of products.

---

[10] Defendants also devote two sentences to allege that Plaintiffs Liston and NeSmith "have conflicts" because they seek to retain "salon-only" advertising on Defendants' labels but stop the diversion of Defendants' products. Opp'n at 29. Although Defendants assert that "That is not the relief sought in the complaint," *id.*, Defendants have apparently misread Plaintiffs' live pleading. *See* Am. Compl. (Dkt. #81) ¶ 127 (a)–(b) (requesting "That this Court enjoin Defendants' use of false and misleading statements by requiring that: (a) Defendants remove the false and misleading statements from their products; (b) Defendants stop the diversion of their products that renders their advertising false.") Defendants could stop their false advertising by ending diversion or by ceasing advertising products as salon-only.

The first assertion is predicated on Defendants' misreading of the Court's January 10, 2011 Order that Plaintiffs may only assert injuries from "alleged reputational harm caused by defendants' advertisements."  Opp'n at 30.  Defendants' reputational-injury-only argument is a repeat of Defendants' argument against commonality, typicality and adequacy. Each contention has been addressed above in Parts 1.a, 2, and 3.a above.

Nor will individualized hearings will be necessary to determine class membership, because the proposed classes exclude salons that Defendants "previously identified as having diverted" Defendants' professional products during the class period.  *See* Plaintiffs' Brief (Dkt. #151) at 9–15 (reciting class definitions).  Under this Circuit's law, a class is ascertainable when the class is defined by objective criteria:

> To be ascertainable, the class must be readily identifiable, such that the court can determine who is in the class and, thus, bound by the ruling.   A class is ascertainable when defined by objective criteria that are administratively feasible, and when identifying its members would not require a mini-hearing on the merits of each case.

*Charron v. Pinnacle Group N.Y. LLC*, 269 F.R.D. 221, 229 (S.D.N.Y. 2010) (citations and quotations omitted).  In *Charron*, a case cited by Defendants, the Court determined that the class *was* ascertainable because it was defined by three objective criteria: (1) whether an apartment is rent-regulated; (2) whether it is owned by Pinnacle; and (3) whether the putative class member is a tenant as of the date of the opinion.  *Id.*

In this case, determining which salons in the class should be excluded as diverters is an easier task than ascertaining the class approved in *Charron*.  All Defendants have to do is examine their anti-diversion records to see if a particular salon has been identified by Defendants as a diverter.  As in *Charron*, this will not require a "mini-trial," but requires only that Defendants review the records that they claim they keep.

And there is ample evidence in the public record that this information concerning identified diverters resides with Defendants.  For example, L'Oreal publicly boasts that it employs a "new state-of-the-art product coding system that is 100% accurate in tracking products to diverters" and even hired a "former FBI agent" to develop anti-diversion strategies.  These anti-diversion efforts allow L'Oreal to "identify exactly which distributor our products have been sold to, and from there, it enables us to identify which salon the distributor has sold the products to."  L'Oreal's "follow-up audits of distributorships have effectively revealed violators," and its "ongoing intelligence procedures uncover diversion schemes."  L'Oreal "strictly enforce[s] our no-diversion policy at every level possible, from production to the salon.  We code.  We shop.  We terminate."  Am. Compl. ¶ 62.  Defendant P&G/Wella likewise has "a state of the art coding system that allows us to identify products found in an unauthorized retail outlet."  *Id.*  P&G's "direct sales model enables us to see what's being bought and sold more closely."  *Id.*

While Defendants were not required to identify during class certification discovery what types of diversion records they maintain, the glimpses provided in Defendants' discovery suggests that substantial records exist.  For example, one of the largest manufacturers, P&G/Wella, tracks individual salons' month to month sales *to the penny*.  *See* F. Warder Decl. to Opp'n (Dkt #164) Ex. 26 to Opp'n at Wella 000140.  L'Oreal, another large manufacturer, has access to a huge diversion data repository that contains "actual scan data" from over 30,000 food retailers, 40,000 drug stores and 3,600 mass market locations.  *See* Ex. 67 (5/26/10 email from L'Oreal's Brand Equity Protection Senior Director Chris Lyden).

Defendants do not, in fact, deny this.  In their Opposition, Defendants weakly suggest that they lack information to identify diverters with this carefully-worded non-denial: that "*plaintiffs*

*cannot show* that lists of diverting salons exist, or that they are accurate or reliable."  Opp'n at 31 (emphasis added).

Plaintiffs do not yet have such lists, but can certainly show that Defendants do.  The reason that Plaintiffs do not yet have records and data showing Defendants' anti-diversion efforts is that Defendants refused to produce them.[11]  When Plaintiffs asked the Court to compel Defendants to produce this information, Defendants repeatedly assured the Court that such discovery was unnecessary for class certification purposes.[12]

Defendants cannot resist discovery into anti-diversion efforts by persuading the Court that such records are not needed for their "narrow" class certification attack, and then assert that the class is unascertainable because Plaintiffs have not shown that Defendants maintain the required records.  *See Folsom v. Blum*, 87 F.R.D. 443 (S.D.N.Y. 1980) (characterizing Defendants' numerosity argument as "pure sophistry" where the exact number was known to the defendant and who had the means to identify class members); *Jackson v. Foley*, 156 F.R.D. 538, 542 (E.D.N.Y. 1994) (noting that Defendants alone have the required data and so "such an information monopoly will not stand in the way of persons seeking relief").  Plaintiffs have sufficiently shown that Defendants have the ability to track their products, identify suspected diverters, and then terminate salons that they have identified as having engaged in diversion.

Defendants also contend that the proposed classes cannot be ascertained because Plaintiffs cannot sufficiently identify which products they sold.  A close review shows that Defendants' specific criticisms are meritless quibbles.

---

[11] *See* N. Peracha Declaration to Plaintiffs' Brief (Dkt. #152) Ex. 55, Feb. 17, 2011 email from J. Janghorbani to J. Southwick.
[12] *See* Ex. 68 (Feb. 22, 2011 Clayton Letter); *see also* N. Peracha Declaration to Plaintiffs' Brief (Dkt. #152)  Ex. 54, Mar. 1, 2011 Tr. at 11 (Mr. Clayton stating "it will be very expensive and, we submit, probably unnecessary for us to provide discovery on issues of our diversion policies"); *id.* at 17 (Mr. Clayton claiming that discovery into "our ability to stop diversion . . . may be something of interest at the merit stage, if we ever get there.  We don't think it's relevant to the issue of individualized versus generalized proof and damages as well"); *id.* at 24 (Mr. Warder asserting that "none of those [contested class certification issues] involve. . . the anti-diversion efforts").

First, it is not clear how this is an ascertainability challenge.  As noted, the question of ascertainability is answered by whether the class is "defined by objective criteria that are administratively feasible."  *Charron*, 269 F.R.D. at 229.  Questions about recordkeeping adequacy is not a reason to refuse to certify the proposed classes, and "the class need not be so ascertainable that every potential member can be identified at the commencement of the action." *O'Connor v. Boeing N. Am., Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998); *Andre H. by Lula H. v. Ambach*, 104 F.R.D. 606 (S.D.N.Y. 1985) (finding, on numerosity grounds, that a constantly revolving class membership not a bar to certification).

Moreover, the only alleged record deficiencies identified in the Opposition concerns JPMS products and Sebastian products (sold by P&G/Wella).  Regarding Sebastian products, Defendants cite the testimony of three Plaintiffs (Ms. Woods, Mr. Murphy and Ms. Pelfrey).  But Plaintiffs have identified *eight* proposed representatives who sold Sebastian.  Regarding JPMS products, Defendants cite only the testimony of Ms. Liston, but Plaintiffs have identified *six* proposed representatives who sold John Paul Mitchell Systems products.  In fact, Plaintiffs have identified multiple proposed class representatives for each proposed class.  *See* Plaintiffs' Brief Dkt. #151 at 9–14 (10 Plaintiffs sold L'Oreal products; 4 sold Conair; 7 sold Tigi).  Even if Defendants were able to identify legitimate recordkeeping issues with some individual salons for particular products—they have not—there are sufficient Plaintiffs and adequate records from other proposed representatives.[13]

---

[13] Notably, Defendants' ascertainability attack is the same that the Court rejected in *Zeisel*.  *See* Ex. 70, *Zeisel v. Diamond Foods, Inc.*, 3:10-CV-01192 JSW (EDL), (Apr. 22, 2011) Dkt. # 109 at 17–19.  This Court should likewise reject Defendants' challenge to ascertainability.

**B.**
**The Proposed Class Action Satisfies Rule 23(b)(3)**

Plaintiffs can show predominance under Rule 23(b)(3) because: (1) the law is common to all members of the class; (2) the facts concerning each Defendants' advertising—which is the crux of liability—is common to all members of each class; and (3) the fact of injury to all class members can be proven through economic evidence common to all members of each class.

Indeed, of the five elements of a Lanham Act claim for false advertising, Defendants do not contest that three are satisfied by common proof. Plaintiffs' Brief Dkt. #151 at 40. The two remaining elements are: (1) whether the deception is material, in that it is likely to influence consumer behavior, and (2) whether Plaintiffs are likely to be damaged, either by declining sales or loss of goodwill. *Id.* Defendants have failed to rebut Plaintiffs' showing that common proof is available to prove these elements.

**1.**     **Fact of Injury Can Be Demonstrated By Common Proof**

Defendants' first attack on predominance is to argue that injury cannot be established using common proof. To the extent Defendants' seek to improperly limit injury to reputational harm, that point has been addressed, *supra*.

**a.**     **Mr. Stampora's Evidence On Injury is of Little Value**

Defendants offer the opinions of their purported expert, Mr. Stampora, for the proposition that no salon has been injured at all. But Mr. Stampora's opinions are of little value and should be given little weight because his experience provides no support for his conclusions and he did not do any empirical work that can be tested. *See Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005) (court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."). "If the [expert] witness is relying

solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.  The trial court's gate keeping function requires more than simply 'taking the expert's word for it.'"  FED. R. EVID. 702 advisory committee's note (2000 amends.).

Mr. Stampora's report reaches two conclusions: (1) it is highly unlikely that any salon suffered reputational injury due to the advertising at issue, and (2) one cannot simply extrapolate injury from one salon to another due to the differences among salons.  F. Warder Declaration to Opp'n (Dkt. #164) Ex. 21, Stampora Report at ¶¶ 11, 71–72.  These conclusions are of little value for three reasons.

First, as Mr. Stampora demonstrated at his deposition, he has no experience measuring reputational injury or extrapolating injury from one business to another.  *See* Ex. 64, Stampora Tr. at 63:17–20 (last owned a salon in 1990); *id.* at 114:8–117:5 (testifying that his experience measuring reputational injury consists of keeping customer retention numbers for his salon and looking at other salons' customer retention numbers).

Second, there is reason doubt that Mr. Stampora even wrote his own report, given that he admits he does not know what his own conclusions mean.  For example, the critical "Summary of Conclusions" section of Mr. Stampora's report states that "one cannot simply extrapolate from one salon's injury to arrive at the nature and extent of an injury (if any) to another salon or stylist."  When asked at deposition "Do you have any experience extrapolating injury from one business to another?"  Mr. Stampora answered:  "I don't know what that means."  *See* Ex. 64, Stampora Tr. at 153:7–13.  Mr. Stampora gave further testimony that demonstrates that he does not even know what "extrapolate" means.  *See id.* 160:6–162:2 (testifying that his experience extrapolating injury

from one salon to another consists of looking at three salons and concluding that one salon was harmed while the other two were not).

Third, nothing in Mr. Stampora's report indicates that he did any empirical work at all. "[I]t is hard to determine what methodology or data, if any, [Stampora] uses to form his conclusions on [reputational injury]. Further, nothing in [Stampora's] stated qualifications and experience provide him with an adequate basis for opining as an expert on [reputational injury]." *Park West Radiology v. CareCore Nat. LLC*, 675 F. Supp. 2d 314, 328 (S.D.N.Y. 2009); *see also Barban v. Rheem Textile Sys., Inc.*, No. 01–CV–8475, 2005 WL 387660, at *4 (E.D.N.Y. Feb. 11, 2005) ("lack of relevant experience and qualifications plainly conveys that whatever opinion [the expert] will ultimately express . . . would be imaginatively speculative.").

Mr. Stampora is a charismatic man who makes a living giving motivational speeches and writing inspiring, short articles about the salon business.  His website states: "As a qualified and certified master of ceremonies, Geno can fill virtually all of your seminar needs.  All of Geno's presentations are exciting, entertaining, filled with useful information and very motivational and inspiring."  http://www.genostampora.com/speaker.html.  Much of his business is apparently paid for by manufacturers, such as Defendants.  *See* www.genostampora.com/consultant.html ("Geno has consulted with many manufacturers.") Mr. Stampora simply has little to offer a rigorous inquiry into whether injury to salons can be demonstrated using common economic evidence.

> **b.**     **Dr. Rubin's Methodology Demonstrates That Plaintiffs Can Establish Harm On A Class-Wide Basis**

As with commonality, Defendants again take issue with Dr. Rubin's methodology in their predominance argument.  The response to these attacks on Dr. Rubin are discussed in Part A.1.c above, but it is worth noting, again, that Dr. Rubin submitted a methodology for calculating damage to the classes from Defendants' false advertising in the form of lost sales.  *See* N. Peracha

Decl. to Plaintiffs' Brief (Dkt. #152) Ex. 60 (Rubin Report ¶¶ 30–31, 40–42); *see also* Ex. 75 (Rubin Dep.) at 51:9–13 (testifying that his equation captures both lost sales due to diversion and lost sales due to a decrease in salon reputation).

In addition to their commonality arguments, Defendants suggest that "common sense dictates that the effect of diversion on individual plaintiffs will depend on, among many other factors, the relative prices of products at salons and retail stores (retail prices are often higher), the number and nature of retail outlets in each local market, and the wealth and loyalty of individual salon customers." Opp'n at 41. Defendants ignore the facts that matter—Dr. Rubin can demonstrate that all salons are negatively impacted by Defendants' falsely advertised products and suffer harm to their business in the form of lost sales. *See* Plaintiffs' Brief at 16–29 (demonstrating that each Plaintiff lost sales due to diversion). The fact that salons are different and therefore suffered different levels of harm is not an argument against class certification. *See, e.g., Thorogood v. Sears, Roebuck and Co.*, 547 F.3d 742, 748 (7th Cir. 2008) ("If it were proved that X thousand buyers of Kenmores had been deceived, a settlement that provided each with an amount equal to an estimate of the average damages they had sustained would be a sensible and legally permissible alternative to remitting all the buyers to individual suits each of which would cost orders of magnitude more to litigate than the claims would be worth to the plaintiffs.").

Defendants criticize Dr. Rubin for pointing to a survey commissioned by defendant Procter & Gamble as support for the proposition that "diversion and the resulting false advertising is a common problem for virtually all salons." But here again, Defendants own documents prove the point in Plaintiffs' favor. In discovery in this case, P&G produced a study titled "Diversion Impact on Salon Purchasing Behavior." The purpose of the report was for P&G to determine whether salons were so upset about diversion that would consider switching to non-diverted

brands, or whether P&G could continue diverting without losing too many salons.  The Executive Summary of P&G's own survey, conducted the month this suit was filed, fully supports Dr. Rubin and establishes that diversion of falsely advertised products is a pervasive concern among salons, finding:

- "While almost 90% of salon owners/employees have complained to a supplier/manufacturer about diversion, they are often unsatisfied with the response";

- "Diversion is an important issue for salons as almost 70% of salon professionals say that some of their product lines are diverted locally"; and

- "Diversion impacts salons professionals' buying decisions.  More than half of salon professionals say diversion has impacted their purchasing decisions and more than three out of five have discontinued a professional hair care line due to diversion."

Ex. 87 at Wella 111.

Dr. Rubin's assumption is even supported by Mr. Stampora, who testified that he would have expected the number of salons surveyed who complain about diversion to be 99 percent.  *See* Ex. 64, Stampora Tr. at 111:4–23.  Defendants cannot be heard to complain about Dr. Rubin's assumption when both their documents and their expert's testimony support the assumption.

Furthermore, Defendants' contention that "individual plaintiffs' testimony as to their injuries from diversion also confirms the individual proof issues required to assess the impact of diversion on sales" is unfounded.  Opp'n at 43.  To the extent Defendants are suggesting that some Plaintiffs testified that they were not harmed by diversion, this suggestion is categorically false.[14]

---

[14] Defendants cite the testimony of Kelly Cretors, Kathy Elrod, Barbara Morrow, and Cindy Poss to support this proposition.  Opp'n at 43.  All of these Plaintiffs testified that they lost sales because of diversion.  *See* Ex. 76 (Cretors Dep.) at 151:14–25 ("Q. And you testified, I think that the reason you want to stop diversion is because it hurts your business and it hurts your credibility with clients, do you remember that answer? A. Yes. Q. Can you tell me how diversion hurts your business? A. Well, it's way more convenient to get product at Target or Wal-Mart or the grocery store than going out of their way to come to me."); Ex. 77 (Elrod Dep.) at 65:2–9 ("Do you think you lost money as a result of diversion? A. Yes. Q. How have you lost money? A. Loss of sales. Q. Because people buy the diverted

To the extent Defendants are suggesting that Plaintiffs suffered different levels of harm, as discussed above, FED. R. CIV. P. 23 does not require each class member to suffer the same level of harm.  *See Thorogood*, 547 F.3d at 748.

Defendants also contend that common issues do not predominate because Dr. Rubin does not know whether his regression will produce a reliable analysis.  Opp'n at 41.  This fails for two reasons.  First, Dr. Rubin has demonstrated that an accepted methodology exists for determining class-wide impact, which is all that the law requires at the class certification stage.  *See, e.g., Weiner v. Snapple Beverage Corp.*, No. 07 Civ. 8742 (DLC), 2010 WL 3119452, at *6 (S.D.N.Y. Aug. 5, 2010) ("At the class certification stage, plaintiffs may demonstrate that [proof of injury and proof of causation] are susceptible to generalized proof by disclosing a suitable methodology.").  Second, the reason Dr. Rubin has not run his regression is Defendants argued the sales data they possessed was unnecessary for any class certification purpose.  "The extent of the Defendants' sales we think is irrelevant at the class certification stage, and it certainly is not an issue which we say precludes class certification . . . ." N. Peracha Declaration to Plaintiffs' Brief (Dkt. #152) Ex. 54 (3/1/11 Conference Call with the Court) at 16:14–16.

Additionally Defendants' expert Mr. Stampora's opinion does not undermine Dr. Rubin's analysis.  While Mr. Stampora opines that he has never heard of any clients lost as a result of the claims at issue, *see* F. Warder Decl. to Opp'n (Dkt. #164) Ex. 21, Stampora Report ¶¶ 53–55, he testified at his deposition that stopping diversion would improve the reputation or success of the "vast majority" of salons.  Ex. 64, Stampora Tr. at 233:20–24.  He further confirmed at his deposition that in a motivational tract of his, called "Adventures in Creative Hair Dressing" he

---

products at other locations? A. Yes."), Ex. 78 (Morrow Dep.) at 118:3–9 ("I object to the fact that it used to be only professional, sold in professional salons, and now it is on the mass market and I object to the confusion that it creates with the clients and I object to the fact that it has taken money out of my pocket."); Ex. 79 (Poss Dep.) at 41:9–13 ("Because they go for convenience, people go for convenience and if they can buy it at other places, you know, while they are at the grocery store or whatever, we're losing sales.").

tells listeners that (1) salon customers buy hair products either from a drug store or another salon, (2) 90 percent of people that get their hair done in a salon buy a product for their hair within 24 hours, and (3) salons should make a commitment to keep people out of the drugstore aisle because it "takes food out of salons' mouths."   *Id.* at 188:14–190:12.   Mr. Stampora's stance in "Adventures in Creative Hair Dressing" demonstrates that salons are unequivocally harmed by diversion.

Similarly, Defendants' reliance on Mr. Stampora for the proposition that some salons benefit from diversion is misplaced.  Opp'n at 40.  Mr. Stampora testified at his deposition that "no one likes diversion" and that the percentage of people who dislike diversion "could be 99 percent."  *See* Ex. 64, Stampora Tr. at 111:4–23.

### c.    Determining Reputational Harm Does Not Require Individualized Inquiry

As discussed above, Defendants cannot separate the reputational injury from the lost sales that their false advertising causes salons. However, even if Defendants could draw this distinction (the Court has already rule that they cannot), determining reputational injury does not require individualized inquiry.  Defendants contend that Plaintiffs will have to establish each individual salon's reputation, because each "diverse" salon is claiming "idiosyncratic reputational injury." Opp'n at 38.   This is false.   Plaintiffs do not have to establish each salon's reputation to demonstrate reputational injury.  As all three of Defendants' experts testified, harm to reputation can manifest itself in lost sales.[15]  *See* Ex. 64, Stampora Tr. at 118:16–20 ("Q. [I]f a salon suffers harm to its reputation, could that manifest itself in less sales in terms of products or services?  A.

---

[15] The cases that Defendants cite to demonstrate that reputational injury requires individualized inquiry are inapposite. In *Sugai Products, Inc. v. Kona Kai Farms, Inc.*, the plaintiffs and defendants were separated by multiple (up to five) distribution levels and plaintiffs presented "no evidence that injury and damages could be determined on a common basis."  No. 97-00043, 1997 WL 824022, at *3, 14 (D. Haw. Nov. 19, 1997).  Similarly, in *Jim Moore Ins. Agency v. State Farm Mut. Auto. Ins. Co.*, plaintiffs were not seeking lost profits and instead sought "mental anguish, harm to business reputation, and loss of goodwill."  No. 02-80381, 2003 WL 22097937, at *2 (S.D. Fla. Sept. 2, 2003).

Of course."); Ex. 80 (Joachimsthaler Dep.) at 163:12–21 (testifying that harm to reputation could manifest itself in form of lost sales); Ex. 72 (Burtis Dep.) at 92:5–15 (testifying that it is possible for a decline in the manufacturer's reputation to cause salons to lose sales).  This is precisely the type of reputational injury that Plaintiffs have alleged and that Dr. Rubin's model captures.  *See* Ex. 81 (Rubin Dep.) at 51:9–13 (testifying that his equation captures both lost sales because of diversion and lost sales due to a decrease in salon reputation).

Moreover, the Court should not afford any weight to Mr. Stampora's opinions that determining reputational injury would be "an impossible task in the aggregate" and that "one cannot simply extrapolate from one salon's injury to arrive at the nature and extent of an injury (if any) to another salon" due to differences among salons.  Opp'n at 38; F. Warder Declaration to Opp'n (Dkt. #164) Ex. 21, Stampora Report ¶ 11.  The fact that salons have some differences and can be thought of as a "diverse group of people" is true of any retail industry and does not change the facts that they all bought Defendants' falsely advertised products for resale in their salons and suffered harm as a result.  Moreover, Mr. Stampora has no experience measuring reputational injury other than tracking customer retention when he owned his salon, which he sold in 1990.  Ex. 64, Stampora Tr. at 63:17–20 (last owned a salon in 1990); *id.* at 114:8–117:5 (testifying that his experience measuring reputational injury consists of keeping customer retention numbers for his salon and looking at other salons' customer retention numbers).

Contrary to Defendants' claims, nothing in Plaintiffs' testimony contradicts their assertion that they have suffered reputational harm as a result of Defendants' advertising and actions at issue in this case.  Some Plaintiffs simply testified that they believe their overall reputation has not decreased since they opened their salons.[16]  This belief does not preclude Plaintiffs from suffering

---

[16] *See* Ex. 77 (Elrod Dep.) at 120:21–121:11 (testifying in response to reputation questions that she worried about diversion and whether she could continue selling the product); Ex. 76 (Cretors Dep.) at 119:17–21 (testifying that her

some harm to their reputation.  In fact, all of the Plaintiffs testified that they believe they lose sales because of diversion.[17]  Moreover, the fact that the quantum of each salons' harm may differ does not preclude certification—the law does not require each salon to suffer the exact same injury. *See In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 92 (S.D.N.Y. 1998) ("It is settled in this Circuit that factual differences in the amount of damages, date, size or manner of purchase, the type of purchaser, the presence of both purchasers and sellers, and other such concerns will not defeat class action certification when plaintiffs allege that the same unlawful course of conduct affected all members of the proposed class.").

Lastly, as discussed in Plaintiffs' opening brief, Defendants' own contracts and public statements repeatedly state that diversion harms salons.  *See* Pls.' Br. at 43–45 (quoting such statements as "Diversion harms both Salon and Wella").  These statements have gone unrebutted by Defendants and serve as independent proof of causation.

---

salon's reputation has remained the same over the last 13 years); Ex. 79 (Poss Dep.) at 63:21–64:5 (testifying that her salon's reputation has remained good "over the years"); Ex. 82 (Wood Dep.) at 162:17–22 (testifying that her salon has a good reputation that hasn't changed over "the past several years"); Ex. 83 (Liston Dep.) at 117:19–21 (testifying that her reputation has not changed "over the years"); Ex. 74 (Murphy Dep.) at 92:17–93:3 (testifying that his salon's reputation has remained "consistent" since it opened).

[17] *See* Ex. 77 (Elrod Dep.) at 113:8–15, 114:18–23 (testifying that her salon lost sales because of diversion); Ex. 76 (Cretors Dep.) at 48:24–49:11 (testifying that diversion hurts her salon's business and credibility with clients); Ex. 78 (Morrow Dep.) at 25:10–17 (testifying that her salon lost sales because of diversion), 44:6–18 (testifying that her salon's reputation has been harmed by diversion); Ex. 79 (Poss Dep.) at 27:20–28:4, 29:19–30:12 (testifying that her salon lost sales because of diversion); Ex. 84 (Carastro Dep.) at 193:22–194:8, 196:10–22 (testifying that his salon lost sales because of diversion), 194:17–196:22 (testifying that diversion harms his salon's reputation); Ex. 85 (Jarmon Dep.) at 63:16–64:9, 101:11–22 (testifying that diversion has harmed her salon's reputation and cost her sales);  Ex. 86 (NeSmith Dep.) at 120:9–121:3 (testifying that diversion costs her salon sales), 123:3–12 (testifying that diversion harms her salon's reputation); Ex. 82 (Wood Dep.) at 66:20–25, 67:13–22 (testifying that diversion costs her salon sales); Ex. 75 (Pelfrey Dep.) at 125:24–126:13, 127:21–128:7, 129:15–130:9 (testifying that diversion harms salons' reputations and costs them retail sales); Ex. 83 (Liston Dep.) at 85:14–19 (testifying that salons lose sales because of diversion), 86:3–10 (testifying that diversion harms her salon's reputation);  Ex. 74 (Murphy Dep.) at 266:6–10, 286:5–15 (testifying that diversion costs him sales and hurts the goodwill of his salon).

2. **Plaintiffs Have Demonstrated That Causation Can Be Proven Using Common Evidence**

Defendants contend, relying on their expert Dr. Joachimsthaler, that Plaintiffs cannot show causation on a class-wide basis because the product labeling and advertising at issue "play no discernable role in affecting a consumer's patronage."  Opp'n at 45.  Courts permit the use of consumer surveys in Lanham Act cases to establish the message that challenged advertising conveys to consumers.  *Johnson & Johnson*, 960 F.2d 294 at 297.  Dr. Joachimsthaler's survey simply does not address the meaning of the advertising, because:

1. his survey did not show any of the challenged advertising to any of his survey participants; and

2. his survey focused on patronage of salons for services, not purchase of hair products.

As a result, Dr. Joachimsthaler's survey does nothing to undermine Plaintiffs' showing of causation, and has nothing to add to any causation inquiry in this case.

Dr. Joachimsthaler's survey focused on salon customers' reasons for "switching" salons and reasons for "choosing" a salon, without distinguishing between product and service sales.  *See* Warder Decl. to Opp'n (Dkt. #164) Ex. 14 (Dr. Joachimsthaler Report) at ¶21.  Dr. Joachimsthaler's study therefore does not measure (1) how many people continue visiting a salon for services, but "switch" and buy professional products elsewhere, or (2) how many people "choose" a salon for services but buy professional products elsewhere.  *See* Ex. 80 Joachimsthaler Dep. at 143:7–143:15 ("Q. In other words, you aren't drawing conclusions in this paragraph about where people go to buy professional hair care products?  A. I'm not studying the question where consumers by professional hair care products, that's right."), 144:10–13 ("Q. So you are not drawing conclusions about where people are buying the professional products?  A. That's what I

said.").  In other words, Dr. Joachimsthaler focused on lost service sales, rather than lost product sales.

Despite purportedly measuring the effect of the advertising at issue on consumers, Dr. Joachimsthaler failed to show his survey respondents any of the advertising at issue in this case. *See* Ex. 14 (Joachimsthaler Report) at 37–46.  As a result, his survey has nothing to say about what message consumers take from Defendants' advertising and whether it plays any role in their purchasing decisions.  Given that Dr. Joachimsthaler's work does not address professional product sales or the advertising at issue, his report is entirely irrelevant to issues of class certification.[18]

By contrast, Dr. Maronick's survey tested Defendants' advertising on consumers.  His results demonstrate the substantial numbers of consumers believe the advertising conveys a message of high quality, that substantial numbers of consumers believe the product will only be available in salons, and the presence of the products in mass retails would raise questions about whether the salon lied to them. *See* Pls.' Br. at pp. 45–48.

Lastly, as discussed in Plaintiffs' opening brief, Defendants' own contracts and public statements repeatedly state that diversion harms salons.  *See* Pls.' Br. At 43–45 (quoting such statements as "Diversion harms both Salon and Wella".  These statements have gone unrebutted by Defendants and serve as independent proof of causation.

### 3.     Plaintiffs Can Demonstrate Aggregate Damages With Common Evidence

Defendants also argue that class certification is inappropriate because individualized damages issues will predominate.  Before addressing the specific points raised by Defendants, it is well-established law in this Circuit that the fact that damages may have to be ascertained on an

---

[18] Additionally, Dr. Joachimsthaler testified that he included 2,000 people in his sample because he wanted to make sure that he had a reliable and valid sample.  *See* Ex. 80 (Joachimsthaler Dep.) at 45:12–46:2. However, Dr. Joachimsthaler's sample fell short of his own target because although the products at issue in this case are marketed and sold primarily to women, roughly 50% of the respondents to Dr. Joachimsthaler's survey were men. *Id.* at 69:20–70:2.

individual basis is not, standing alone, sufficient to defeat class certification. "Common issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 140 (2d Cir. 2001) (affirming certification of class of large and small retailers, even though some individual damages issues existed); 6 NEWBERG ON CLASS ACTIONS § 18.27 (in antitrust cases, "a particularly significant aspect of the Rule 23(b)(3) approach is the recognition that individual damages questions do not preclude a Rule 23(b)(3) class action when the issue of liability is common to the class"); 5 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION §27.44 ("Since the basic purposes of both the antitrust laws and §43(a) are similar in protecting consumers and injured commercial interests, and problems of proof are similar, the approach of antitrust damage rulings could be applicable to §43(a)").

Defendants contend that common proof of damages is impossible for three reasons:

1. Dr. Rubin's work is irrelevant because his methodology measures harm caused by diversion, not false advertising, and will not identify whether a salon's reputation was harmed or by how much.

2. Dr. Rubin's methodology needs salon-level data to calculate damages to individual salons, but Rubin doesn't know whether salon-level data exists.

3. Salons come in all different sizes and locations, and differ in number of employees, profitability, pricing, thus preventing any common approach to calculating damages.

Defendants' first argument—that Dr. Rubin measures harm from diversion, not false advertising—is fundamentally flawed. Salon sales lost to mass retailers is a measure of the harm from Defendants' false advertising. Indeed, in most false advertising cases, the measure of harm from false advertising is lost sales. Even with respect to harm limited to reputation and goodwill, the way to measure that harm is by lost sales. In this case, one measure of harm from the false advertising is sales lost to mass retailers, which Dr. Rubin's methodology can ascertain.

But even without Dr. Rubin's methodology, liquidated damages provisions in Defendants' supplier contracts speak directly to the harm caused by injury to goodwill and reputation.  Dr. Rubin testified at deposition that such negotiated, market-based measures of damages are valid and can be used to calculate individual damages.  Ex. 81 (Rubin Tr. at 82:18–83:10.)  Defendants Tigi and Conair note that they have not yet produced any such documents.  But they do not claim no such documents exist, nor do they argue why it does not follow logically that the harm recognized by the other Defendants' contracts applies as well to Tigi and Conair.

Defendants should be estopped from asserting their second argument—that Rubin cannot prove that salon-level purchase and sale data exists—because Defendants objected to producing any data, claiming their sales data were irrelevant to class certification.  In particular, Plaintiffs' 19th document request sought "documents sufficient to identify the number of units and dollar value of purchases of your products for each salon that sells your products for each quarter of the class period."  Ex. 68, Clayton 2/22/11 letter to Court.  Defendants advised the Court by letter that such documents need not be produced because "Defendants' profits and sales are irrelevant to the elements of adequacy, typicality, commonality and predominance . . ." *Id.*  The Court accepted Defendants' position and denied the requested discovery.  N. Peracha Declaration to Plaintiffs' Brief (Dkt. #152), Ex. 54 (3/1/11 transcript) at 25.  Having successfully argued that the salon-level information is irrelevant to class certification, Defendants cannot oppose class certification by arguing that Plaintiffs do not have salon-level data.

To further obfuscate the availability of salon-level purchase data, Defendants quote their expert, Dr. Burtis, that "Dr. Rubin assumes that Defendants keep records of the sales of professional hair care products by each salon included in the proposed class, broken down by manufacturer, by product, by month . . . To my knowledge no such records exist, nor would I

expect them to exist."  Opp'n at 53.  However, at deposition Dr. Burtis testified that she never asked Defendants or Defense counsel whether salon-level data was available:

> Q:     You did not—did you go and ask the defendants in this case whether or not they maintained sales records?
>
> A:     I did not.
>
> Q:     Did you ask any of the attorneys who represent the defendants in this case whether or not the defendants maintained such sales records?
>
> A:     I don't recall asking that question.

Ex. 72 Burtis Tr. at 61:14—21.

Contrary to Defendants' coy position that salon-level information may not be available, certain documents produced in this case, plus documents gathered by Plaintiffs' outside of this case, show that salon-level sales information is available and available to Defendants.  Several heavily redacted documents from P&G, as well as a spreadsheet from L'Oreal, show that Defendants have monthly purchase information at the salon-level down to the penny.  *See* Ex. 87 (Wella 135–137, 139–141, and 149–151); Ex. 88 (L'Oreal 851).

Further, Plaintiffs requested "copies of any contracts you have with distributors that sell your professional products."  Ex. 68 (Plaintiffs' document request No. 5, attached to Clayton Letter).  Defendants refused to produce their distributor contracts, claiming such documents "have nothing to do with class certification (and likely are irrelevant to any issue in the case)."  N. Peracha Declaration to Plaintiffs' Brief (Dkt. #152), Ex. 68 (Clayton 2/22/11 letter to the Court). Despite Defendants refusal to produce their contracts with distributors, Plaintiffs counsel located two distributor contracts that impose detailed record-keeping requirements on the distributors and give Defendant manufacturers unlimited rights to review and audit the sales data.

- Plaintiffs obtained court records from the Second Circuit in the *Matrix v. Quality King* case (cited in Plaintiffs' Amended Complaint).  L'Oreal's distribution agreement states that:

"Upon Matrix's request, Distributor will make available to Matrix all business records related to Distributor's purchase and sale of Matrix Products for the purpose of auditing Distributor's operations including inspection of the premises, interviews with its employees, and other activities which are reasonably designed to uncover product diversion activity."   L'Oreal's distributor agreement also requires that its distributor provide a "Customer Data Exchange" consisting of, among other items, detailed monthly reports of sales to salons by sku, by store, and by percent or orders filled.  Ex. 66 at section 7(B)(xiii) and Exhibit F.

- Sexy Hair Concepts was the smallest Defendant named in this action; it was severed for bankruptcy reorganization earlier this year.  As part of a class-wide settlement approved by the bankruptcy court in May 2011, Sexy Hair produced copies of a distribution contract.  Like L'Oreal's contract, Sexy Hair's contract required its distributor to keep careful records of all sales at the salon level and gave Sexy Hair full rights to review those records at any time.  Sexy Hair's distribution agreement requires that "Distributor shall maintain and preserve as required by and during the term of this agreement and for at least three (3) years thereafter full, complete and accurate records . . . showing all of Distributors sales and transfers of Products.  Sexy Hair Concepts shall have the right to inspect the books and records of Distributor which relate to the sale and/or transfer of Products at any time during normal business hours . . . ."  Ex. 89 at §3.11.  Sexy Hair's separate Anti-Diversion Agreement with distributors provides that Sexy Hair "will have the right to inspect and audit Distributor's books and records as it relates to the sale of the Professional Beauty Products.  Distributor will make all documents and inventory available to the Company for such purposes."  Ex. 89, Anti-Diversion Agreement, § 4.

- Sexy Hair's documents also prove that tracking of salon level sales is done in the industry. A November 2010 board of director's presentation about diversion states that a particular distributor "provided monthly sell out report by store with [Sexy Hair] to match with purchases."[19]  *See* Ex. 90, Sexy Hair Board Presentation, p. 11.

Given that two named Defendants have contracts requiring their distributors to keep and report sales to salons, and there is no evidence that the other Defendants do not have similar contracts, a predominance of the available evidence proves that salon level sales data is available.

Additionally, Dr. Rubin testified that even if salon level sales data are not available, he can likely perform the damage calculation using a combination of Census and Nielsen data, sources Dr. Rubin knew existed at the time of his deposition.  But the recently received Sexy Hair documents reveal a much richer cache of sales data maintained by L'Oreal.  Although not mentioned anywhere in Defendants' brief, Sexy Hair's documents reveal that L'Oreal collects monthly sales data of diverted products through Information Resources Company ("IRI").  According to an email from L'Oreal to the President and CEO of Sexy Hair, IRI tracks diversion using "actual scan data from 32,032 food retailers, 40,980 drug stores, and 3,608 mass locations."  *See* Ex. 67.

In sum, there are abundant sources of data available for Dr. Rubin to run his regression, both at the salon level and the mass retailer level.  Defendants have full access to that data through their distributor contracts, through records they keep themselves of salon sales, and data they purchase from Nielsen and IRI.  The reason the distributor data, Defendants' own data, and the IRI data has not been produced, is that Defendants argued it was irrelevant to class certification.

---

[19] Notably, the same board presentation on diversion includes a slide stating "Who Diverts" with the first entry being "Manufacturers".

Lastly on damages, even if the Court concludes that Plaintiffs cannot prove individual damages on a salon-by-salon basis using common proof, the Lanham Act and cases thereunder recognize the difficulty of proving damages from false advertising and provide an alternative measure of relief—disgorgement of defendants' ill-gotten profits.  Proof of Defendants' profits from their sales of products advertised as available only from salons, but sold through mass retailers, provides an alternative measure of damages that is focused specifically on Defendants and requires no individualized proof of salon purchases, sales, and profits.

### 4.  Plaintiffs Will Establish Materiality With Common Evidence

Defendants argue that the materiality of their advertising cannot be demonstrated using common evidence because "consumer's purchasing decisions are highly fact-specific."  Opp'n at 54.  This argument fails for several reasons.

First, the argument is a red herring.  Materiality is an issue in all false advertising cases, not just class actions.  Common proof of materiality is needed in all Lanham Act false advertising cases.  If merely arguing that consumer purchasing decisions are fact-specific was enough to prevent proof of materiality, then the materiality of an advertisement could never be proven, regardless of whether the case is brought by a single plaintiff or a class.  Defendants cite no Lanham Act cases where materiality was proven by any means other than common evidence.

Second, courts regularly determine the materiality of challenged advertising simply by looking at the advertising itself.  *See, e.g.*, *Time Warner Cable, Inc. v. DirecTV, Inc.*, 497 F.3d 144, 153 n.3 (2d Cir. 2007) (finding materiality by looking at the advertising itself and without extrinsic evidence); *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 855 (2d Cir. 1997) (affirming district court's finding "after reviewing the complained of statements in this action in their context" that the statements were not material); *S.C. Johnson & Son, Inc. v. The Clorox Co.*, 241 F.3d 232, 238–241 (2d Cir. 2001) (affirming district judge's finding that challenged

advertising was facially false and violated section 43(a) without any need for surveys or consumer-by-consumer reaction to advertising); *L. & J.G. Stickley, Inc. v. Cosser*, 255 Fed. Appx. 541, 543 (2d Cir. 2007) ("repeated claims that one of them was the finishing foreman at appellee for twenty-five years and that their furniture polish derives from a formulation of Gustav Stickley. These misrepresentations are clearly material . . ."); *Hearst Bus. Publ'g, Inc. v. W.G. Nichols, Inc.*, 76 F. Supp. 2d 459, 469, 471 (S.D.N.Y. 1999) (finding challenged statements material on their face).

The advertising in this case identifies Defendants' professional products as superior to products that are not professional. A claim of superior quality is plainly material and addresses an inherent quality or characteristic of the product. *Time Warner Cable*, 497 F.3d at 153, n.3 ("plaintiff must demonstrate that the false or misleading representation involved an inherent or material quality of the product. TWC has met this requirement, as it is undisputed that picture quality is an inherent and material characteristic of multichannel video service"); *Vidal Sassoon v. Bristol-Myers, Inc.*, 661 F.2d 272, 278 (2d. Cir. 1981) (affirming district court findings that the "effect of the advertisements were to lead consumers into believing that Body on Tap was competitively superior, surely a representation regarding its inherent quality"). If the challenged advertisement relates to an inherent quality or characteristic of the product, it is presumed material. *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 301, 311–12 (1st Cir. 2002).

Third, "[o]nce it is determined that a statement is false, it is presumed to be material." *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, 348 F. Supp. 2d 165, 180 (S.D.N.Y. 2004); s*ee PPX Enters., Inc. v. Audiofidelity Enters., Inc.*, 818 F.2d 266, 273 (2d Cir. 1987). In this case, Defendants stipulate that the truth or falsity of their advertising does not require salon-

by-salon proof.  Opp'n at 57.  As common proof can be used to prove falsity, once that proof is presented, the materiality of the advertising is presumed.

Fourth, while not necessary, materiality can also be demonstrated by consumer surveys. *See, e.g., Merck & Co., Inc. v. Mediplan Health Consulting, Inc.*, 425 F. Supp. 2d 402, 417 (S.D.N.Y. 2006) ("[t]ypically, an implied claim is proven through the use of a consumer survey that shows a substantial percentage of consumers are taking away the message that the plaintiff contends the advertising is conveying.  In addition, the false or misleading statement must be material").  Dr. Maronick's study shows that substantial numbers of consumers believe Defendants' advertising claims that their products are sold in professional salons are higher quality than non-salon products.  Regardless of whether Defendants think Dr. Maronick's survey is flawed, they do not argue that no survey could be designed that could be used as common evidence demonstrating that the challenged advertising addresses a quality or characteristic of the products that influences consumer behavior.

Defendants cite no cases holding that materiality cannot be proven on a class-wide basis or that materiality must be proven on a consumer-by-consumer basis because purchasing decisions are fact-specific.  The only case that Defendants cite in support of their position that materiality must be proven on a consumer-by-consumer basis, *Caro v. Proctor & Gamble*, 22 Cal. Rptr. 2d 419 (Cal. Ct. App. 1993).  *Caro* is inapposite because the challenged advertising—orange juice cartons that said the product was fresh, made from the heart of the orange, and 100 percent pure juice—also stated that the product was from concentrate and included additives.  Defendants' advertising carries no such conflicting messages.

**5.**     **Plaintiffs Will Demonstrate Consumer Deception With Common Evidence**

Defendants argue that class certification is improper because "whether consumers were deceived about the availability of defendants' products will also be a highly individualized

inquiry."  Opp'n at 56.  Like their argument on materiality, this argument fails for multiple reasons.

First, as with materiality, this is not an issue that arises only in class actions.  Every Lanham Act false advertising case involves a claim of consumer deception.  Common proof of consumer deception is relevant to every Lanham Act false advertising case.  If merely arguing that consumer deception cannot be proved because it is an individualized inquiry were a successful tactic, then no Lanham Act plaintiff could prove consumer deception, regardless of whether there is a single plaintiff or a class of plaintiffs.

Second, the law in this Circuit does not support Defendants' argument.  Rather, "the law governing false advertising claims under the Lanham Act is well-settled in this circuit.  In order to recover damages or obtain injunctive relief, a plaintiff must show that either: 1) the challenged advertisement is literally false, or 2) while the advertisement is literally true it is nevertheless likely to mislead or confuse consumers."  *Johnson & Johnson,* 960 F.2d at 297; *PPX Enters. Inc.,* 818 F.2d at 271 (upholding award of damages without proof of deception and noting with approval that "as one commentator has noted, the distinction drawn between stating a claim for injunctive [relief] and establishing entitlement to damages has less relevance in the context of false advertising.")

Literally false claims do not require extrinsic proof of consumer confusion "because plaintiffs alleging a literal falsehood are claiming that a statement, on its face, conflicts with reality, a claim that is best supported by comparing the statement itself with the reality it purports to describe."  *Time Warner Cable,* 497 F.3d at 153.  For impliedly false claims, proof of consumer deception is typically presented through consumer surveys.  "The success of a plaintiff's implied

falsity claim usually turns on the persuasiveness of a consumer survey." *Johnson & Johnson*, 960 F.2d at 298. Survey evidence of consumer confusion is common proof.

Further, even for impliedly false claims, where a plaintiff demonstrates that a defendant has intentionally set out to deceive the public, and the defendant's deliberate conduct is of an egregious nature, a presumption arises that consumers are, in fact, being deceived. *Resource Developers, Inc. v. The Statue of Liberty – Ellis Island Found., Inc.*, 926 F.2d 134, 139 (2d Cir. 1991); *Johnson & Johnson Vision Care*, 348 F. Supp. 2d at 179.

Plaintiffs in this action allege that Defendants' advertising is literally false, impliedly false, and intentionally false. The law permits the use of common proof of consumer deception for each of these elements of a Lanham Act claim:

- The literal falsity is proven by the advertising itself;

- Each Defendant's intent to deceive is proven by evidence from that Defendants' files, which is common evidence;

- To the extent it is necessary to prove the impliedly deceptive nature of the advertising, survey evidence is commonly used.

This is well-established law. Defendants do not cite a single case where proof of consumer deception was provided through individualized, consumer-by-consumer proof of deception. Indeed, the Lanham Act would be a dead letter if Defendants' position is adopted.

**6.    Defendants' Affirmative Defenses of Limitations, Laches and Mitigation Should Not Preclude Certification**

**a.    The Court Should Apply One Limitations Period To The Entire Class**

The rule on statute of limitations is that "since there is no statute of limitations in the Lanham Act, courts apply the analogous statute of limitations from the forum state. New York's analogous statute is the six-year statute of limitations for fraud." *Gross v. Bare Escentuals*

*Beauty, Inc.*, 641 F. Supp. 2d 175, 196 (S.D.N.Y. 2008).  Straining to create individualized issues where they do not exist, Defendants contend that New York's borrowing statute, N.Y.C.P.L.R. § 202, applies to Plaintiffs' claims and that the Court must therefore "look to each jurisdiction in the United States to determine the analogous statute of limitations."  Opp'n at 59.

Like the Lanham Act, the Securities Exchange Act of 1934 does not provide a statute of limitations and courts had looked to analogous state law to determine the statute of limitations until the Supreme Court's ruling in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 358–60 (1991).  Despite the lack of an express limitations period, courts handling class actions pursuant to §10(b) of the Exchange Act did not let the lack of a statute of limitations prevent a finding of predominance.  *See* Newberg on Class Actions § 22:66 ("It is further settled that in securities class actions possible differences in the application of the statute of limitations to class members, including the named plaintiff, will not preclude a finding of predominance of common issues.  If individual class members later are barred from recovery by the statute of limitations, their claims are subject to dismissal.").  Courts reasoned that applying varying limitations periods in every securities class action involving class members from different states "is without legal and rational support," and that securities class actions "in which all elements for class certification have been met, the propriety of proceeding as a class should not and will not be removed by such a vagrant factor."  *State Teachers Ret. Bd. v Fluor Corp.* 80 F.R.D. 142, 144–45 (S.D.N.Y. 1978). The same reasoning applies to Lanham Act class actions. The Court should therefore apply one limitations period to this entire action when it addresses the merits.[20]

---

[20] The Court does not need to decide which limitations period to apply at this stage.

**b.**     **Applying Multiple Limitations Periods To The Class Does Not Preclude Certification**

Even if the Court were to apply varying statutes of limitation to the proposed classes, "any defense based on the statute of limitations is an affirmative defense, and courts have traditionally been reluctant to deny class action status simply because affirmative defenses may be available against individual members." *Lorber v. Beebe*, 407 F. Supp. 279, 294 (S.D.N.Y. 1975).  In fact, "[c]ourts have been nearly unanimous . . . in holding that possible differences in the application of a statute of limitations to individual class members, including the named plaintif[f], does not preclude certification of a class action so long as the necessary commonality and, in a 23(b)(3) class action, predominance, are otherwise present." *Steinberg v. Nationwide Mut. Ins. Co.* 224 F.R.D. 67, 78 (E.D.N.Y. 2004) (internal citations and quotations omitted).

Here, Plaintiffs have shown that a "sufficient constellation of common issues binds class members together" and therefore any variations in the source or application of a limitations defense should not preclude certification.  *See In re Nassau County Strip Search Cases*, 461 F.3d 219, 225 (2d Cir. 2006).  Where plaintiffs have demonstrated predominance as to the merits of their claims, courts have certified classes despite variation in the statutes of limitation that may apply.  *See Cruz v. Hook-Superx, LLC*, No. 09 Civ. 7717(PAC), 2010 WL 3069558, at *3 (S.D.N.Y. Aug. 5, 2010) ("The Defendants' claimed variations in the State Claims are minor and would not undermine the Court's ability to manage the six subclasses in a class-action framework. Variations in the limitations period are not a fundamental element of a claim, and courts have certified state law claims despite statute of limitations variations"); *Avagliano v. Sumitomo Shoji America, Inc.*, 614 F. Supp. 1397, 1405 (S.D.N.Y. 1985) (applying different limitations periods to

members of a class depending on the state in which they reside).[21]   The cases that Defendants cite

for the proposition that varying limitations periods can defeat class certification are inapposite

because in those cases Plaintiffs had not shown "a sufficient constellation of common issues" on

the merits of their claims.[22]

Moreover, applying varying statutes of limitation in this case would be particularly easy to

administer given that each act of Defendants' false advertising is independently actionable under a

"continuing violation" theory.  *See, e.g., Axcan Scandipharm Inc. v. Ethex Corp.*, 585 F. Supp. 2d

1067, 1078 (D. Minn. 2007) ("the challenged conduct was . . . a series of repeated violations of an

identical nature, namely, the Defendants' repeated (false) advertising of their drugs as 'generic

equivalents to' and 'substitutes for' Ultrase").  Therefore, any viable statute of limitations defense

would only apply to the portion of a class member's claims that accrued outside of the limitations

period.  *See id.* (holding that the statute of limitations only barred false advertising claim insofar as

it sought damages for conduct that occurred outside of the limitations period).  In other words,

regardless of when class members in a particular state discovered diversion, their claims would be

similarly limited to whatever the limitations period is in that state.  The limitations issue therefore

is essentially one of allocation that arises in every class action.  *See* NEWBERG ON CLASS ACTIONS

---

[21]  *See also Lee v. ITT Corp.,* No. C10–0618–JCC, 2011 WL 2516367, at *5 (W.D. Wash. June 24, 2011) ("Since common issues bind the class members together, the Court concludes that the variations in statutes of limitations do not preclude class certification under Rule 23(b)(3)"); *Smilow v. Southwestern Bell Mobile Sys., Inc.*, 323 F.3d 32, 39 (1st Cir. 2003) ("[If] evidence later shows that an affirmative defense is likely to bar claims against at least some class members, then a court has available adequate procedural mechanisms.  For example, it can place class members with potentially barred claims in a separate subclass or exclude them from the class altogether.").

[22]  *See, e.g., McLaughlin v. American Tobacco Co.*, 522 F.3d 215, 222 (2d Cir.2008) ("Certifying, for example, the issue of defendants' scheme to defraud, would not materially advance the litigation because it would not dispose of larger issues such as reliance, injury, and damages"); *Avritt v. Reliastar Life Ins. Co.*, Civil No. 07-1817 (JNE/JJG), 2009 U.S. Dist. LEXIS 14000, at *23 (D. Minn. Feb. 23, 2009) ("[W]ith respect to Plaintiffs' contract claims, the Court cannot conclude that common questions predominate.").

§ 10:12 ("[M]anagement difficulties may reappear if the plaintiff prevails and the court seeks to distribute damages to individual class members").[23]

### c.      Defendants' Laches Defense Does Not Preclude Certification

As with the statute of limitations, courts are reluctant to deny certification on the basis of a laches defense. "[T]he suggestion that defendants may interpose the defense of laches against one or more but not all members of the class would not bar class action treatment. If the court finds that some members are barred, they will be excluded from the class. However, this is not the time to make that determination." *Milberg v. Lawrence Cedarhurst Fed. Sav. and Loan Ass'n*, 68 F.R.D. 49, 52 (E.D.N.Y. 1975).

Laches claims involve two essential elements: (1) delay, and (2) resulting undue prejudice to the defendant. *Grant Airmass*, 645 F. Supp. at 1515. Here, "determinations regarding undue delay in filing the claim, and whether the [Defendants] [were] prejudiced by any such delay, can be presented categorically." *See Kelly v. City and County of San Francisco*, No. C 05-1287 SI, 2005 WL 3113065, at *3 (N.D. Cal. Nov. 21, 2005). Furthermore, Defendants have not suggested that they suffered any prejudice from Plaintiffs' alleged delay, such as "loss of evidence and unavailability of witnesses which diminish the defendant's chance of success," that would be relevant to a laches analysis. *Grant Airmass*, 645 F. Supp. at 1515. Given that (1) any potential laches defense can be analyzed in large part based on common evidence, (2) Defendants have made no showing that they are likely to have a viable laches claim, and (3) Plaintiffs have shown

---

[23] Additionally, Defendants' argument that several of plaintiffs' testimony demonstrates that their claims would be time-barred is misleading. Opp'n at 63–64. Learning about "diversion" generally is not the same as seeing a professional product that you carry in a mass market retailer in your area. *See* Ex. 78 (Morrow Dep.) at 80:12–81:12 (mentioning October 2007 as a date when she possibly first learned of availability of Rusk in retail outlets), 275–278:21 (stopped carrying Matrix and Redken 3 or 4 years ago when it was clear that manufacturers were not doing anything to stop diversion); Ex. 74 (Murphy Dep.) at 103:6–12 (opened in 2005, carried L'Oreal Professionnel for a year), 104:2–6 (stopped carrying L'Oreal Professionnel because was given opportunity to carry Kerastase), 115:20–24 (first saw diversion and complained to his rep 6 months after he started carrying Kerastase).

that common issues predominate as to the merits of their claims, the Court should not deny certification on the basis of laches.

While it need not be decided at this point, laches is an equitable defense that the Court should decline to apply to this case.  Defendants continue to engage in national advertising that is literally and intentionally false.  They profit richly from this ongoing lie.  By seeking to invoke laches against the Plaintiffs, Defendants ask the Court for a free pass to continue their campaign of intentional misrepresentation.  Equity requires that the Court refuse Defendants' request.

### d.      Individualized Issues Do Not Predominate in Defendants' Failure to Mitigate Affirmative Defense

Defendants assert the affirmative defense of failure to mitigate and contend that individual issues of whether and how class members tried to mitigate the damage caused by Defendants' advertising require denial of certification.  This argument is merely grasping at straws,  because failure to mitigate is not a defense to Plaintiffs' Lanham Act claims.

One court in this district has squarely held that failure to mitigate is not a defense to Lanham Act false advertising and unfair competition claims.  *Coach, Inc. v. Kmart Corp.*, 756 F. Supp. 2d 421, 431 (S.D.N.Y. 2010) (striking failure to mitigate damages from defendant's answer and noting that "defendants have not cited to, and this Court has not found, any case applying a mitigation of damages defense to claims similar to those asserted by Plaintiffs").

Defendants do not cite a single case where a court has recognized failure to mitigate as an affirmative defense to a Lanham Act false advertising or unfair competition.  All of the cases cited by Defendants deal with causes of action unrelated to Lanham Act.

### C.      Alternatively, the Classes Are Certifiable Under Rule 23(b)(2)

While this case meet the requirements of Rules 23(a) and 23(b)(3), should the Court disagree that Plaintiffs meet the predominance and superiority requirements of Rule 23(b)(3), the

Court can still certify the proposed classes pursuant to Rule 23(b)(2).  Defendants do not contest Plaintiffs' showing that Defendants have acted and refused to act on grounds that apply generally to salons.  *See* Opp'n at 67–68.  Instead, Defendants argue that (1) individualized fact-finding will be required to determine whether individual members of the proposed class suffered the "cognizable injury required to establish standing," and (2) the proposed class members "fundamentally disagree on what injunctive relief they want."  *Id.* at 68.

Defendants' first argument regurgitates the standing argument that the Court rejected in ruling on Defendants' motion to dismiss.  As the Court held: "Plaintiffs have thus satisfied the injury-in-fact requirement of constitutional standing.  For similar reasons, plaintiffs also meet the redressability requirement, since the false statements at issue in this litigation are the cause of the plaintiffs' injury and thus can be remedied by a court."  Dkt. 114 at 11–12.  The proposed class members therefore have standing to pursue their claims and no "individualized fact-finding" is necessary.[24]

Defendants' second argument mischaracterizes Plaintiffs' deposition testimony. Defendants argue that Ms. Pelfrey wants to see the word "professional" come off of Defendants' products while Ms. Poss and Ms. Morrow "do not want the labeling" removed.  Opp'n at 69.  But Plaintiffs are in complete agreement about what they want—they want Defendants' to stop their false advertising.  That can happen by either stopping the advertising of the products as salon-only or stopping the sale of products outside salons.  Ms. Pelfrey testified that she wants two types of injunctive relief (1) the false statements removed, and (2) diversion stopped.  Ex. 75 (Pelfrey Tr.) at 146:4–148:4.  Ms. Pelfrey acknowledged that if the advertising was changed, "then there

---

[24] Defendants also make the puzzling argument that "it is just as likely as not that most members of the proposed class *benefit* from defendants' advertising" because some Plaintiffs testified that they would be happy with Defendants' labels if not for diversion.  *See* Opp'n at 68.  If diversion did not exist, Defendants' advertising would not be false, and Plaintiffs would not be harmed.  Unfortunately, diversion does exist, Defendants' advertising is false, and Plaintiffs are harmed.

probably wouldn't be any diversion." *Id.* at 147:22–148:3. Ms. Pelfrey did not testify that she would be dissatisfied if manufacturers stopped diversion and kept their advertising. Similarly, while Ms. Poss and Ms. Morrow testified that they would like for the diversion of products to stop, neither testified that they do "not want the labeling removed" if diversion is to continue. *See* Opp'n at 68. In fact, both testified that the labeling should be removed if the manufacturers allow diversion to continue. Ex. 79 (Poss Dep.) at 60:2–6 ("Q. How could the claim be changed, you're alleging the claim is false, how could it be changed so that it is not false? A. Professional needs to come off"); Ex. 78 (Morrow Dep.) at 62:8–14 ("Q. You don't have any problem with a manufacturer putting that language, meaning 'available only in salons,' on a product right? A. I have a problem with it if they put that on there and then sell it in the grocery stores and drugstores"). Therefore, there is no conflict among the proposed class members and the classes should alternatively be certified pursuant to Rule 23(b)(2).

**D.    The Individual Opposition Briefs Raise No Additional Meritorious Points to Defeat Class Certification**

Each Defendant has submitted an individual opposition brief. They largely advance arguments that repackage their joint contentions. The few individualized points, though, also do not defeat certification.

**1.    John Paul Mitchell Systems**

Paul Mitchell's opposition brief (Dkt. #154) ("JPMS Opp'n") raises three meritless points.[25] First, it cites bits and pieces of testimony from the representative Plaintiffs to argue that none has suffered an injury to its reputation. *See* JPMS Opp'n at 2–6. But for the reasons already stated in Part A.2, *supra*, this contention fails to withstand scrutiny.

---

[25] Paul Mitchell also repeats Defendants' mantra that the representative Plaintiffs' "goal in this lawsuit is to stop diversion, not for any alleged false advertising," to argue that their "goals are in conflict with the class they seek to represent." JPMS Opp'n at 6. But Defendants' manufactured distinction between diversion, on the one hand, and false advertising on the other is sophistry. *See* Preliminary Statement, *supra*.

Next, Paul Mitchell says that because many of the representative Plaintiffs sold products from multiple manufacturers, their damages are "purely speculative." JPMS Opp'n at 6. Not only is this argument purely conclusory, it turns a blind eye to Dr. Rubin's entire methodology for calculating damages for class members. *See* Parts A.1.c & B.1.b, *supra*; *see also* N. Peracha Decl. to Plaintiffs' Brief (Dkt. #152), Ex. 60. Nor does Paul Mitchell's further contention that disgorgement cannot be determined or managed because none of the representative Plaintiffs "assert that they have purchased Paul Mitchell's complete line" (JPMS Opp'n at 6, 7) make sense. Just like the other Defendants, Paul Mitchell refused to produce sales data during class certification discovery, so it cannot now complain that the class should not be certified because it would be too "unmanageable" to fashion a disgorgement remedy. If anything, the phony nature of this argument is revealed by Paul Mitchell's further assertion that distributors' records would be required to know which salons purchased which products and in what amounts, JPMS Opp'n at 7. Paul Mitchell does not say that such records cannot be obtained: it merely says they are "trade secrets."[26] At bottom, all of Paul Mitchell's disingenuous arguments to say that damages cannot be determined on a class-wide bases should be rejected.

Finally, Paul Mitchell says that the "first sale" doctrine deprives Plaintiffs of any available judicial remedy. JPMS Opp'n at 8–10. This contention is essentially a cut-and-paste of the same argument that Paul Mitchell raised without success in its motion to dismiss.[27] And it fails for the same reasons, too. The "first sale" doctrine applies to claims of trademark or copyright infringement—not to false advertising claims brought against manufacturers. None of the cases

---

[26] Paul Mitchell submits the declaration of one of its executives, Brenda DuVal, to establish that the amounts and types of diversion varies by retail outlet and to show that because Paul Mitchell sells through distributors, it would be "unmanageable" to obtain sales data for damages purposes. JPMS Opp'n at 2, 7. This submission should be disregarded. Paul Mitchell is barred from advancing these arguments because of the position all Defendants took to refuse producing discovery on diversion for class certification purposes. *See* note 12 and accompanying text, *supra*.

[27] *Compare* Paul Mitchell's Memorandum of Law in Support of its Motion to Dismiss First Amended Complaint (Dkt. #84-1) at 10-11 *with* JPMS Opp'n at 8–10.

Paul Mitchell offers involved this kind of false advertising claim.[28]   And even the "first sale" doctrine cases Paul Mitchell cites actually show that doctrine is limited and intended to protect the innocent *purchaser* of the good from incurring liability for reselling it.[29]   That doctrine cannot be contorted into a shield to protect Paul Mitchell—a *manufacturer*—from liability for its own false advertising.

### 2.     L'Oreal

L'Oreal's individual opposition brief (Dkt. #157) ("L'Oreal Opp'n") advances four arguments—three of which merely revisit assertions in Defendants' joint opposition. First, L'Oreal contends that named Plaintiffs "conceded" that they suffered no reputational injury. L'Oreal Opp'n at 6–7.   But this argument is unfounded for the reasons explained in Part A.2, *supra*.   Second, L'Oreal argues, based on Mr. Stampora's testimony, that the representative Plaintiffs are not typical of the class because the class members *want* to sell L'Oreal product despite it being diverted.   *See* L'Oreal Opp'n at 2–3.   As explained in Part B.1.b, *supra*, though, this position too is untenable.   Mr. Stampora actually conceded that he would expect 99% of salons to complain about diversion.   Ex. 64, Stampora Tr. at 111:4–23.   This was further confirmed in P&G's own study.   *See* Part B.1.b, *supra*.   Third, L'Oreal maintains that damages are not susceptible to common proof because of differences in (1) each salon's relationship with L'Oreal and how it sells L'Oreal products and (2) the lack of uniform advertising.   L'Oreal Opp'n at 7–9.   The existence of variation among salons as to their relationship with L'Oreal or how they specifically sell products does not, *a fortiori*, make analysis of damages impervious to common

---

[28] *See Quality King Distrib., Inc. v. L'Anza Research Int'l, Inc.*, 523 U.S. 135, 138–52 (1998) (copyright); *Sebastian Int'l, Inc. v. Longs Drug Stores*, 53 F.3d 1073, 1074–77 (9th Cir. 1995) (trademark); *John Paul Mitchell Sys. v. Randalls Food Markets, Inc.*, 17 S.W.3d 721, 736 (Tex. App. 2000) (state law trademark infringement and unfair competition); *Matrix Essential, Inc. v. Drug Emporium Drug Mart, Inc.*, 988 F.2d 587, 590 (5th Cir. 1993) (trademark).

[29] *E.g.*, *Sebastian Int'l*, 53 F.3d at 1076 ("It is the essence of the 'first sale' doctrine that a purchaser who does no more than stock, display, and resell a producer's product under the producer's trademark violates no right conferred upon the producer by the Lanham Act.").

proof.  *See* Parts A.1.c & B.1.b, *supra*.  Nor can L'Oreal now raise the lack of common advertising as a reason to oppose certification because it—along with the other Defendants—already conceded this point for certification purposes.  *See* N. Peracha Decl. to Plaintiffs' Brief (Dkt. #152), Ex. 54 (3/1/11 Conference Call with the Court) at 16:16–19.

The only argument that L'Oreal advances that is not in Defendants' joint opposition is its bizarre contention that there is insufficient proof that the representative Plaintiffs actually *sold* L'Oreal's products.  *See* L'Oreal Opp'n at 4 ("records that plaintiffs have produced in this case are largely *purchase* invoices") (emphasis added).  In other words, L'Oreal asks this Court to completely disregard the testimony of the representative Plaintiffs and reach a contrary finding that the salon owners did not actually sell the L'Oreal products they purchased.  But if they did not purchase the products for sale to customers, why did they buy them at all?  The representative Plaintiffs are salon owners who are in the business of selling products; they logically bought products from L'Oreal for resale.[30]  The preponderance of the evidence simply does not support the finding L'Oreal asks the Court to make.

### 3. <u>P&G</u>

P&G advances three arguments in its individual opposition brief—only one of which is distinctive.  Like the other Defendants, P&G says that the representative Plaintiffs' own testimony shows that they did not suffer any reputational injury.  P&G Opp'n at 7–9.  This argument has been refuted in Part A.2, *supra*.  P&G also declares that the P&G class is not ascertainable under Rule 23(a).  P&G Opp'n at 9–10.  But for the reasons articulated in Part A.4, *supra*, that contention also fails.

---

[30] L'Oreal's further assertion that "Plaintiffs have offered no basis for the belief that a manufacturer would somehow have access to records of sales between a salon and its customer," L'Oreal Opp'n at 5, must also be rejected.  Not only did L'Oreal refuse to produce this kind of information for class certification purposes, at least one spreadsheet produced by L'Oreal shows that it does maintain records of sales at the salon level.  *See* Ex. 88 (L'Oreal 851); *see also* Part B.3, *supra*.

P&G does raise one individualized argument. It says that its professional product line, Sebastian, is not advertised as "salon-only" like the other Defendants' products, but is instead touted as "guaranteed only when sold by an authorized salon."   P&G contends that "an individualized inquiry is needed in order to know precisely what meaning consumers ascribe to" what it calls its "Guarantee Claim."   P&G Opp'n at 4.   This factual investigation, P&G says, precludes certification.

P&G is not correct.   At most, P&G's "Guarantee Claim" differs from the other Defendants' salon-only advertising in that it arguably can be treated as misleading—or, impliedly false—as opposed to literally false.   Misleading or impliedly false advertisements are, of course, actionable under the Lanham Act.   *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 112 (2d Cir. 2010); *Johnson & Johnson*, 960 F.2d at 297.   And consumer surveys are the appropriate method to prove customer deception.   *Johnson & Johnson*, 960 F.2d at 298.   The record evidence shows that P&G's "Guarantee Claim" is impliedly false.   The survey conducted by Plaintiffs' expert, Dr. Maronick, demonstrated that nearly 2/3—or 63%—of the survey respondents "believe that, based on what is said or suggested in the package, that Sebastian hair care products are only available in salons or spas." N. Peracha Declaration to Plaintiffs' Brief (Dkt. #152) Ex. 58, Maronick Report at 25.   And "when asked whether the 'guaranteed only' claim said or suggested anything about the quality of Sebastian hair care products sold in mass retailers, over half (54%) of all respondents (n=46) said it did." *Id.* at 26.[31]

P&G does not come forward with *any* countervailing evidence.   Defendants' survey expert, Dr. Joachimsthaler, did not even show P&G's advertising to his survey respondents.   Instead,

---

[31] In fact, respondents' reactions to expectations about the availability of Sebastian products were not markedly different because of the "guaranteed only" claim as distinguished from the "salon only" claim.  *See* N. Peracha Declaration to Plaintiffs' Brief (Dkt. #152) Ex. 58, Maronick Report at 42 (Table 53).  Likewise, there is not a huge difference between where respondents expected Sebastian products to be available relative to the other Defendants' products.  *Id.* (Table 54).

P&G's simply declares that Dr. Maronick's survey was flawed because of its small sample size. *See* P&G Opp'n at 4 n.2.  That criticism, though, does not disprove Dr. Maronick's conclusions. Nor does it establish that common proof *cannot* be used to show that P&G's advertising is false such that certification is inappropriate.  (At most, it may suggest that, at the merits stage, Plaintiffs' expert may need to conduct a further study with a greater sample size.)

### 4. Conair & Tigi

The individual opposition briefs of Conair and Tigi essentially advance the same four arguments.  First, both contend that the testimony of the representative Plaintiffs shows that their reputations were not harmed.  *See* Conair Opp'n at 2–4; Tigi Opp'n at 2–5.  This argument has, however, been shown to be unfounded in Part A.2, *supra*.  Second, Conair and Tigi say that the claims of the representative Plaintiffs are time-barred.  Conair Opp'n at 2–4; Tigi Opp'n at 2–5. But this argument, too, has been exposed as misplaced in Parts B.6.a & B.6.b, *supra*.  Third, Conair and Tigi maintain that damages cannot be inferred from the liquidated damages clauses that are found in contracts between manufacturers and salons because neither Conair nor Tigi has such contracts.  *See* Conair Opp'n at 5; Tigi Opp'n at 5.  This conclusory assertion should be rejected, because both Defendants declined to produce this kind of evidence for class certification purposes.  But even if such contracts do not exist, there is no reason why the salons that retail Conair's and Tigi's products do not suffer the same type of harm that the liquidated damages clauses in the other Defendants' contracts recognize.

Finally, Conair and Tigi argue that no proposed Plaintiff has standing to seek injunctive relief under Rule 23(b)(2) because the four proposed representatives no longer sell Conair products, Conair Opp'n at 5–6, and six of the seven representative Plaintiffs for the Tigi class no longer sell Tigi products, Tigi Opp'n at 7.  Conair is correct that discovery has shown that the current representative Plaintiffs for the Conair class were not selling Conair products at the time

the Complaint in this action was filed and therefore do not have standing to seek injunctive relief.[32]  But Tigi's argument that the Chu's Salon, which does sell its product, is barred from seeking injunctive relief because of unclean hands is dead wrong.

In an obvious effort to try knocking out any injunctive class, Tigi contrives an unclean hands defense.  It says that, because Chu's Salon continues to sell the products but does not tell its customers that they are diverted, "Chu's is inviting its own injury."  Tigi Opp'n at 7.  Thus, Tigi sets up a Catch-22 in which *no salon* would ever have standing to represent a Rule 23(b)(2) class.  Any salon that continues to sell Tigi products would—by Tigi's logic—have unclean hands and be unable to represent the class.

That argument not only defies logic, but it misses the mark as a matter of law.  To sustain an "unclean hands" defense, Tigi must show that Chu's Salon engaged in "inequitable conduct or bad faith" where the misconduct had a "material relation to the equitable relief" that Chu's Salon seeks.  *Prowley v. Hemar Ins. Corp. of Am.*, No. 1:05 CV. 981(KTD), 2010 WL 1848222, *4 (S.D.N.Y. May 7, 2010) (quoting *Laugh Factory Inc. v. Basciano*, 608 F. Supp. 2d 549, 560 (S.D.N.Y. 2009)).  Chu's Salon has clearly not engaged in any "inequitable conduct or bad faith." It simply sells Tigi's products.  Chu's Salon is not responsible for Tigi's false advertising.  Tigi's attempt to "blame the victim" under the pretext of an unclean hands defense is little more than a desperate attempt to avoid certification of a Rule 23(b)(2) injunction class.  It should be rejected.

## CONCLUSION

For the foregoing reasons and those stated in Plaintiffs' motions for class certification and supporting memorandum, Plaintiffs' classes should be certified under Rule 23.

---

[32] If a salon is later identified that has standing to seek injunctive relief and is willing to serve as a named plaintiff, Plaintiffs will seek leave to have it represent the Rule 26(b)(2) class against Conair.

Dated:  August 26, 2011

Respectfully submitted,

SUSMAN GODFREY L.L.P.

_____/s/ James T. Southwick_____
James T. Southwick (JS-4264)
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone:  (713) 651-9366
Fax:  (713) 654-6666
jsouthwick@susmangodfrey.com

Attorney-in-Charge for Plaintiffs

OF COUNSEL:

Suyash Agrawal (SA-2189)
SUSMAN GODFREY L.L.P.
560 Lexington Avenue, 15th Floor
New York, New York  10022-6828
Telephone: (212) 336-8330
Fax:  (212) 336-8340
sagrawal@susmangodfrey.com

Richard W. Hess (pro hac vice)
Nabeel H. Peracha (pro hac vice)
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
rhess@susmangodfrey.com
nperacha@susmangodfrey.com

## CERTIFICATE OF SERVICE

I hereby certify that on August 26, 2011, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and served the following counsel by ECF and/or First Class Mail.

Michaeline A. Re
LAW OFFICES OF MICHAELINE A. RE
350 W. Colorado Blvd., Suite 200
Pasadena, CA 91105

Frederick B. Warder III
Scott Caplan
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY  10036

John A. Furutani
FURUTANI & PETERS, LLP
350 W. Colorado Blvd., Suite 200
Pasadena, CA  91105

Harold P. Weinberger
Norman C. Simon
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York  10036

Lewis Clayton
Susanna M. Buergel
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019


/s/ James T. Southwick
James T. Southwick