UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
SALON FAD, et al.,                      :
                        Plaintiffs,     :
                                        :
            -v-                         :
                                        :    10 Civ. 5063 (DLC)
L'OREAL USA, INC., CONAIR CORPORATION,  :
FAROUK SYSTEMS, INC., JOHN PAUL         :        OPINION & ORDER
MITCHELL SYSTEMS, SEXY HAIR CONCEPTS,   :
LLC, THE PROCTOR AND GAMBLE COMPANY,    :
and TIGI LINEA, LP,                     :
                        Defendants.     :
                                        :
----------------------------------------X

Appearances:

For Plaintiffs:
James T. Southwick
Richard W. Hess
Nabeel H. Peracha
Susman Godfrey LLP
1000 Louisiana Street
Suite 5100
Houston, TX 77002

Suyash Agrawal
Susman Godfrey LLP
560 Lexington Avenue, 15th Floor
New York, NY 10022

For Defendant L'Oreal USA, Inc.:
Frederick Burdett Warder III
Harry S. Clarke III
Scott Caplan
Paterson, Belknap, Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036

For Defendants Conair Corporation and TIGI Linea, LP:
Lewis Richard Clayton
Jaren Elizabeth Janghorbani
Scott Jonathan Sholder
Paul, Weiss, Rifkind, Wharton & Garrison LLP

1285 Avenue of the Americas
New York, NY 10019

For Defendant John Paul Mitchell Systems:
John A. Furutani
Furutani & Peters, LLP
350 W. Colorado Blvd. Suite 200
Pasadena, CA 91105

Michaeline A. Re
Law Offices of Michaeline A. Re
350 W. Colorado Blvd. Suite 200
Pasadena, CA 91105

Robert P. Knapp III
Mulholland & Knapp, LLP
641 Lexington Avenue, 20th FLoor
New York, NY 10022

For Defendant The Proctor and Gamble Company:
Eileen Miriam Patt
Harold Paul Weinberger
Norman Christopher Simon
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036


DENISE COTE, District Judge:

    This case concerns whether hair care products manufacturers' labeling of their products as available exclusively in salons results in lost sales and damage to the reputation and goodwill of the salons that carry those products. The plaintiffs move for class certification pursuant to Rules 23(a), (b)(3), and (b)(2), Fed. R. Civ. P.  For the following reasons, the motion is denied.

BACKGROUND

The defendants are manufacturers of hair products which they market and sell to salons under their respective brands. The plaintiffs are salons which sell the defendants' hair products. Sales of hair care products represent an important revenue source for salons; indeed, the profit margin on these products is generally higher than the margin for the hair care services provided in the salons.

The first amended class action complaint (the "Complaint") asserts three causes of action: false advertising and unfair competition under the Lanham Act, and injunctive relief. The Complaint alleges that the defendants each represent, through their product labels, on company websites, and in print advertisements, that their hair care products are available for purchase exclusively through salons and not through mass-market retailers such as CVS and Walgreens. According to plaintiffs, although the defendants maintain that they offer their products exclusively through salons, since at least 2004 the defendants have engaged in widespread diversion of their products to mass retailers. "Diversion" here is defined as the sale of products marketed as salon-only through stores that do not have salons on the premises. Diversion now accounts for "more than $1 billion of the beauty industry's $5 billion in annual sales of salon-only products." Plaintiffs contend that the defendants' false

3

"salon-only" advertising damages their reputation with consumers who purchase products at their salons, only to discover that the products are also available at mass retailers.

The plaintiffs seek to certify a class for each of five defendants,[1] consisting of

> [A]ll professional hair salons and licensed cosmetologists that purchased [a defendant's] professional products for resale to their customers within the United States from July 1, 2004, to the present. Excluded from the class are any salons [a defendant] previously identified as having diverted [its] professional products during the class period.

The primary reason that this motion to certify a class fails is the unresolved tension between the legal claims brought by the plaintiffs and their theory of damages. While the claims emanate from a theory of false advertising, the plaintiffs' evidence of damage arises from the phenomenon of diversion and not from any false advertising. As a consequence, the plaintiffs have failed to satisfy the requirements for pursuing their claims as representatives of a class.

---

[1] The Court severed the claims against defendant Farouk Systems, Inc. ("Farouk") and transferred them to the Southern District of Texas by Order of February 1, 2011. On February 14, 2011, the Court stayed the claims against defendant Sexy Hair Concepts, LLC ("Sexy Hair"), Sexy Hair having filed for bankruptcy. Accordingly, the plaintiffs do not seek to certify classes with respect to these two defendants.

A.   The Defendant Hair Care Product Manufacturers

Defendant L'Oreal USA, Inc. ("L'Oreal") manufactures and sells several lines of hair and skin care products, including the Matrix, Kerastase, Redken, and Pureology lines of products. Prior to 2011, Matrix products were labeled "For sale only in professional beauty salons."  Kerastase products are labeled "For professional use only"; Pureology products advise that they are "Available Only at Fine Salons and Spas."  A sample distribution contract between L'Oreal's distributor and a salon notes that diversion damages L'Oreal's goodwill with consumers. The contract provides for liquidated damages in the amount of $100 per unit of L'Oreal product diverted by the salon.

Defendant TIGI Linea, LP ("TIGI") manufactures and sells the Bed Head line of hair products.  Bed Head products are labeled as "Sold Only in Professional Salons."

Defendant Conair Corporation ("Conair") manufactures and sells the Rusk premium line of hair care products.  Rusk products contain the label "Sold exclusively in professional salons."

Defendant John Paul Mitchell Systems ("Paul Mitchell") manufactures and sells the Paul Mitchell line of hair care products.  The packaging of these products contains the following warning:  "Guaranteed only when sold by a professional hairdresser, otherwise it may be counterfeit, black market, and

or tampered with."  Paul Mitchell advertisements in magazines advise readers that products are available "Only in salons and Paul Mitchell schools."  A sample contract between a Paul Mitchell distributor and a salon states that diversion "seriously damages the reputation and good will established by [Paul Mitchell] and the Distributor and interferes with their business relationship with other SALON customers as well as the consumer."  The contract provides that the distributor or Paul Mitchell shall be entitled to at least $25,000 in liquidated damages for any diverted products.

Defendant The Wella Corporation ("Wella")[2] manufactures the Sebastian line of products, which are labeled "Guaranteed only when sold by an authorized salon."  A sample contract between Wella and a salon for the distribution of Wella hair care products provides that diversion "damages Wella's brands, trademarks, and goodwill and damages its contractual relations with its distributors and other salon customers."  Wella's contract also provides for liquidated damages in the event that the salon is found to be diverting Wella products.

---

[2] Wella was improperly sued by the plaintiffs as The Proctor and Gamble Company ("P&G").  Wella is a wholly-owned subsidiary of P&G; it is the owner of the Sebastian trademark and the distributor of the Sebastian products, which are the products that form the basis of the plaintiffs' allegations against Wella in this suit.

B.  The Plaintiff Salons

     The plaintiffs are a group of salons located in Georgia and
Alabama, as well as a non-profit organization founded to address
the problem of diversion of hair products to mass retailers.


1.  Salon FAD

     Salon FAD is a non-profit organization founded by Linda
Pelfrey ("Pelfrey") in 2008 to "advance the interests of salons
in the face of the large-scale diversion of professional
products into non-professional retail channels."  "FAD" stands
for "Fight Against Diversion."  Pelfrey is also the owner of J
Beverly Hills of Georgia, a company that distributes the J
Beverly Hills line of professional hair care products.

     Salon FAD is the assignee of the claims of the Daily Trends
salon in Georgia.  Daily Trends has in the past sold the Bed
Head line of products, which are manufactured by TIGI.


2.  Cindy's Hair Salon

     Plaintiff Cindy's Hair Salon ("Cindy's") is owned by Cindy
Poss ("Poss") and is located in Augusta, Georgia.  Poss
testified that Cindy's has sold the L'Oreal product lines Matrix
and Redken.  When asked to explain how diversion harms her
salon, Poss stated that "I feel like the products are sitting on

my shelf more than what they used to be" and that for this
reason she had had a harder time paying rent and utilities.

3.  Chu's Hair Salon

    Plaintiff Chu's Hair Salon ("Chu's") is located in
Columbus, Georgia and owned by Hyon Chu Jarmon ("Jarmon").
Chu's sells hair products manufactured by L'Oreal, TIGI, Paul
Mitchell, and Wella.  Jarmon testified that she stopped
purchasing several hair care lines when she learned that they
were also sold by mass retailers.  Jarmon explained that she
"will lose profit" and that her "reputation not good" with
consumers because of diversion.  Jarmon estimates that she has
lost 15% of her customers because she no longer carries certain
lines of diverted products.

4.  Carastro & Company Hair Design

    Plaintiff Carastro & Company Hair Design, a Marietta,
Georgia salon owned by Sheri Carastro and Dr. Lawrence Carastro
("Dr. Carastro"), has at one time sold L'Oreal, Conair, TIGI,
Paul Mitchell, and Wella products.  Dr. Carastro testified that
diversion harms his salon "monetarily" and that his customers
have started to lose confidence in him and accuse him of being a
"rogue salesman."

8

5.   EnV Studio Salon LLC

     Plaintiff EnV Studio Salon LLC ("EnV"), a salon located in
Roswell, Georgia and co-owned by Gena NeSmith, sells L'Oreal,
TIGI, and Paul Mitchell products.  According to NeSmith,
diversion harms her salon due to lost profits and lost
"credibility" with customers.  NeSmith testified that she is
"offering [her customers] exclusive products in my salon and
when they find it somewhere else, it is not exclusive to them
any longer."


6.   New Millennium Salons L.L.C. d/b/a Salon 2000

     New Millennium Salons L.L.C. d/b/a Salon 2000 ("New
Millennium"), a Milledgeville, Georgia, salon, sells L'Oreal,
Wella, Conair, and TIGI hair products.  New Millennium's owner,
Linda Marrow, testified that at least one of her customers had
complained about diversion when she purchased a product at New
Millennium that she later discovered on the shelves of a mass
retailer.  Marrow acknowledged, however, that the customer had
continued to patronize the salon with the same frequency after
complaining about diversion.


7.   Salon 1325

     Salon 1325 is a Stockbridge, Georgia salon owned by Brenda
Liston ("Liston").  Salon 1325 sells L'Oreal and Paul Mitchell

products.  Liston testified that diversion "is going to reduce
our profits, it is also going to harm our reputation,
credibility, stylists' relationship with the client."

8.  Sassy & Classy Salon and Spa

    Sassy & Classy Salon and Spa ("Sassy") is located in Grey,
Georgia and is owned by Shana Wood ("Wood").  Sassy sells
products manufactured by the following defendants:  L'Oreal,
Paul Mitchell, TIGI, Well, and Conair.  Wood testified that she
had never had a client who had stopped patronizing Sassy after
discovering products sold at Sassy on the shelves of mass
retailers.

9.  The Works Hair and Nail Salon

    Plaintiff The Works Hair and Nail Salon ("The Works") is a
Centre, Alabama salon owned by Kathy Elrod ("Elrod").  The Works
sells L'Oreal, TIGI, and Conair products.  Elrod testified that
the defendants' allegedly false advertising harms her business
in that it "kind of makes [her customers] wonder, you know, of
everything I have told them."

10.   The Veranda Salon and Spa, Inc.

Plaintiff The Veranda Salon and Spa, Inc. ("Veranda") is a Kathleen, Georgia salon owned by Kelley Cretors.  Veranda sells or has sold L'Oreal, Paul Mitchell, and Wella products.

11.   The William David Salon

Plaintiff The William David Salon is located in Alpharetta, Georgia and is owned by William Murphy ("Murphy").  The William David Salon sells both L'Oreal and Wella hair products.  Murphy testified that diversion "was a lie, it damaged my business because they both lied to me, by lying to me it ruined my integrity, it ruined my brand worth and on top of it, I could not compete."

C.  Procedural History

Plaintiffs filed their original complaint on July 1, 2010. The original complaint asserted claims for false advertising and unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), but did not assert a claim for injunctive relief.  Each of the seven defendants filed individual motions to dismiss on August 20.  Plaintiffs subsequently amended their complaint on September 10 to add a claim for injunctive relief under 15 U.S.C. § 1116(a).  On September 23, defendant John Paul Mitchell Systems filed a motion to dismiss the plaintiffs'

11

amended complaint.  On September 24, defendants L'Oreal, Conair, Sexy Hair, P&G, Farouk, and TIGI also filed motions to dismiss the amended complaint.

The defendants argued in their motions to dismiss that any injury identified by plaintiffs in their complaint was attributable to diversion and not to the "salon-only" advertising on the defendants' products.  The plaintiffs countered that they were identifying an injury distinct from that due to the availability of the defendants' products through other channels.  According to plaintiffs,

> [b]y falsely advertising that their products are available for purchase only in salons or affiliated with salons, Defendants threaten the goodwill that Plaintiffs have built with their customers as providers of professional products.  This loss of goodwill and sullied reputation threaten Plaintiffs because their customers may choose not to purchase products at Plaintiffs' salons or purchase fewer products and services at those salons.

By Opinion and Order of January 10, 2011, the Court denied the defendants' motions to dismiss the amended complaint.  See Salon FAD v. L'Oreal USA, Inc., No. 10 Civ. 5063 (DLC), 2011 WL 70591, at *6 (S.D.N.Y. Jan. 10, 2011).  The Court found that the plaintiffs had alleged a "plausible" theory of injury, namely that "their reputation is damaged because customers associate the 'salon-only' advertising with the salons and therefore may stop patronizing the salons when they discover the falsity of the advertising."  Id. at *3.  The Court held that the

plaintiffs "alleged the existence of a causal connection between the false advertising and the injury to their reputation" sufficient to satisfy both Article III constitutional standing and the prudential standing requirement under the Lanham Act. Id. at *4.

At a conference on February 3, 2011, the Court ordered bifurcated discovery on the motion for class certification. Class certification discovery was completed on June 17.  The plaintiffs moved for class certification on July 8; the motion was fully submitted on August 26.


## Discussion

A.  Requirements for Class Certification

"[A] district judge may not certify a class without making a ruling that each Rule 23 requirement is met."  McLaughlin v. Am. Tobacco Co., 522 F.3d 215, 221 (2d Cir. 2008) (citation omitted).  Thus, the plaintiffs will be able to sue the defendants as representatives of a class

> only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Rule 23(a), Fed. R. Civ. P.; see Brown v. Kelly, 609 F.3d 467, 475 (2d Cir. 2010).  "What matters to class certification is not

13

the raising of common 'questions' -- even in droves -- but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011) (citation omitted).  If the Rule 23(a) criteria are satisfied, an action may be maintained as a class action only if it also qualifies under at least one of the categories provided in Rule 23(b). Rule 23(b), Fed. R. Civ. P.; Brown, 609 F.3d at 476.

In this case, plaintiffs seek to certify a class under Rule 23(b)(3) or, in the alternative, under Rule 23(b)(2).  Rule 23(b)(3) permits certification "if the questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class litigation is superior to other available methods for fairly and efficiently adjudicating the controversy."  Rule 23(b)(3), Fed. R. Civ. P.; Brown, 609 F.3d at 476.  Rule 23(b)(2) permits class certification if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Rule 23(b)(2), Fed. R. Civ. P.

"In evaluating a motion for class certification, the
district court is required to make a 'definitive assessment of
Rule 23 requirements, notwithstanding their overlap with merits
issues,' and must resolve material factual disputes relevant to
each Rule 23 requirement." Brown, 609 F.3d at 476 (quoting In
re Initial Pub. Offering Sec. Litig., 471 F.3d 24, 41 (2d Cir.
2006) ("In re IPO")). "The Rule 23 requirements must be
established by at least a preponderance of the evidence."
Brown, 609 F.3d at 476 (citation omitted). In other words, the
district judge must "receive enough evidence, by affidavits,
documents, or testimony, to be satisfied that each Rule 23
requirement has been met." Teamsters Local 445 Freight Div.
Pension Fund v. Bombardier, Inc., 546 F.3d 196, 204 (2d Cir.
2008) (citation omitted). The burden of proving compliance with
all of the requirements of Rule 23 rests with the party moving
for certification. In re IPO, 471 F.3d at 40.

The defendants contend that the plaintiffs have not
satisfied the commonality and typicality requirements; that
Salon FAD in particular is not an appropriate representative of
the class; and that the class is not sufficiently ascertainable.
Many of these arguments, which are addressed to the Rule 23(a)
criteria, arise again in the defendants' arguments that the
plaintiffs have not shown that any common issues will
predominate over those requiring individualized proof or that

15

there is a group-wide injury to be addressed here.  Because the motion for certification so clearly fails the criteria set forth in Rule 23(b)(3) and Rule 23(b)(2), it is unnecessary to address the parties' debate regarding the Rule 23(a) criteria.


B.  Rule 23(b)(3) Predominance

     "As a general matter, the Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Brown, 609 F.3d at 476 (citation omitted).  The predominance requirement is met only "if the plaintiff can establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, predominate over those issues that are subject only to individualized proof." Id. at 483 (citation omitted); see also McLaughlin, 522 F.3d at 222. While a plaintiff need not show the "exclusivity" of common questions, it must show their predominance. McLaughlin, 522 F.3d at 231 (citation omitted).  The requirement that the court conduct a "rigorous analysis" to ensure "actual, not presumed conformance" with the Rule 23 requirements applies with "equal force to . . . those set forth in Rule 23(b)(3)." In re IPO, 471 F.3d at 33 n.3.

     Section 43(a) of the Lanham Act provides

16

Any person who, on or in connection with any goods
or services . . . uses in commerce any word, term,
name, symbol, or device, or any combination thereof,
or any false designation of origin, false or
misleading description of fact, or false or
misleading representation of fact, which—
(a)  is likely to cause confusion, or to cause
     mistake, or to deceive as to the affiliation,
     connection or association of such person with
     another person, or as to the origin, sponsorship,
     or approval of his or her goods, services, or
     commercial activities by another person, or
(b)  in commercial advertising or promotion,
     misrepresents the nature, characteristics,
     qualities, or geographic origin of his or her or
     another person's goods, services, or commercial
     activities,
shall be liable in a civil action by any person who
believes that he or she is likely to be damaged by
such act.

15 U.S.C. § 1125(a).

To prove a false advertising claim under the Lanham Act,

a plaintiff must demonstrate that (1) the defendant
made a false or misleading description of fact or
representation of fact in a commercial advertisement
about his own or another's product; (2) the
misrepresentation is material, in that it is likely
to influence the purchasing decision; (3) the
misrepresentation actually deceives or has the
tendency to deceive a substantial segment of its
audience; (4) the defendant placed the false or
misleading statement in interstate commerce; and (5)
the plaintiff has been or is likely to be injured as
a result of the misrepresentation, either by direct
diversion of sales or by a lessening of goodwill
associated with its products.

Cashmere & Camel Hair Mfs. Institute v. Saks Fifth Ave., 284

F.3d 302, 310-11 (1st Cir. 2002); see also S.C. Johnson & Son,

Inc. v. Clorox Co., 241 F.3d 232, 238 (2d Cir. 2001).

As in McLaughlin, proof of actual injury in this case "is bound up in proof of damages, or by how much plaintiffs have been harmed." McLaughlin, 522 F.3d at 227. At the class certification stage, plaintiffs may demonstrate that these elements are susceptible to generalized proof by disclosing a suitable methodology. See, e.g., Fogarazzo v. Lehman Bros., Inc., 263 F.R.D. 90, 106-07 (S.D.N.Y. 2009); Lapin v. Goldman Sachs & Co., 254 F.R.D. 168, 186 (S.D.N.Y. 2008); In re Alstom SA Secs. Litig., 253 F.R.D. 266, 281 (S.D.N.Y. 2008). When plaintiffs attempt such a showing, however, they must demonstrate that the proposed methodology can be applied class-wide and "that they could, at trial, marshal facts sufficient to permit them to rely upon" the proposed methodology. McLaughlin, 522 F.3d at 229. Like any component of a Rule 23 requirement, the court must "assess all of the relevant evidence admitted at the class certification stage," including expert testimony, and determine whether it sufficiently supports a showing of predominance. In re IPO, 471 F.3d at 42.

The plaintiffs' theory of causation and damage rests on the contention that their customers read the labels on the defendants' products, find the representations about those products being exclusively available in salons material, come to believe that the representations are false, attribute the false labeling to the salons, and decide to act on that knowledge and

18

belief in a way that harms the salons.  While it has been
assumed for the purpose of this motion practice that the
labeling is false and that widespread diversion exists, the
defendants concede little else.  The defendants contend that
beyond these two facts there are a host of individual issues
which prevent these Lanham Act claims from being pursued through
the class action vehicle.  They emphasize that the plaintiffs
will be unable to show that the defendants' advertising on
product labels, even if false, played any role in a consumer's
decision to patronize a salon or hair stylist.

    As the defendants point out, it is difficult to imagine how
there could be class-wide proof of causation and injury.  How
salon customers would react to learning that a product which was
advertised as exclusively sold in salons was also available in
another retail environment is inherently an individualized
question.  To some consumers, it may be of little significance
that the product is also available outside of the salon, unless
of course it could be acquired more cheaply in a general retail
establishment.  Even if a consumer were affected by the
discovery of false labeling and also came to conclude that the
salon was implicated in the deception, whether and to what
extent that leap of association would affect the consumer's
loyalty to the salon would necessarily depend on a multitude of
factors.  A consumer may feel that he or she has no convenient

or less expensive alternative to purchasing the products in the salon, may have a strong loyalty to the salon or stylist that outweighs any concern about the false labeling, or may find that every convenient salon is similarly tainted.  Alternatively, a consumer may choose to follow a stylist to a new salon, or to change salons for a host of reasons that have nothing to do with the false labeling at issue here.  Thus, as defendants posit, it is difficult to imagine how the false advertising claim could properly be pursued through the class action vehicle.

In an effort to meet this burden, plaintiffs have offered a methodology for establishing the crucial element of injury, and thus damages.  They have offered a skeletal expert report of Dr. Paul H. Rubin, an economics professor at Emory University.  Dr. Rubin identifies three different harms that the plaintiff salons could have suffered as a result of the defendants' advertising: (1) reduction in sales of the defendants' hair products; (2) harm to the salons' goodwill and reputation because "customers who learn of the diversion cannot disentangle the behavior of the Defendants (in diverting products) from those of Plaintiffs"; and (3) wasted costs to the salon from advertising diverted products when they could have advertised non-diverted products.  Dr. Rubin proposes to measure the reduced demand for

the defendants' products using regression analysis.[3]  His model
would estimate the salons' lost profit share in the defendants'
hair care products that is directly attributable to the
defendants' diversion of those products to mass retailers.

Dr. Rubin's model fails to distinguish between harm to the
salons caused by the act of diversion, and harm caused by the
defendants' false advertising, which is the relevant harm here.
The salons' sales of the defendants' products may have declined
either because:  (1) consumers stopped patronizing the salons
because they associated the false advertising with the salons
and so took their business elsewhere; or (2) consumers purchased
the defendants' products at mass retailers for reasons unrelated
to the false advertising, such as lower price or greater
availability.  Dr. Rubin's model does not distinguish between
lost sales due to a reputational harm from the false

---

[3] Dr. Rubin asserts that he was unable to actually perform the
regression analysis because he did not have access to the
necessary data from the defendants on the amount of diverted
sales and total sales of hair products for each defendant.
During a March 1, 2011 telephone conference with the Court, the
defendants represented that they would not challenge the falsity
of the advertising on their products or the existence of
diversion for the purpose of the class certification motion.
Instead, defendants asserted that they would challenge
plaintiffs' satisfaction of the adequacy, typicality, and
predominance requirements.  The Court therefore ruled that it
would not require the defendants to produce sales data for the
products sold by the salons for the purpose of discovery on the
class certification motion.

advertising, and lost sales due to other factors unrelated to the false advertising.

Dr. Rubin separately asserts that injury to the reputation and goodwill of the salons can be measured by consumer surveys and by the liquidated damages clauses contained in the distributorship contracts with the salons.  Dr. Rubin has not conducted a consumer survey to gauge reputational harm, however, nor does he set forth a proposed methodology for conducting such a survey.  The liquidated damages clauses suffer from the same flaw as the regression model:  the damages do not distinguish between harm from diversion of products and harm from false advertising of those products.  Thus, the liquidated damages clauses in the salons' distributorship contracts cannot be taken as any measure of the reputational harm to the salons.

The plaintiffs rely heavily on Dr. Rubin's proposed model to rebut the defendants' contention that proof of harm to the salons' reputations requires inquiry into the specifics of each individual salon.  The plaintiffs assert that harm to reputation "can manifest itself in lost sales."  While this may be true, the plaintiffs have not demonstrated that they are able to distinguish between lost sales due to reputational harm and lost sales due to other factors.  The plaintiffs further argue that the defendants' "own contracts and public statements repeatedly state that diversion harms salons."  But again, these statements

refer to the harm caused by <u>diversion</u>; the harm caused by the "salon-only" advertising -- the harm at issue in the Lanham Act claims -- is a separate injury.

In addition to the expert report of Dr. Rubin, plaintiffs offer a consumer survey conducted by Dr. Maronick, a professor of marketing at Towson University, to establish that the elements of materiality and causation can be demonstrated with common proof.

> One of the two most common bases for admitting survey evidence is Rule 803(3), which creates an exception to the hearsay rule for statements that express a declarant's state of mind at the time of the utterance. . . . The great majority of surveys admitted in this Circuit, including those used in Lanham Act cases to establish actual confusion or secondary meaning, fall into this category: they poll individuals about their presently-existing states of mind to establish facts about the group's mental impressions.

<u>Schering Corp. v. Pfizer Inc.</u>, 189 F.3d 218, 227 (2d Cir. 1999). The Second Circuit has held that errors in methodology in surveys may be so severe that they preclude the admissibility of the survey at trial under Rule 403, Fed. R. Evid., or may "properly go only to the weight of the evidence." <u>Id.</u> at 228.

The 3,244 female respondents to Dr. Maronick's survey represented a "nationwide sample drawn from an internet panel of individuals who have agreed to participate in internet surveys on a periodic basis." After the sample of 3,244 was randomly selected, the respondents were asked whether they had ever

23

purchased professional hair products in a salon to determine whether they qualified to participate in the survey.  Of the 3,244 respondents, only 1,261, or approximately 36%, answered yes to this question.  Those 1,261 respondents were asked to identify the brand of products they had purchased, and were then shown either a print ad or package for that brand that described the product as being available exclusively in salons.  The respondents were asked, "Based on what is said or suggested by the ad/package, where would you expect (brand) hair care products to be available for purchase?"  The respondents could select from the following answers:  only in spas or salons, only in mass retailers, or in both spas and mass retailers.  70% of respondents answered that the "salon-only" claim suggested that the product was exclusively available in salons.  The respondents were also asked whether the "salon-only" claim on the packaging "suggested anything about the quality" of the product.  53% said it suggested that the product was of a higher quality.  Finally, the respondents were asked about their "reaction" to seeing products on the shelves of a mass retailer with "salon-only" claims.  Response options included that the packaging "raised questions" about the following:  "whether the salon lied to me about the hair care products available in the salon," "the truthfulness of the (specific salon-only claim)," "the quality of other hair products sold in the salon," and "the

expertise of the stylist who recommended (brand)."  38% of respondents answered that it made them wonder if the salon had lied, and 60% said it made them question the truthfulness of the salon.

Dr. Maronick's survey is riddled with methodological flaws and fails to support any claim that the salons suffer lost sales as a result of consumers' unhappiness with the false advertising of the products.  The sample size of only 1,261 respondents who actually purchased hair care products in salons is quite small, raising doubts about the representativeness of the survey responses.  The survey's questions about presumption of quality from "salon-only" claims are overly suggestive, as are the questions about presumptions of deception on the part of the salon from the "salon-only" claims.  Moreover, the survey respondents were not given the option to respond that they took nothing away from this claim, or that they blamed the manufacturer and not the salon.

The plaintiffs argue that their false advertising claim is amenable to class certification because of the nationwide scope and uniformity of the advertising at issue.  They point to two instances in which a district court certified a class involving misleading product labels for support.  But those cases are readily distinguishable as the plaintiffs only sought to associate the advertising in those cases with the product

manufacturers.  In Zeisel v. Diamond Foods, Inc., No. C 10-01192
(JSW), 2011 WL 2221113 (N.D. Cal. June 7, 2011), the plaintiffs
challenged as misleading the labeling on packages of the
defendant's shelled walnut products.  Id. at *2.  Plaintiffs in
Zeisel offered a more straightforward theory of injury than the
one asserted here:  that consumers were mislead by the labeling
into purchasing the walnuts for their asserted health benefits.
The claims in the other case cited by the plaintiffs, In re
Brazilian Blowout Litig., No. 10 Civ. 8452 (JFW) (C.D. Cal. Apr.
12, 2011), were similarly straightforward and involved the
defendants' "standardized marketing campaign" for a hair-
straightening product which allegedly mislead consumers into
thinking that the product was free of formaldehyde.  In both
cases, the defendants were responsible for the false labeling
and the plaintiffs were the consumers.  Here, the consumers who
were allegedly misled by the false advertising are not parties
to the litigation, and the plaintiff class representatives
assert that the consumers associated the false advertising not
with the manufacturers but with the plaintiff salons.  Although
the advertising at issue in all three instances may be
nationwide in scope, plaintiffs have not shown that these two
cases provide much guidance on the class certification issues at
stake here.

26

The plaintiffs next argue that the defendants err in describing the injury suffered by plaintiffs as merely a reputational one.  Plaintiffs assert that the proper measure of injury is lost sales, which can be captured by Dr. Rubin's model.  As discussed above, however, Dr. Rubin's model fails to isolate the portion of lost sales that is attributable to the defendants' false advertising, as opposed to the diversion of products.

Finally, plaintiffs assert that the defendants' profits from the sales of diverted products can serve as an alternate measure of damages.  While the disgorgement of profits can serve as an appropriate measure of damages in some instances, see, e.g., Hester Industries, Inc. v. Tyson Foods, Inc., 160 F.3d 911, 915, 917 (2d Cir. 1998), it fails to address the lack of class-wide proof of causation here.  The plaintiffs have not shown that there is any generalized link between the defendants' profits from diversion and the injury that they have alleged from the defendants' false advertising, and the disgorgement of defendants' profits does not supply the missing connection.

The plaintiffs have failed to demonstrate that the alleged injury to the salons' reputations is susceptible of class-wide proof.  The motion to certify a class under Rule 23(b)(3) is therefore denied.

C.   Rule 23(b)(2)

     The plaintiffs move for certification under Rule 23(b)(2)

in the event that the Court declines to certify a class under

Rule 23(b)(3).  For the following reasons, this motion is also

denied.

     "The (b)(2) class action is intended for cases where broad,

class-wide injunctive or declaratory relief is necessary to

redress a group-wide injury."  Robinson v. Metro-North Commuter

R.R. Co., 267 F.3d 147, 162 (2d Cir. 2001).  When "monetary

relief is requested in tandem with injunctive and declaratory

relief, the court must determine whether the requested monetary

relief predominates over the claims for equitable relief."

Parker v. Time Warner Entertainment Co., 331 F.3d 13, 18 (2d

Cir. 2003) (noting that the 1966 Advisory Committee note to Rule

23(b)(2) provides that the (b)(2) "subdivision does not extend

to cases in which the appropriate final relief relates

exclusively or predominately to money damages").  The Second

Circuit has held that in considering a motion for class

certification under Rule 23(b)(2), a district court should

          assess whether (b)(2) certification is appropriate
          in light of the relative importance of the remedies
          sought, given all of the facts and circumstances of
          the case.  The district court may allow (b)(2)
          certification if it finds in its informed, sound
          judicial discretion that (1) the positive weight or
          value to the plaintiffs of the injunctive or
          declaratory relief sought is predominant even though
          compensatory or punitive damages are also claimed,

28

and (2) class treatment would be efficient and
manageable, thereby achieving an appreciable measure
of judicial economy.

　　　Although the assessment of whether injunctive
or declaratory relief predominates will require an
ad hoc balancing that will vary from case to case,
before allowing (b)(2) certification a district
court should, at a minimum, satisfy itself of the
following:  (1) even in the absence of a possible
monetary recovery, reasonable plaintiffs would bring
the suit to obtain the injunctive or declaratory
relief sought; and (2) the injunctive or declaratory
relief sought would be both reasonably necessary and
appropriate were the plaintiffs to succeed on the
merits.  Insignificant or sham requests for
injunctive relief should not provide cover for
(b)(2) certification of claims that are brought
essentially for monetary recovery.

Robinson, 267 F.3d at 164 (citation omitted) (emphasis

supplied).

　　　Rule 23(b)(2) certification is unwarranted here because the

plaintiffs' claim for injunctive relief is secondary to their

pursuit of money damages for the alleged reputational harm to

the salons caused by the defendants' advertising.  Several salon

owners testified that they were interested in pursuing the

lawsuit because of the lost sales caused by the defendants'

diversion of their products to mass retailers.  For example,

Poss, the owner of Cindy's, testified that ""I feel like the

products are sitting on my shelf more than what they used to be"

and that for this reason she had a harder time paying rent and

utilities.

Even more troubling, not all plaintiffs agree on the nature of the injunction to be achieved through this litigation.  Some plaintiffs desire that the defendants stop advertising their products as "salon-only."  Others indicated that the "salon-only" claims on the defendants' products contributed to a feeling of exclusivity that they hoped to foster in their businesses.  These plaintiffs have more of an interest in halting the diversion of products than in preventing the defendants from advertising their products as "salon-only."

Further contributing to the sense that plaintiffs' claim for injunctive relief is merely incidental to their damages claim is the fact that plaintiffs' original complaint did not assert any claim for injunctive relief; this claim was added when the plaintiffs amended their complaint in response to the defendants' motions to dismiss the original complaint.  The plaintiffs devote a mere two pages of their fifty-two page brief in support of their motion for class certification to their request for (b)(2) certification.  In sum, the plaintiffs' claim for injunctive relief does not predominate over their claim for damages.  The motion for certification pursuant to Rule 23(b)(2) is denied.

### Conclusion

The plaintiffs' July 8, 2011 motion for class certification is denied.  A scheduling order to govern the remainder of the case shall follow this Opinion.


SO ORDERED:

Dated:    New York, New York
          September 14, 2011


_____
          DENISE COTE
United States District Judge